VOLUME I (EXCERPT)
UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------x
UNITED STATES OF AMERICA

vs.                         1:2012-CR-381

MICHAEL BOUCHARD,

                    Defendant.

------------------------------------------x

        Transcript of a Jury Trial Excerpt held on

November 14, 2012, at the James Hanley Federal

Building, 100 South Clinton Street, Syracuse,

New York, the HONORABLE NORMAN A. MORDUE, United

States District Judge, Presiding.


                A P P E A R A N C E S

For The Government: UNITED STATES ATTORNEY'S OFFICE
                    P.O. Box 7198
                    100 South Clinton Street
                    Syracuse, New York  13261-7198
                      BY:  MICHAEL C. OLMSTED, AUSA
                           TAMARA THOMSON, AUSA


For Defendant:      GASPAR M. CASTILLO, JR.
                    Attorney at Law
                    817 Madison Avenue
                    Albany, New York  12208

1

2                    I N D E X   O F   T E S T I M O N Y

3

4      Witness                 D     C    RD    RC    FRD    FRC

5      Irma Valdez             8    42    75    77    --     --

6      Kelly Monahan          80   160    --    --    --     --

7      Francis Disonell      188    --    --    --    --     --

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           MS. THOMSON:  Now we'll call our first

2    witness.  Government calls Irma Valdez.

3           THE CLERK:  Good morning.  If you could stand

4    right here, please.  State and spell your full name for the

5    record.

6           THE WITNESS:  Irma Marie Valdez, I-r-m-a,

7    M-a-r-i-e, V-a-l-d-e-z.

8

9           I R M A   M . V A L D E Z , called as a

10   witness and being duly sworn, testifies as follows:

11                DIRECT EXAMINATION BY MS. THOMSON:

12        Q    Good morning.

13        A    Good morning.

14        Q    Could you please introduce yourself to the

15   members of the grand jury.  Or of the jury.

16           THE COURT:  Not a grand jury.

17        A    My name is Irma Marie Valdez.

18        Q    And could you tell the jury where you work?

19        A    I currently work for Signature Group Holdings,

20   successor in interest to Fremont Reorganizing Corporation

21   formerly known as Fremont Investment & Loan.

22        Q    How long did you work for Fremont?

23        A    I was hired back in October of '97, and I've

24   held several positions there.

25        Q    Can you tell us what some of those positions

1    are and were?

2              A    Sure.  From October of '97 up until August of

3    2002, I was a senior underwriter in our lending division.

4    From August of 2002 up until February of 2008, I -- my title

5    was a senior training, senior training specialist where I

6    would train account executives nationwide on Fremont's

7    underwriting guidelines and then February of 2008, that's

8    kind of where the market took a turn so I held various

9    positions, and -- but basically my job consisted of, which is

10   my title now, is senior investigation research specialist

11   where I investigate mortgage fraud, stolen identity, I work

12   closely with the legal department in investigating

13   origination issues.

14             Q    And you've been doing that particular position

15   since about 2008?

16             A    Correct.

17             Q    Could you tell us what the Federal Deposit

18   Insurance Corporation is?

19             A    That's a U.S. corporation that insures

20   deposits in the U.S. against bank failure.

21             Q    Was Fremont Investment & Loan guaranteed by

22   the FDIC in the years 2002 through 2007?

23             A    Yes, we were.

24             Q    And were the depository accounts of Fremont

25   Investment & Loan guaranteed by the FDIC?

1          A      That is correct.

2          Q      What does that mean?

3          A      That means that if -- they're insured up to a

4   certain amount, we had a retail banking division that

5   received deposits from and was insured, our whole company was

6   insured by the FDIC and just in case, their money is secure,

7   it's not going to -- just in case the bank goes bad, they

8   will get paid out, up to a certain portion, I think it's,

9   there's a -- a hundred thousand, up to individual or if

10  there's a joint, there's a certain dollar amount.

11         Q      At this time I'm going to show you what has

12  been previously received into evidence as Exhibit 1.1, and

13  I'm going to ask you if you recognize Exhibit 1.1.

14         A      Yes.  This is the certification from the FDIC

15  and the copy of the certificate we hold in, it was framed in

16  our front office.

17         Q      And could we see the certificate which is the

18  last page of Exhibit 1.1, please.  That's it, thank you.  The

19  certificate that you reference, is that the certificate

20  that's displayed on the screen?

21         A      That is correct.

22         Q      And that certificate says what?

23         A      It states that hereby certifies that the

24  deposits of each depository in Fremont Investment & Loan,

25  Brea, California are insured to the maximum amount provided

1    by the Federal Deposit Insurance Act.

2              Q    Now in the years 2002 through 2007, did

3    Fremont offer mortgages?

4              A    We did.

5              Q    So if we could take it from the beginning.

6    When a person's interested in buying a house, could you tell

7    us what the first step of that process is?

8              A    When someone's interested in purchasing a

9    home, there's work they do prior to -- they usually connect

10   themselves or they go around and look for a property that

11   they wish to purchase.  Sometimes they will hire a realtor,

12   majority of the times they hire a realtor, and once they

13   decide on a home that they would like to purchase, they

14   submit a written offer to the seller of the home, and that

15   written offer is filled out in a purchase contract and the

16   purchase contract is submitted to the seller.  The seller

17   could either agree with the price that they offered or they

18   can counter, and so sometimes there's some counteroffers

19   going back and forth.  If both parties agree on a price, then

20   they sign the contract together and then they proceed with

21   the next step which is typically getting an appraisal to

22   determine the actual value of the property.

23             Q    Now focusing here on residential mortgages and

24   multi-family dwellings, how does a borrower get a mortgage to

25   purchase property?

1          A     Okay.  In continuing with the purchase, most

2     people don't have means to pay cash outright so they look to

3     get financing.  To finance a mortgage there's a couple

4     options.  There's the retail side where the borrower goes

5     directly to the bank, the bank, they fill out an application

6     with any bank that they've decided to get financing from, the

7     bank completes the application with them, collects some

8     information and if they approve them, then they proceed.  If

9     they don't, then the borrower has to go to another bank,

10    that's the retail, where the borrower has to do the work of

11    shopping for the loan.  Fremont was a wholesale lender.

12    Wholesale lender means that the borrower goes to mortgage

13    broker or mortgage banker, and the broker helps them complete

14    the application, and then once the application is completed,

15    the broker shops the loan to the various lenders for -- on

16    behalf of the borrower, to obtain financing.

17         Q     And can you tell us a little bit about what

18    that process involves, the obtaining the financing?

19         A     Sure.  Once the application, there's a lot of

20    information that the lender searches in order to process a

21    loan for a -- approval, the borrower, going through, on the

22    wholesale side going to the broker, they fill out that loan

23    application which we call a 1003, that's the form number, it

24    has a bunch of information, they also pull a credit report to

25    establish a credit grade, they pull, get the appraisal of the

1    property, the preliminary title report and once they compile
2    all that information, they could get loan -- income
3    documentation, like a W-2, pay stub, tax returns.  Once they
4    compile all that information, they put it in a loan package
5    and they submit it to a lender, like as -- like Fremont, and
6    once Fremont receives it in house, it goes through, we have
7    various parties it goes to.  It goes to a processor to input
8    into the system and pull our mandatory disclosures and send
9    it to the borrower, it goes to our underwriter, our
10   underwriter, their job is to evaluate the entire -- all the
11   documentation, calculate the income to see if they have the
12   means to pay the loan back, assess, you know, review the
13   credit report to establish a credit grade based on the credit
14   risk and see if what they're requesting for a loan, they
15   actually qualify based off our parameters and our guidelines.
16   And then our underwriter will approve or decline the loan.

17           If they approve the loan, it goes to our
18   account manager who manages the process of getting any
19   outstanding stipulations or conditions to the loan, and then
20   it would go to our doc. person who works closely, our account
21   manager and our doc. people work closely with the closing
22   agent and the title company to get the docs prepared and sent
23   out for the borrower to sign, and once all that information
24   is sent over, the closing agent which is also considered the
25   settlement agent in the state of New York here that's an

1    actual attorney, all the documents get sent to them and they

2    complete the closing process and they send the initial

3    paperwork -- I mean certain paperwork back to us, certain

4    paperwork to the title company and they close the loan.  We

5    actually fund money to their account to help, you know,

6    disburse the funds based off the information in the file.

7         Q    If I understand you, you mentioned that an

8    attorney in the state of New York will be the one who handles

9    the closings, is that correct?

10        A    That is correct.

11        Q    And who handled the closings for Fremont?

12        A    Fremont funded two loans, two properties were

13   funded and the Bouchard Law Firm was the closing settlement

14   agent in that -- those two cases.

15        Q    And how was the Bouchard Law Firm selected as

16   a settlement agent for the two cases that you've referenced?

17        A    The mortgage broker, mortgage banker is the

18   one that fills out what we call a broker demand, fees that

19   are going to be charged, who's going to close it, other

20   information as far as any impounds on the accounts and where

21   they send us closing instructions on where the closing agent

22   that they selected sends us a confirmation of where the funds

23   are to be wired to, wiring instructions.

24        Q    What does Fremont expect from its closing

25   attorney?

1          A      Fremont expects the closing attorney to follow

2    our closing instructions, it's about a nine-page document

3    that explains in detail what documents are to be signed, what

4    documents are to be sent back, what documents are to be

5    notarized, how the funds are to be disbursed, and recipients

6    and amounts and there's what predisclosures are to be signed,

7    it's a pretty in-depth document.

8          Q      Now once you have the settlement attorney

9    identified and once you have the loan approved, is there a

10   HUD-1 or any documentation that's prepared for the closing?

11         A      That is correct.  Prior to the docs being

12   drawn on our end, our account manager will initially request

13   a -- our account manager or our funder, prior to drawing the

14   docs will request an estimated HUD-1 from the closing agent

15   or the settlement agent, which are one and the same.  And the

16   estimated HUD-1 is a document, it's -- it describes all the

17   disbursements and receipts, any parties that brought in money

18   for this transaction, any parties that are -- is due a fee at

19   the end of this transaction, or even money that is paid out

20   of closing, for example if they paid an appraisal and they

21   paid out a check, that would be noted, any -- anything that's

22   related to this transaction, specific transaction must be

23   noted and identified on this estimated HUD-1, so our funder

24   can evaluate it, determine it's accurate and then proceed

25   with drawing the documents so the documents, fees and amounts

1    are accurate as well.

2              Q    After that HUD-1 is prepared and received by

3    Fremont, what's the next step in the process?

4              A    Actually drawing the docs and e-mailing them

5    to the closing agent so the closing agent can call the

6    borrower up and have them come in and sign.

7              Q    When the decision is made to approve the loan

8    and you have a closing date selected, at some point does

9    Fremont fund the loan?

10             A    That is correct.  Fremont wires the fees to

11   the -- we receive wiring instructions and it's towards the

12   end of the process, it's wired into, you know, the account of

13   the closing agent which is an escrow account or a trust

14   account.

15             Q    What is an escrow account?

16             A    It's an account established to basically park

17   the money until it's disbursed based off the instructions and

18   the HUD-1.

19             Q    And what's the obligation that the attorney

20   has with regard to the money that's placed in their escrow

21   account, of the money of the lenders?

22             A    To disburse the funds accordingly.

23             Q    When that money, the lender's money, is in the

24   attorney's escrow account, who does that money belong to?

25             A    That money is technically still Fremont's and

1    it's held there to be disbursed.  We rely heavily on the job

2    of the closing agent to be responsible to disburse it

3    according to the lending instructions.

4         Q    You've mentioned lending instructions.  Are

5    those written instructions?

6         A    Yes, that is correct.

7         Q    And what do those instructions tell the

8    closing attorney about the disbursement of the money at the

9    closing?

10        A    It specifically states that all disbursements

11   need to be disbursed according to the recipients on the HUD

12   and the specific dollar amounts, if any money is to be

13   collected, it's got the dollar amounts on the HUDs also and

14   if it's a purchase transaction, the seller has to be, you

15   know, if seller is receiving funds back, it has to go

16   directly to the seller and it also indicates throughout the

17   HUD if there's any changes to the way that the disbursements

18   are made, the lender must be notified and we need to approve

19   it in writing prior, for them to disburse it because in some

20   cases, if there's changes of fees, we need to know because it

21   could be affecting the APR and we may have to redraw the

22   documents and have it actually resigned.

23        Q    You used the term APR, what's that term mean?

24        A    Annual percentage rate, it's on the truth in

25   lending form and it's required by federal law to be disclosed

1    accurately.

2           Q    So if there were a change to some of the terms

3    in the loan, that might affect the rate at which Fremont is

4    getting paid back on the loan?

5           A    Oh, absolutely.

6           Q    Is that what you mean by it might change the

7    APR?

8           A    Correct.  If the fees change, then it slightly

9    changes the whole dynamic of the entire financing model.

10          Q    At this time I'm going to show you what's

11   previously been received into evidence as Government's

12   Exhibit Number 1.27, I'm going to ask you to take a look at

13   that document and I can retrieve that back from you.  Looking

14   at Exhibit 1.27, can you tell us what the first two pages of

15   this exhibit are?

16          A    The first two pages, the final HUD-1

17   settlement statement of the 1 Sheridan Avenue, Troy, New York

18   property, that we financed.

19          Q    Is this a HUD-1, the first two pages?

20          A    Yes, it is.

21          Q    Now does that HUD-1 indicate who the buyer of

22   the property is?

23          A    Yes, it does.  The buyer is Brian Haskins, on

24   the top left-hand side, item D.

25          Q    And how about the seller?

1          A     The seller is Deborah Bueg.

2          Q     I believe you indicated it's indicated on the

3   HUD-1 that this was a loan where Fremont was the lender, is

4   that correct?

5          A     Yes, that is correct.

6          Q     And could you tell us what the property that

7   is being purchased, the address?

8          A     1 Sheraton Avenue, Troy, 1 -- 12180.

9          Q     Who prepared this HUD?

10         A     This was prepared by the settlement agent, the

11  Bouchard Law Firm.

12         Q     Is that noted on the HUD?

13         A     It is on H, right next to the property

14  address.

15         Q     And can you also tell me if the date is noted

16  on the HUD?

17         A     Yes, the settlement date is on the right-hand

18  side on -- it says settlement date 4/18/2005.

19         Q     Now looking at this document, can you tell us

20  where the sales price is listed?

21         A     The sales price is listed on item 101,

22  contract sales price, 85,000.

23         Q     Is this the price that the buyer was

24  contracting with the seller to purchase the property?

25         A     That is correct.

1          Q     Now that contract price, is that important to

2     Fremont?

3          A     Oh, absolutely.

4          Q     Why?

5          A     In underwriting, in the initial underwriting

6     stages, the underwriter reviews the sales contract to

7     determine what price they have agreed upon, and we, we

8     evaluate it along with the appraised value.  Whenever there's

9     a difference between the appraised value and the purchase

10    price, as an underwriter we always use the lower of the two,

11    so we're always looking at the value of the property, whether

12    it be the purchase price or the appraised value.  We

13    typically take the conservative approach because sometimes

14    there's -- I mean sometimes the borrower is buying the

15    property for less than what it's actually truly worth or vice

16    versa.  It's -- sometimes there's a bidding war and they

17    might pay a little bit more than what it's worth.

18         Q     Can you tell us what the loan amount is listed

19    on this HUD-1?

20         A     The loan amount is 75 -- I'm sorry, 76,500,

21    it's on line 202.

22         Q     Now looking at the HUD-1, can you tell if the

23    buyer is expected to bring money to the closing, and if so,

24    what that amount is?

25         A     On line 303 on the very bottom here it says

1    cash from borrower and the total amount on the very bottom

2    $16,580.39.

3          Q    So that's the amount that the buyer is to

4    bring to close this loan?

5          A    That is correct.

6          Q    And this HUD reflects that the buyer is going

7    to bring that amount?

8          A    Yes.

9          Q    Is the amount that the buyer is bringing to

10   the closing important to Fremont?

11         A    Absolutely.  The loan was approved, on this

12   particular deal, this loan was approved on 90 percent loan to

13   value.  Loan to value is the ratio of what the property is

14   worth and how much we're going to lend.  As a lender we never

15   lend -- on these two loans we funded, they were also

16   considered non-owner-occupied properties so we would never

17   lend 100 percent on non-owner-occupied property, investment

18   properties where the borrower is not going to reside in the

19   subject.  So it was important that the borrower brought cash

20   to close.

21         Q    You indicated an importance with regard to

22   non-owner-occupied properties.  Why is it particularly

23   important for non-owner-occupied properties?

24         A    In reviewing a risk of a file, there's

25   different risk levels.  Owner occupied where someone's going

1    to live in it, that's the best risk, it's a lot lower because

2    most people, you know, if something were to happen

3    financially, they're going to pay the roof over their head

4    versus a property they don't actually reside in.  And in an

5    investment property as a lender, we don't lend -- Fremont did

6    not allow lending up to a hundred percent because we wanted

7    the borrower to have vested interest in the property as well,

8    skin in the game, if something were to happen, they're going

9    to potentially lose money, not just the lender.

10           Q    So if the buyer was going to come to this

11   closing without putting any money down, would Fremont have

12   funded the loan?

13           A    Absolutely not.

14           Q    What was the amount that Fremont did agree to

15   lend this borrower?

16           A    Fremont agreed to lend this borrower 76,500

17   which is on line 202.

18           Q    How does Fremont insure that the buyer

19   actually brings funds to the closing?

20           A    Fremont relies on the settlement agent or the

21   closing agent to receive the funds because it's part of their

22   responsibilities and they provide us a receipt, a document,

23   the cashier's check or whatever was provided to them, with

24   the specific dollar amount to show that the funds are

25   available and we're ready to close.

1          Q      When you say receipt, the settlement attorney

2     doesn't send you the check, correct?

3          A      No, it's a copy.

4          Q      They send you a copy of the check?

5          A      Correct.

6          Q      The fact that the settlement agent needs to

7     show that proof that the buyer brought money to the closing,

8     is that instruction contained in those written instructions

9     that are given to the settlement attorney?

10          A      Yes, it is.

11          Q      Now looking again at this HUD, how much money

12     was noted to be paid to the seller?

13          A      The seller was to receive $82,910.46, it's on

14     line 603.

15          Q      Now the amount that goes to the seller, is

16     that important to Fremont when it considers the loans?

17          A      Absolutely.

18          Q      Why?

19          A      The accounting on this transaction needs to

20     balance and we need to make sure that the seller receives the

21     funds accordingly.  If -- once again on our closing

22     instructions, it specifically states if the seller is due

23     funds, they must -- it must go to the seller only.  If the

24     funds go to other places, the lender must be notified prior

25     to that actually happening.

1          Q     Now if we could turn to the next page after

2     the HUD, please.  I'd ask you if you recognize what the next

3     document is after the HUD.

4          A     This is the specific amounts that were paid to

5     individuals or companies that -- for services rendered or

6     possibly property taxes to pay recording, so it's an itemized

7     list of what -- on the seller and the, the buyer and the

8     seller side.

9          Q     Now if you could turn to the page after the

10    HUD.  Could you tell me what that document is.

11         A     Appears to be a purchase contract for

12    1 Sheridan Avenue, Troy.

13         Q     Is that the same property that's listed on the

14    HUD?

15         A     Yes, it is.

16         Q     And what does it recite the contract price to

17    be, the price that the house is going to be purchased?

18         A     45,000.

19         Q     Now the HUD-1, I believe from your testimony

20    from looking at the document showed a contract price of

21    85,000.  Would that difference be important to Fremont?

22         A     Absolutely.  If this purchase contract was

23    evaluated and reviewed by the underwriter, the underwriter

24    would pretty much stop and decline this transaction.  Reason

25    being is that there is concern in regards to the appraised

1    value if someone's willing to purchase this property for

2    45,000, Fremont would have never lent 76,500 on a property

3    that's only worth 45,000.

4            Q    Looking at that contract, who is the buyer on

5    the sales contract?

6            A    The buyer in this transaction is Greater

7    Atlantic Association and or assigns.

8            Q    Who's the buyer that's noted on the HUD-1?

9            A    Brian Haskins.

10           Q    Would that difference be important to Fremont?

11           A    Absolutely.  This indicates it was what we

12   call a flip transaction where the property is sold for, in a

13   short period of time to two different parties and the value

14   has increased in a short period of time.  It would have been

15   declined.

16           Q    Now if we could turn to the next document

17   after the sales contract.  If you could tell me if you

18   recognize what that document is.

19           A    These are Fremont's lending and closing

20   instructions.

21           Q    Are these the written instructions you've

22   already testified goes to the settlement attorney?

23           A    Yes, that is correct.

24           Q    The name of the settlement or the closing

25   agent, is that on the instructions?

1          A     Yes, on the top left-hand side, the Bouchard

2   Law Firm.

3          Q     Could you read the directions written in bold

4   that begin with, "Do not disburse," could you read those

5   directions?

6          A     "Do not disburse without calling lender for

7   funding number.  Before you can disburse, lender must receive

8   via fax the following:  HUD-1."

9          Q     Does it indicate a HUD-1 is needed?

10         A     Yes, it does.

11         Q     Why?

12         A     Because we need to make sure that the

13  recipients and the fees disbursed are according to what we

14  approved.

15         Q     And if you could turn to the next page of that

16  document.  On the second page of that document, does Fremont

17  Mortgage give Bouchard Law Firm specific directions about the

18  accuracy of the HUD-1?

19         A     Yes.  It's on the bottom section, E.

20         Q     If you could read that for us, please.

21         A     "HUD settlement statement E1.  The final HUD-1

22  settlement statement must accurately describe the receipts

23  and disbursements indicated in these closing instructions and

24  any amended closing instructions; each recipient of fees or

25  disbursements must be clearly identified."  E2 is, "If any

1    changes to the fees occur without the express written

2    approval of the lender, the loan documents will need to be

3    redrawn and resigned by the appropriate parties."

4         Q    And if you could look at E4, please.

5         A    E4 states, "If this is a purchase transaction,

6    sellers' funds must be disbursed to seller only, unless you

7    have received lender's written approval to do otherwise."

8         Q    So those are the instructions that are given

9    to your settlement agent, your closing attorney?

10        A    Absolutely.

11        Q    Do the instructions say that Fremont needs a

12   copy of the certified funds brought to the closing by the

13   buyer?

14        A    Yes.

15        Q    Now taking a look at the instructions, are

16   those instructions signed by your settlement agent?

17        A    Yes, they are.  It's on page 6.

18        Q    All right.  Looking at the document, where is

19   it indicated that the closing agent signs?

20        A    On the top section, it says -- it has closing

21   agent signature.

22        Q    And could you read the instruction immediately

23   above the closing agent's signature?

24        A    Sure.  It's, on top it says, "This loan must

25   be closed and disbursed according to these instructions.  If

1    you obtain information that is contrary to the information

2    contained herein, do not proceed with the closing until you

3    have contacted your funder for authorization of changes.  Do

4    not disburse any funds until you have complied with all of

5    the requirements contained in these instructions."  Then it

6    says, "This loan was closed and disbursed in strict

7    accordance with these instructions."

8            Q    Now I'm going to have you take a look at some

9    of the checks that were associated with this closing.  Do you

10   see in the exhibit that's been handed to you that there are

11   some checks?

12           A    Yes.

13           Q    Now you see in front of you hopefully and also

14   the actual copy that there's a check in the amount of

15   $23,769.61, to Brian Haskins?

16           A    Yes, I see that.

17           Q    Should that check have been issued by your

18   settlement agent?

19           A    Absolutely not.

20           Q    Why not?

21           A    This is a purchase transaction, the borrower

22   is not to make any money off the purchase transaction,

23   they're just purchasing a mortgage and in most cases they're

24   going to bring in money to close the transaction.  Any funds

25   given to the borrower must have been disclosed properly on

1    the HUD-1 and approved by the lender prior.

2              Q    We don't need to go back to the HUD but

3    looking at the HUD in Exhibit 1.27, what amount was the buyer

4    supposed to bring to the closing?

5              A    It was $16,580.39.

6              Q    If we could go to the next check, please.  The

7    check that you see in front of you on the screen in paper

8    copy, who is that check made payable to?

9              A    Michael Bouchard.

10             Q    In what amount?

11             A    500.

12             Q    So was Michael Bouchard paid from the mortgage

13   funds for his services as a settlement agent?

14             A    Yes, and I believe that is the correct amount

15   that he was to receive, yes.

16             Q    If you could take a look at the next exhibit,

17   and that is a check stub.  Can you tell me if that check stub

18   indicates an amount that was paid out of the HSBC bank

19   account?

20             A    $42,410.46.

21             Q    Was that the amount that was disbursed to the

22   seller of this property?

23             A    No, it should have been $82,910.46.

24             Q    So the seller should have received 82,910.46?

25             A    That is correct.

1          Q    And there's a check here that's indicated

2     $42,410.46?

3          A    That is correct.

4          Q    Looking at the documents that you have in

5     front of you, does the HUD-1 accurately reflect the

6     disbursements that were mailed at this closing?

7          A    Absolutely not.

8          Q    Was that -- would that be important to

9     Fremont?

10         A    If Fremont would have known that information

11    prior to funding this loan or -- it would have unwound the

12    loan and requested the funds back.

13         Q    Whose responsibility is it to make sure that

14    the disbursements are done in accordance with the HUD-1?

15         A    On this transaction, the Bouchard Law Firm.

16         Q    I'm going to show you a document that's been

17    received into evidence and that would be Exhibit 17.4.

18    You've previously given testimony that there were two

19    properties that Fremont mortgage used the Bouchard Law Firm?

20         A    Yes.

21         Q    Is that the second property?

22         A    Correct, this is 147 Fifth Avenue in Troy,

23    New York.

24         Q    And as indicated on the HUD-1 that Fremont was

25    the lender?

1          A     Yes, it was.

2          Q     Who was the buyer on this property?

3          A     Brian Haskins.

4          Q     And who was the seller?

5          A     Pamela Stressel Wells.

6          Q     The HUD that you're looking at, who prepared

7    this HUD?

8          A     The Bouchard Law Firm.

9          Q     Could you tell us what the contract sales

10   price is on this HUD?

11         A     110,000.

12         Q     And where is that listed?

13         A     On line 101.

14         Q     What was the loan amount that Fremont was

15   lending to the borrower?

16         A     It's on line 202, it's 88,000.

17         Q     Does this HUD-1 reflect that the borrower

18   Brian Haskins will be bringing money to the closing?

19         A     That is correct, it's on line 303, it's

20   $31,961.26.

21         Q     Would Fremont have made this loan if the

22   buyer, Mr. Haskins, was not bringing $31,961.26 to the

23   closing?

24         A     Fremont would not have funded the loan if the

25   borrower did not bring the 31,000 as indicated on the HUD,

1   because that's the way the loan was approved.

2          Q    So for this loan, how would Fremont insure

3   that the buyer was bringing that, those proceeds to the

4   closing?

5          A    Once again, we rely on the closing agent to

6   provide us documentation from the borrower which is a copy of

7   the cashier's check, the bank check, whatever it may have

8   been that he brought in.

9          Q    And would this loan also have had the same

10  instructions about that to your settlement agent?

11         A    That is correct.

12         Q    Looking at the HUD, how much money is supposed

13  to be paid to the seller?

14         A    Seller is to receive on line 603 $71,906.88.

15         Q    I'm now going to show you --

16              THE COURT:  What line was that?

17              THE WITNESS:  Very bottom, 603.

18              THE COURT:  What line was that, 71,000?

19              THE WITNESS:  603.

20              THE COURT:  This is Exhibit 17.4.

21         Q    Yes, and now I'm going to show the witness

22  Exhibit 17.5 which has already been received into evidence.

23  Does Exhibit 17.5 reflect proof of down payment brought to

24  the closing attorney?

25         A    Yes.  This is the $31,961.26.

1          Q    And that check is the same amount that's noted

2    on the HUD as the amount required by the borrower for the

3    closing?

4          A    That is correct.

5          Q    Do you know if this money was truly received

6    and used at the closing?

7          A    We received a copy of it and it's in our file.

8          Q    Now going to show you what's been previously

9    received into evidence as Exhibit 17.91.  Can you tell me

10   what Exhibit 17.91 is?

11         A    This is a purchase contract.

12         Q    For what piece of property?

13         A    Same property, 147 Fifth Avenue, Troy,

14   New York.

15         Q    And what's the name of the seller?

16         A    Greater Atlantic Associates and or assigns.

17         Q    And what's the amount that the property is

18   being purchased for?

19         A    41,000.

20         Q    That difference, the 41,000 versus the

21   contract price that you've already testified was 110 on the

22   HUD, would that difference have been important to Fremont?

23         A    Absolutely.  Once again, if the underwriter

24   was aware of this purchase contract, this loan would not have

25   funded.

1          Q     And could you take a look again at

2    Exhibit 17.4.  On the second page.  Above the signature of

3    the Bouchard Law Firm, could you tell us what that says?

4          A     "The HUD-1 settlement statement which I have

5    prepared is true and correct amount of this transaction.  I

6    have caused or will cause the funds to be disbursed in

7    accordance with the statement."

8          Q     I'm now going to show you Exhibit 17.6, which

9    has already been received into evidence.  Can you tell me

10   what Exhibit 17.6 is?

11         A     This is a check to Brian Haskins for

12   $38,038.74.

13         Q     So instead of receiving $31,000 from Brian

14   Haskins, the settlement attorney disbursed over $38,000 to

15   Brian Haskins.  Would that difference matter to Fremont?

16         A     Yes, it would, once again.

17         Q     Why?

18         A     It would have -- this was a purchase

19   transaction, the borrower is not to be making money off of --

20   I mean the only, on a purchase transaction, they're to

21   acquire a property, they're not to make money off the

22   transaction.

23         Q     I'm now going to show you Exhibit 17.3.  If

24   you could tell me what Exhibit 17.3 is.

25         A     It's a check to Pamela Wells which was a

1    seller for $1,906.88.

2           Q    If I recall your testimony on the HUD, it

3    indicated seller was going to receive $71,906.88.  This check

4    reflects the seller received $1,906.88.  With the difference

5    in the disbursement of these checks to the seller, would that

6    matter to Fremont Mortgage?

7           A    Absolutely.

8           Q    Why is that?

9           A    Our closing instructions were not followed.

10   They -- if Fremont would have known this up front, they once

11   again, we would have requested our funds back.

12          Q    Does the HUD-1, that is Exhibit 17.4, does

13   that HUD-1 accurately reflect the disbursements that were

14   made at this closing?

15          A    Yes.  Oh, I'm sorry, it's -- they should have

16   been disbursed this way, they were not disbursed, no, it does

17   not accurately.

18          Q    So looking at the checks which are the

19   disbursements, those checks do not reflect what is indicated

20   on the HUD?

21          A    That is correct.  We received a HUD that does

22   not indicate what was actually disbursed.

23          Q    And so now looking at Exhibit 17.4, the second

24   page, did Michael Bouchard get paid from the mortgage funds

25   for this loan?

1          A     Yes.

2          Q     And what amount?

3          A     500.

4          Q     I'm now handing you Government Exhibit 17.4B.

5     I'm going to ask you if you recognize Exhibit 17.4B.

6          A     Yeah, this is our entire loan documentation,

7     our preliminary property report section of our loan file.

8          Q     Are these the business records of Fremont

9     Investment & Loan?

10          A     Yes, they are.

11          Q     And were these records kept in the ordinary

12     course of business of the Fremont Investment & Loan?

13          A     That is correct and they're currently kept as

14     of today.

15          Q     And is it the obligation of Fremont to keep

16     these records?

17          A     Yes, it is.

18          Q     Were these records kept at or near the time of

19     the occurrence that's reflected in the records?

20          A     That is correct.

21          MS. THOMSON:  At this time, your Honor, I

22     would move to admit Government Exhibit 17.4B as business

23     records of Fremont.

24          THE COURT:  Any objection?

25          MR. CASTILLO:  Just one second, Judge.

1          No objection, Judge.

2          THE COURT:  Received.

3          Q    Now, it's a pretty large packet so we'll have

4    to go through the pages relatively slowly, but if you could

5    thumb through the package and let us know what is contained

6    in your records.

7          A    Okay.  The first page, first page is a cover

8    sheet, just states the section that it's filed under.  The

9    second page is a memorandum, it's the wiring instructions of

10   where we're going to send the funds, the funds are to be

11   wired to, in this case, it's to the lender from the Bouchard

12   group, giving us the instructions of where to wire the money

13   to.

14         Q    So that's how Fremont knows what account to

15   put the proceeds of the loan into?

16         A    That is correct.  The next page is an internal

17   form, it's a tax service order, gets printed up with all our

18   files.  The following page is a legal description of the

19   subject property.  The next page is -- it's a form that when

20   our, our department that Visiflos the files, if they

21   determine that some of the quality of the paper that they're

22   about to microfilm is poor quality, they just stick this page

23   in to kind of say, you know, it's not the filming, it was a

24   poor quality when we received it.  Because a lot of, you have

25   to understand that in the lending process, some -- a lot of

 1   documents are scanned, faxed, photocopied, e-mailed, and the

 2   quality of the documents get worn.  The next few pages --

 3          Q    If you could describe them to us, the next

 4   three pages.

 5          A    They're provided by the -- actually the next

 6   few pages are the liability insurance of the closing agent,

 7   and his next, it's the next couple pages are the proof of --

 8   in the state of New York we're required to get proof that the

 9   closing agent is -- has liability insurance up to a certain

10   percentage and then they also provide us a -- kind of like a

11   little resume.  So that's the next three pages.  This is the

12   warranty deed showing the transfer from the seller to the

13   buyer.  It appears that there was a correction by the

14   seller -- I'm sorry, by the buyer, they initialed, and this

15   is supposed to be recorded concurrently with the documents to

16   transfer ownership.  After the warranty deed which is two

17   pages, you have -- we receive a preliminary title report, the

18   preliminary title report is provided by the title company to

19   the lender, and this has much information on who's currently

20   vested on the property, who owns it, any liens, any -- it

21   gives you the property description, and that's quite a few

22   pages, one, two, three, four, five, six, seven, it gives you

23   property taxes paid or if they're still pending open.  State

24   of New York has pretty in-depth preliminary title reports.

25   It's actually kind of nice because it gives you all the

1    bankruptcy information, it has -- it gives, very last page of

2    the preliminary title report is the -- they do a, due to the

3    9/11 occurrence, they run names to see if they're in our

4    system, Patriot Act.  And then that's still the legal

5    description.  All part of the preliminary title report,

6    information that the underwriter reviews to determine, okay,

7    what liens have to be corrected and paid off to perfect our

8    lien once this loan eventually records.

9               So this is -- keep going.  It's pretty -- it's

10   the bankruptcy search based on the preliminary title report,

11   another bankruptcy search.  That's the Patriot Act, running

12   the names.  This is an internal form, the final HUD-1 that

13   our funder determines the APR affecting fees on the HUD-1 and

14   the loan docs and needs to be within a certain variance.  So

15   that's the internal form to state that it is within the

16   accurate variance.  The next page, this is the copy of the

17   receipt that we received from the closing agent.

18            Q    I'm going to stop you.

19            A    Okay.

20            Q    So looking through your files, this photocopy

21   was in the Fremont file having been sent from the Bouchard

22   Law Firm?

23            A    That is correct.

24            Q    Okay.  You can keep going to the next page.

25            A    This is our copy of the HUD-1 settlement

1    statement or for the 147 Fifth Avenue, Troy, New York.

2              Q    So Fremont Mortgage received that HUD-1 from

3    the Bouchard Law Firm?

4              A    That is correct, it's a signed copy.

5              Q    And are the remaining pages the copies of, for

6    example, other copies of the HUD?

7              A    Yes, there's the estimated HUD-1 prior to

8    drawing docs so you've got the final HUD-1, then you've got

9    copies of the estimated HUD-1 that's not signed, and then we

10   have the sales contract.

11             Q    That sales contract.  There we go.  Who's

12   indicated as the seller on this contract?

13             A    Pamela Stressel.

14             Q    And what's the amount that's indicated on this

15   sales contract?

16             A    111,000 -- hold on a minute.  110.

17             Q    And I believe you gave testimony earlier that

18   with regard to a different sales contract at a lower price,

19   is that correct?

20             A    That is correct.

21             Q    And so within the records of Fremont, the copy

22   that you have of the sales contract indicates a purchase

23   price of 110,000?

24             A    That is correct.

25             Q    And that's the price that's on the HUD you

1   received?

2            A    Yes.

3            Q    And then after that document, is it basically

4   the riders that go along with the sale?

5            A    Yes, the sales contract has about, you know, I

6   don't know, 10 to 15 pages depending on if there's

7   counteroffers and stuff.

8            Q    If Fremont had seen the other sales contract

9   for the price significantly lower than that $110,000, would

10  this loan have been funded?

11           A    Absolutely not.

12           MS. THOMSON:  One moment, your Honor.  That's

13  all I have for this witness.  Thank you, and I can retrieve

14  those documents.

15           THE COURT:  Was it 111,000 or 110?

16           THE WITNESS:  It's 110,000.

17           THE COURT:  Did you say 111,000?

18           THE WITNESS:  I think I did because I was

19  looking at this site but on the top here it says the 110 and

20  it's written out 110,000.  I just briefly looked at the -- it

21  was handwritten.

22           THE COURT:  In any event, in that contract,

23  Pamela Stressel is the seller at 110,000?

24           THE WITNESS:  That is correct.

25           THE COURT:  For the same property, 147 Fifth

1  Ave., Troy?

2           THE WITNESS:  Yes.

3           THE COURT:  Cross?

4           MR. CASTILLO:  Yes.

5           CROSS-EXAMINATION BY MR. CASTILLO:

6      Q    Good morning.

7      A    Good morning.

8      Q    If I asked you a question about a prime lender

9  versus a sub-prime lender, you would know what I'm talking

10 about, correct?

11     A    Yes, that is ...

12     Q    And could you please tell the ladies and

13 gentlemen of the jury what a prime lender is, what that

14 refers to.

15     A    A prime lender is considered a conventional

16 loan lender.  A lot of times they're government-backed

17 lenders, a sub-prime lender is a nonconforming lender, a

18 nonconventional lender.  We were known as that type of -- we

19 like to see it as --

20     Q    I didn't ask you that question, ma'am, excuse

21 me, I merely asked you to tell the jury what the differences

22 are.

23     A    Okay.

24     Q    So sub-prime lender is what?

25     A    The sub-prime lenders evaluates loans and

 1   it's -- prime lenders have certain guidelines and they have

 2   to fit in the box.  Nonconventional lenders have additional

 3   guidelines where they can -- their box is kind stretch --

 4   kind of goes outside the box.  So the prime lender may have

 5   specific strict guidelines as to what the property has to

 6   look like, what their amount of debt ratio they have to have,

 7   and they will not stretch from there.  Noncon -- conforming

 8   lender, they have other guidelines.

 9           Q     And when you say nonconforming lender, you're

10   talking specifically about sub-prime lenders, correct?

11           A     Yes.

12           Q     And Fremont, the company that you work for,

13   was a sub-prime lender, correct?

14           A     That is correct.

15           Q     And by that, you will agree, means that your

16   particular bank, should I call your company a bank or did you

17   call yourself something else?

18           A     We were Fremont Investment & Loan.

19           Q     So Fremont had a box that was more expansive

20   and would stretch a little bit more than the prime lenders,

21   correct?

22           A     Potentially, yes.

23           Q     Not potentially, that's exactly how it worked,

24   isn't that right?

25           A     In some cases.

1          Q     Not in some cases, in all the cases, sub-prime

2    by definition means that you had looser requirements than

3    conventional banks, isn't that right?

4          A     Well, not all our borrowers were sub-prime

5    borrowers.

6          Q     I understand that but you -- when I say you,

7    now I'm talking about Fremont, you understand that?

8          A     Correct.

9          Q     Fremont put itself out to the public as a

10   lender that was in the business of sub-prime loans, isn't

11   that right?

12         A     We were considered, yes.

13         Q     You weren't considered, that's what you --

14   your company portrayed yourself to the public to be, isn't

15   that right?

16         A     We were an alternative lending source other

17   than someone that was -- could not get a conforming loan.

18         Q     Right, and by conforming loans, what you mean,

19   ma'am, is that those people that credit history was not as

20   good as some other people, those people that perhaps had

21   lesser ability to document things such as employment, a

22   sub-prime lender like Fremont would be more open to doing

23   business with people that fit in that type of category,

24   correct?

25         A     Potentially, yes, and the reason I say that is

1   because a lot of -- lot of loans I underwrote, the borrowers

2   had excellent credit, the property completely conformed,

3   their debt ratio was in line and they could have chosen to

4   get a conforming loan but they chose to come to us for some

5   reason or other, they chose to go to a broker who shopped

6   below for less.

7            Q    Would you agree, ma'am, that the years in

8   question that we're talking about here, your bank, or

9   Fremont, the majority of your borrowers fit into the category

10  of sub-prime borrower?

11           MS. THOMSON:  Objection, your Honor, that's

12  well beyond the scope of direct.

13           THE COURT:  Overruled.

14           A    I do not evaluate every single loan Fremont

15  did, so I mean, I can tell you we were a nonconforming

16  lender, however, in my five years of underwriting for

17  Fremont, I saw a range of credit quality borrowers.

18           Q    You said that your current job, ma'am, is that

19  you're involved in some type of investigative capacity, is

20  that right?

21           A    Yes.

22           Q    How long have you been doing that work?

23           A    Since 2008.

24           Q    Okay.  And so in that you're involved in that

25  type of capacity that you've been involved in assisting

1    Fremont or the current company, whatever you said, it's

2    Signature now?

3              A    Correct, it's Signature.

4              Q    Is Signature really Fremont with another name

5    or is it a totally different --

6              A    They acquired Fremont in June of 2010, all

7    their assets and liabilities, so yes, they are working their

8    legacy cases.

9              Q    So then because of your investigative capacity

10   then, you're fully familiar with all of the litigation that's

11   ongoing involving Fremont and its lending practices, correct?

12             A    I'm not hands on with every single, but yes, I

13   am familiar with majority of them.

14             Q    You know what I'm talking about, though,

15   right, the litigation that I'm talking about?

16             A    No, I don't know exactly.

17             Q    You know about the litigation where there have

18   been numerous accusations made against Fremont about its

19   lending practices and procedures, correct?

20             MR. OLMSTED:  Objection, your Honor, witness

21   has already indicated that she doesn't know what he's talking

22   about, and again, it's beyond the scope of the direct.

23             THE COURT:  Overruled.  I think she said she

24   was aware of these, the litigation that was going on, didn't

25   you?

1          THE WITNESS:  I have been testifying for the

2    last couple years on Fremont's cases that pertain to possibly

3    some cases in that realm.

4          Q    Yes.  Not possibly.  In the realm I'm talking

5    about, isn't that right?

6          A    Well, I will tell you for a fact all the cases

7    I have testified, they've been in favor for Fremont.

8          Q    Okay.  But there are -- the litigation that

9    I'm talking about is ongoing still, correct?

10         A    If you can be a little bit more specific in

11   regards to what you're indicating, then I can ...

12         Q    Now, you said that Fremont had pretty specific

13   requirements and stipulations that it imposed on its loans,

14   correct?

15         A    That is correct.

16         Q    And you know from your work directly at

17   Fremont and also because of the litigation that you've been

18   involved in, that Fremont routinely would waive those

19   stipulations and conditions, isn't that right?

20         A    Waive in what way?  I mean which --

21         Q    I'm sorry, go ahead, excuse me.

22         A    If you could be a little bit more specific.

23         Q    Yeah, sure, I will.  Isn't that in essence

24   part of some of the lawsuit that have been brought against

25   Fremont, that in fact its underwriters would routinely waive

1  these requirements that you told the jury about, isn't that

2  part of the litigation that I'm talking about?

3          A    No.

4          Q    No?

5          A    No.

6          Q    All right.  Now you said in answer to one of

7  the prosecution questions that the costs that are listed on

8  the HUD-1 forms, that it is important for Fremont to know

9  about any costs because it could affect the APR, you said

10 that, right?

11         A    Potentially, yes.

12         Q    Right.  And what you mean by that is that

13 there are certain costs that are written into the loan,

14 right, correct?

15         A    Correct.

16         Q    And therefore if those costs are written into

17 the loan, then that would affect the loan amount, correct?

18         A    Potentially, yes.

19         Q    And ultimately affect the APR, correct?

20         A    Correct.

21         Q    You're talking about situations where perhaps

22 borrowers in addition to borrowing the moneys that they

23 needed to buy the property would also borrow moneys that they

24 needed to actually complete the transaction, correct?

25         A    Fremont would need to know that during the

1  underwriting process because it is approved accordingly.

2          Q    I understand that but my question is isn't

3  that a fact that borrowers would, in addition to borrowing

4  moneys needed to buy the property, would also borrow moneys

5  needed to complete the transaction, such as moneys to order

6  title reports and things of that nature?

7          A    Well, once again, that information needed to

8  be forthcoming because in the underwriting process --

9          Q    Ma'am, excuse me, you're not answering my

10  question.  My question is this, maybe I'm not being clear and

11  I apologize.  Is it true that borrowers, in addition to

12  borrowing moneys needed to buy the property itself, would

13  sometimes borrow additional money to do the other things that

14  are required as part of the closing such as ordering a title

15  search or other things like that, is that true?

16          A    That is true.

17          Q    And if they did borrow moneys that were needed

18  to complete those other services associated with the real

19  estate transaction, that would have to be considered by

20  Fremont in determining the loan and the APR rate, correct?

21          A    That is correct.

22          Q    Okay.  Now, the purpose of the HUD-1 form, as

23  you understand it, is to alert and let the borrower know

24  exactly what that loan is costing the borrower, correct?

25          A    No, it's for all parties involved and

1    especially the lender as far as where the fees are to be

2    disbursed.  The lender is the one lending the money.

3               Q     Got that.

4               A     So we send the -- we approve the loan based

5    off our terms.

6               Q     I understand that as well.  But here's my

7    question.  Is it true that the purpose of the HUD-1 form is

8    to let the borrower know what that transaction is costing the

9    borrower, is that a fair statement?

10              A     There's multiple documentation throughout the

11   loan that the good faith lets the borrower know, the

12   itemization of amount financed shows the exact fees in

13   regards to the transaction, the final HUD-1 settlement

14   statement is the entire transaction, the buyer's side and the

15   seller's side on where all the funds for this transaction has

16   gone to.

17              Q     The purpose of the HUD-1 is to let the

18   borrower know all such fees, is that correct?

19              A     Sure.

20              Q     Now the processes that the people that you

21   called underwriters who worked at your Fremont, that they

22   went through in order to decide whether or not to approve a

23   loan, that's all work that's done by Fremont and its

24   representatives prior to that point in time that any lawyer

25   is contacted for purposes of being a settlement agent, isn't

1   that right?

2          A    Put -- yes and no, because in the wholesale

3   side, once it gets to us, they may have shopped the loan

4   already and indicated who the closing agent was going to be.

5          Q    Well, my question, ma'am, is this:  In terms

6   of deciding whether someone fit the requirements of Fremont

7   in a sub-prime capacity, and deciding whether or not to give

8   that particular loan applicant the loan, that happens before

9   you contact a lawyer to be a settlement agent, isn't that

10  true?

11         A    Once again, we may have approved the loan and

12  the information is given to us after we approve the loan, but

13  the broker may have decided already who the settlement agent

14  was.

15         Q    Okay.  I'm sorry, I'm just not being clear.

16  The process of applying for the loan, deciding what the

17  person's credit is, if you require employment verification,

18  what history that particular borrower or applicant has,

19  that's not work that's done by the lawyer you contact to be

20  the settlement agent, correct?

21         A    That is correct.

22         Q    That work is all done by Fremont prior to that

23  point in time that you would contact any lawyer to be a

24  settlement agent, isn't that right?

25         A    It's completed by the broker and Fremont, yes.

1          Q    That would be done prior to even those two

2    occasions you talked about where Fremont ultimately contacted

3    Michael Bouchard's office, isn't that right?

4          A    There's a certain amount of information that

5    is, that he -- the closing is later on in the process.

6          Q    Okay.  So Michael Bouchard in the two

7    instances that you talked about wasn't in any shape or form

8    involved in deciding whether Haskins who was the borrower in

9    the two loans that you talked about would be approved or not

10   approved for that loan, isn't that fair to say?

11         A    Based on the way we approved it, we approved

12   it a certain way and for funds to be disbursed accordingly.

13   Ult --

14         Q    I'm sorry, you're not understanding me or I'm

15   not being clear.  What I'm asking you is this.  Fremont

16   decided to approve a man by the name of Haskins for two

17   loans, is that true?

18         A    That is correct.

19         Q    The process involved in approving that man

20   Haskins for those two loans, that happened before Michael

21   Bouchard's office was ever contacted, correct?

22         A    Potentially, yes.

23         Q    Well, you tell me if it's different in this

24   case, I don't want -- I need to know the answer to those

25   questions.

1          A    Once again, we're a wholesale lender so we

2     deal with the broker.  I don't know for a fact if the broker

3     contacted him prior.  I'm just saying that once we approved

4     the loan and prior to going to docs, we were informed that

5     the Bouchard Law Firm was closing this transaction.

6          Q    Okay, let me put it to you this way.  Whether

7     or not any person whatsoever talked to Michael Bouchard about

8     it before, the fact of the matter is that the process of

9     approving the loan is done by Fremont, correct?

10          A    Correct.

11          Q    And only Fremont, correct?

12          A    Correct.

13          Q    So if there's any -- if there's a credit

14     report to be run and looked over, and evaluated, that was

15     done by Fremont, correct?

16          A    Correct.

17          Q    If there was any employment checking or

18     employment verification that had to be done, that was done by

19     Fremont, correct?

20          A    The broker and Fremont, that is true.

21          Q    In terms of deciding the value of the

22     property, in other words whether the property that was going

23     to be the subject of that loan transaction would be allowed

24     as the property to be used for the loan, that's something

25     that was determined by Fremont, correct?

1          A     The licensed appraiser along with Fremont.

2          Q     An appraiser would be hired but ultimately

3     that information would be given to Fremont, correct?

4          A     That is correct.

5          Q     And then the underwriter would decide, in the

6     case involving the two loan transactions that you talked

7     about involving this man Haskins, would decide if that

8     property was worth it or not, correct?

9          A     To the best of our ability, we're limited

10    resources as far as --

11         Q     What does that mean to the best of your

12    ability?  You get an appraisal, you look at it and you decide

13    should you give a loan for that property or not, isn't that

14    the way it worked?

15         A     That is true; however, we do a certain amount

16    of due diligence on our end and we have limited internet

17    resources.  The appraiser has additional resources that the

18    underwriter does not have.  So to the best of our ability,

19    yes.

20         Q     Okay.  What you were shown and you gave

21    testimony about an Exhibit 17.4B, do you recall that?

22         A     Yes.

23         Q     Okay.  And within 17.4B, there's a whole bunch

24    of documents, correct?

25         A     Correct.

1           Q     And actually you went over some of them in

2     front of the jury, isn't that right?

3           A     Yes.

4           Q     And one of the documents that's in this 17.4B

5     is an actual appraisal that was done on the property,

6     correct?

7           A     No, I didn't review any of the appraisal.

8           Q     Okay, I'm sorry, was there a tax search done?

9     You said there was certain background checks that are done,

10    correct?

11          A     That's an internal form, that's -- the tax

12    search, we didn't review any of the appraisal or appraisal

13    review documents.

14          Q     Did your underwriter review the tax search?

15          A     I mean we didn't review in court here.

16          Q     Okay.

17          A     There's --

18          Q     But you looked at it when it was put up on the

19    board there, isn't that right?

20          A     We didn't talk about any -- we talked about a

21    purchase contract.

22                MR. CASTILLO:  Excuse me, sir.

23          Q     See 17.4B up there, ma'am, you see it, right?

24          A     Yes.

25                THE COURT:  You know what, we'll take a

1    15-minute break at this time, members of the jury.

2                    THE CLERK:  Court's in recess.

3                    (Court in recess, 11:04 a.m. to 11:27 a.m.)

4                    (Open Court, Jury Out.)

5                    THE COURT:  Bring the jury in, please.

6                    (Jury Present.)

7                    THE COURT:  Okay, jury's back, you may

8    continue, sir.

9                    MR. CASTILLO:  Thank you.

10        Q    Ms. Valdez, I'm going to direct your attention

11   to Exhibit 17.4B and the page up on the board here, can you

12   see that all right?

13        A    I do.

14        Q    And you said that this was a document that's

15   contained in a file kept by Fremont, correct?

16        A    Correct.  That's part of the preliminary title

17   report that was provided to us from the title company.

18        Q    Okay.  And so this document that has at the

19   top heading Superior Data Services, Inc., this is a document

20   that would have been used by your underwriter in determining

21   whether or not to approve the loan, is that correct?

22        A    It's -- it's part of the document that we

23   evaluate of the title report and this document tells us

24   whether the taxes need to be paid or not.

25        Q    But this is the document that you would look

1   at as part of the approval process, is that fair to say?

2          A    Sure.

3          Q    Okay.  And you said that this document will

4   tell you -- give you some information such as whether or not

5   the taxes are paid or not, correct?

6          A    Correct.

7          Q    This document as part of Government

8   Exhibit 17.4B also gives you other information, correct?

9          A    That is true.

10          Q    And it gives you the value that's been

11   assessed on the property by the city that this property is

12   located in, correct?

13          A    Correct.

14          Q    And the assessed value, the total assessed

15   value by the city in this particular case involving the

16   property known as 147 Fifth Avenue in Troy, New York, what's

17   the total?

18          A    You have to take into consideration --

19          Q    Ma'am, what's the total that's reflected on

20   the document?

21          A    21,000?

22          Q    Yeah, what's that number?

23          A    This is -- well, you have to take into

24   consideration ---

25          Q    Ma'am, I'm sorry, you're not answering my

1    question.

2            A    -- this was in 1986.

3            Q    Excuse me, I apologize.  Here's my question.

4    On this document that's part of 17.4B, which is a document

5    that you said was in Fremont's file, correct?

6            A    Correct.

7            Q    Which is a document that was utilized by your

8    underwriter in deciding what to do with respect to this

9    applicant Haskins, right, yes?

10           A    Not pertaining to the value, but yes.

11           Q    Oh, not pertaining to the value?

12           A    Of the property.

13           Q    Is that what you're going to say now?

14           A    This document is not used in regards to the

15   value of the property.

16           Q    Okay, ma'am, does this document that's part of

17   your file, that's part of Government Exhibit 17.4B, have

18   within it information regarding the valuation that's been

19   given to this property by the city of Troy where this

20   property's located, yes or no?

21           A    Yes.

22           Q    And the value that the city of Troy has

23   assessed on this particular property is $21,870, correct?

24           A    That -- based off that information there, yes.

25           Q    Well, do you have a doubt, is that what it

1      says or no?

2              A    It does state that.

3              Q    And the loan that Fremont approved in

4      connection with this loan applicant Haskins in relation to

5      the property known as 147 Fifth Avenue, city of Troy, was how

6      much?

7              A    I can't -- we did two loans.  I can't remember

8      which one.  One's against --

9              Q    In the area of 110,000, does that sound right

10     to you?

11             A    That was the purchase price.  But this value

12     is assessed based off --

13             Q    Ma'am, you're answering a question I haven't

14     asked yet.  I'm sorry.  Are you about to tell us that the

15     value that's reflected on this document as part of

16     Exhibit 17.4B is unimportant, is that what you're gonna say?

17             A    It may not be accurate as of the date of

18     underwriting.

19             Q    May not be accurate as of the date of what?

20             A    Underwriting.

21             Q    Underwriting.  Oh.  Well, what's the date of

22     the document?

23             THE COURT:  Date of underwriting?  That's the

24     same date.

25             A    No, what you have to take into

1   consideration --

2           Q    No, ma'am, what's the date of the

3   underwriting?

4           A    I'd have to look at the file to determine.

5           Q    Do you have that?

6           A    It was in 2005.

7           Q    Do you have that with you?

8           A    No, I don't have the file with me.

9           Q    Do you have that?

10          THE COURT:  Do you need Exhibit 17.4B?  Would

11  it be in there?

12          THE WITNESS:  It would --

13          THE COURT:  I can give you the exhibit if you

14  want to take a look at it.  Refresh your recollection.

15          MS. THOMSON:  Judge, I have a copy available,

16  if I could approach the witness with a copy.

17          THE COURT:  Okay.

18          A    See, this one doesn't have the underwriting.

19          THE COURT:  The question before you is this:

20  What is the date of the underwriting of this loan?  Correct?

21          MR. CASTILLO:  Yes.

22          A    The date of the underwriting of this loan is I

23  believe in March or April of 2005.

24          Q    This document that's on the board that's part

25  of Exhibit 17.4B, is this a document that would have been

1    ordered by a representative of Fremont in connection with

2    this loan application by Brian Haskins?

3              A    No, it was ordered by the broker.

4              Q    Okay.  And can you tell us the date of this

5    document?

6              A    This document is January 31st, 2005.

7              Q    Okay.  And do you know when this loan closed

8    or when it was approved, how about that?

9              A    March or April of 2005.

10             Q    So short in time to the date of this document

11   that's reflected on the board that's part of 17.4B, correct?

12             A    But close.

13             Q    Ma'am, is this close in time to that date?

14             A    The preliminary title report is, yes, within

15   90 days, however, this --

16             Q    Are you telling me that you are questioning

17   the accuracy of that information on that document?

18             A    May I explain?

19             Q    No, I want you to answer my question.

20             A    The value is not accurate as of this date.

21             Q    Okay.  What's the correct value?

22             A    I don't know because they only reassess when

23   the value is repurchased and this original property was a

24   purchase back in '86, 1986.

25             Q    Okay.  But this document is dated 2005?

1          A     That is correct.

2          Q     So therefore it refers to information that's

3     relevant to the year 2005, right?

4          A     That is incorrect.

5          Q     That's incorrect?

6          A     Yes.

7          Q     Okay.  So then this is a document that really

8     has no relevance, right?

9          A     This has relevance pertaining to the property

10     taxes that need to be paid on the property.

11          Q     So the information about the valuation, the

12     assessed valuation by the city, the government where this

13     property is located, you're saying is totally irrelevant, is

14     that right?

15          A     Properties are not --

16          Q     Ma'am, is that -- you're saying it's totally

17     irrelevant, is that what you're saying?

18          A     I'm just saying that particular piece of this

19     information is not accurate as of this point.

20          Q     And you're saying that it's not relevant and

21     not considered by your underwriter, is that right?

22          A     Oh, it's reviewed.

23          Q     Okay.  Now by the way, you twice said in

24     response to a question by the prosecutor that the legal fees

25     of $500 that were paid to Mr. Bouchard's law office, $500

1   payments, you recall the questions about that?

2           A    Yes.

3           Q    And you said that those fees were paid out of

4   the loan funds; you recall that question and that answer?

5           A    I do.  Yes.

6           Q    Okay.  Now, the procedure, the process when a

7   bank or a lender such as Fremont hires a lawyer to handle the

8   transaction is that Fremont never pays the legal fees,

9   correct?

10          A    Fremont does not hire in a wholesale

11  environment, it's -- we are given that information by the

12  broker.

13          Q    Okay.  And this particular case, for purposes

14  of these two transactions that you just talked about, did you

15  hire Michael Bouchard's office as a lawyer?

16          A    Fremont did not.

17          Q    Okay.  So they weren't representing you then,

18  is that it?

19          A    They were to follow the lending instructions

20  according the --

21          Q    Ma'am, that's not what I'm asking you.  Do you

22  understand my question?  I'm sorry to interrupt you.  Was the

23  Michael Bouchard Law Firm representing Fremont in connection

24  with these two loan transactions that you just testified to,

25  yes or no?

1          A     They were representing all parties involved.

2          Q     Ma'am, were they representing Fremont, was the

3     law office of Michael Bouchard representing Fremont, your

4     company, in connection with these two loan transactions

5     involving Haskins that you just testified to, yes or no?

6          A     Pertaining to this transaction, yes.

7          Q     Of course pertaining to this transaction,

8     that's what I'm talking about, these transactions, so you're

9     saying he did represent your company?

10         A     All parties involved, yes, he did.

11         Q     Does that mean he represented Fremont, yes or

12    no?  Because that's what I'm asking you, I'm not asking you

13    about any party other than --

14         A     Yes.

15         Q     -- Fremont.

16         A     Yes.

17         Q     Did the law office of Michael Bouchard

18    represent you, Fremont, in these two transactions?

19         A     In the -- yes, he did.

20         Q     Okay.  But the procedure is that the borrower

21    has to pay the lawyer who is representing your company

22    Fremont, isn't that right?

23         A     Once again, he's representing all parties

24    involved.  He's representing this transaction.

25         Q     Okay.  Are you done with your answer?

1          A    Yes.

2          Q    Okay.  Now here's my question.  The process is

3    that the legal fee is not paid by Fremont, isn't that

4    correct?

5          A    Correct.

6          Q    The legal fee is paid by the borrower, isn't

7    that right?

8          A    Out of the proceeds that --

9          Q    It doesn't matter where the money comes from.

10         A    Yes, that is correct.

11         Q    The legal fee is paid by the borrower, is that

12    correct?

13         A    Correct.

14         Q    Whether the borrower takes the money out of

15    his or her pocket or as part of the transaction borrows

16    enough money to pay whatever the costs are, the fees are paid

17    by the borrower, correct?

18         A    Technically, yes.

19         Q    Not technically, actually.  You're not sending

20    any tax document to the Bouchard Law Firm indicating that you

21    paid his office a legal fee, correct?

22         A    That is correct.

23         Q    So the legal fee is paid by the borrower,

24    correct?

25         A    Correct.

1          Q     Now I assume, I know you said something about

2    having limited internet access in the course of your

3    testimony.  But Fremont certainly has computers, correct?

4          A     Yes.

5          Q     And Fremont certainly keeps track of all

6    borrowers that borrow money from Fremont, correct?

7          A     Correct.

8          Q     And in the event that a borrower who has been

9    approved for a loan and then given a loan applies again to

10   your same company for another loan, that would be information

11   that would be on your computer, correct?

12         A     Correct.

13         Q     So in the case of Brian Haskins who within a

14   short period of time applies for two loans, that would be

15   information that would be in your computers, correct?

16         A     Yes.

17         Q     And by the way, the two loans, as far as

18   Fremont was concerned, that Brian Haskins applied for, was

19   for the higher prices of the higher contract that you

20   approved him for, correct?

21         A     Yes.

22         Q     One was a contract for like 110,000, correct?

23         A     One was I believe 110, the other one was

24   88,000, I think -- no?

25         Q     So your company determined that he was fit and

1    appropriate to lend him loans to satisfy those two

2    transactions, correct?

3            A    Based on the terms with him coming in with

4    funds to close.

5            Q    Regardless, your company made that approval

6    decision, correct?

7            A    Sure.

8            Q    And I assume that when a borrower has

9    indicated to your company that the borrower has a certain

10   amount of money to bring to the closing, that you take steps

11   to investigate that information, correct?

12           A    That is taken into consideration, yes.

13           Q    You do more than take it into consideration.

14   If a buyer needs to bring for example $17,000, to a closing,

15   you will want information to show that the borrower has that

16   money, isn't that right?

17           A    We require receipt from the closing agent.

18           Q    Even before, the closing agent works at the

19   closing, I'm talking about before, when you're deciding

20   whether to approve, you will take steps to make sure that

21   that buyer indeed has, if he needs 17,000 to bring to the

22   closing, you're going to take steps to make sure that he

23   indeed has that $17,000, correct?

24           A    It's indicated within the loan file.

25           Q    What does that mean?  You take steps to figure

1    out whether the person has the money, isn't that right?

2    Ma'am, do you do that or not?  If you can't say yes or no,

3    just tell me.

4            A    Yes and no.

5            Q    Okay.  Do you like, for example, ask to see

6    the person's bank records to see if he or she has on deposit

7    that amount of money?

8            A    In some cases, yes.

9            Q    You look for tax returns to show that the

10   person would indeed have the ability to come up with that

11   money, do you do stuff like that?

12           A    Yes and no.

13           Q    Oh, yes and no.  Okay.  I guess when you're in

14   the sub-prime stuff, that's when you don't bother to look for

15   things like that, is that it?

16           A    Not in all cases, absolutely not.

17           Q    Now you said, Ms. Valdez, that if you had

18   become aware of a contract reflecting a different price, a

19   lower price, than what your approval was based upon, that

20   that would be information that would be relevant to your

21   company, correct?

22           A    That is correct.

23           Q    That would be information that would cause

24   some person at your company to pause and start to look at

25   things a little bit more carefully or look at things again,

1    is that fair to say?

2            A    That is fair to say.

3            Q    Because as you said in your testimony, if a

4    contract for a lower price -- let me withdraw that.  A

5    contract for a lower price might suggest that the property

6    value is lower, right?

7            A    That's definitely a red flag, correct.

8            MR. CASTILLO:  I'm going to need a moment to

9    find an exhibit, okay?

10           THE COURT:  Sure.  What's going on, as she's

11   typing, taking down the transcript, it's being brought up to

12   me and I'm making notes about things that I can go back and

13   check, and all of a sudden nothing was coming out.  Is your

14   company located in California now?

15           THE WITNESS:  Yes.

16           (A discussion was held off the record.)

17           THE COURT:  You got it?

18           MR. CASTILLO:  Yeah, but I'm going to have to

19   have it marked, Judge.

20           THE COURT:  Okay.  It's exhibit what number?

21           THE CLERK:  AA40.

22           THE COURT:  AA40?  Okay.

23           MR. CASTILLO:  May I approach the witness,

24   Judge.

25           THE COURT:  Sure.

1          Q     Ms. Valdez, I'm going to hand you what's

2     marked for identification as Defense Exhibit AA40.  Now could

3     you identify that document for the record, please.

4          A     This is -- appears to be, it's from Superior

5     Data Services, and it's for the property 1 Sheridan Avenue

6     and it appears to be identical to the document we have in our

7     preliminary title report from the title company showing the

8     property taxes, whether they're paid or open, and certain

9     assessed values also.

10          Q     All right.  Thank you.  And does that relate

11     to 1 Sheridan Avenue?

12          A     Yes, it does.

13          Q     And to the borrower, Brian Haskins?

14          A     That is correct.

15          Q     One of the two transactions you've testified

16     about?

17          A     Yes.

18                MR. CASTILLO:  I'm going to offer it, Judge.

19                THE COURT:  Any objection?

20                MS. THOMSON:  No, your Honor, but for

21     completeness, I would ask that the entire exhibit be

22     introduced.

23                THE COURT:  Well, you could, if it's relevant,

24     you can put it in when you want or you can put it in now.

25     It's your call.

 1              MR. CASTILLO:  Okay.

 2         Q    So Ms. Valdez, the assessed value by the city

 3    of Troy in connection with this property, 1 Sheridan Avenue,

 4    that your company approved the loan for, do you recollect

 5    what it is?

 6         A    Mm-hmm.

 7         Q    What is it?

 8         A    The -- 12,000.

 9         Q    Yeah, $12,790, correct?

10         A    Correct.

11         Q    And this was a document that was in your

12    underwriting file, correct?

13         A    I'd have to go --

14         Q    Well, you just said that a minute ago.

15         A    Our document indicated a different amount.

16         Q    This is for 1 Sheraton?

17         A    Oh, that's 147, this is the other property,

18    got it, okay.

19         Q    This was in your underwriting file, correct?

20         A    That's correct.

21         Q    In connection with Mr. Haskins' loan

22    application for the purchase of 1 Sheridan Avenue, correct?

23         A    Yes.

24         Q    And you already said that your company

25    approved the loan for what amount for that property?

1          A     Let's see.  76,500 was that one.

2          Q     All right.  Ms. Valdez, with respect to the 1

3    Sheridan Avenue property, I just wanted there to be no

4    question, the loan that was approved by your company was what

5    amount?

6          A     76,500.

7          Q     Okay.  And the document that I showed you a

8    minute ago, Exhibit AA40, document that was issued by

9    Superior Data Services, shows an assessed value by the city

10   of Troy in the amount of 7 -- $12,790, correct?

11         A     Yes.

12               MR. CASTILLO:  Judge, I'm going to need a

13   moment.

14         Q     Ms. Valdez, you said that as part of your loan

15   procedures, that you would require a preliminary HUD form to

16   be sent to your company, correct?

17         A     Yes.

18         Q     And upon receipt of that preliminary HUD form,

19   and a review by someone in your company, then you would issue

20   the green light so to speak, to allow that transaction to go

21   forward, is that fair to say?

22         A     To draw the docs, correct.

23         Q     And then at the end, once the transaction is

24   completed, once there has actually been a real estate

25   closing, you will then require that certain documents be

1    transmitted to your company, correct?

2                A    Yes.

3                Q    Including a HUD document, correct?

4                A    The final HUD-1s, correct.

5                Q    And were there final HUDs provided to your

6    company in connection with these two loans that we've just

7    talked about, involving Mr. Haskins?

8                A    Yes, they were.

9                Q    You've had an opportunity to review those?

10               A    Yes.

11               Q    Did you review them in preparation for your

12   testimony?

13               A    I did.

14               Q    You don't have a file with you that you're

15   looking at, correct?

16               A    The entire file?

17               Q    Well, let's talk about in connection with the

18   loan application in the closing that happened with respect to

19   Mr. Haskins and the property known as 147 Fifth Avenue, Troy,

20   New York.

21               A    Okay.

22               Q    Do you have those documents?

23               A    I have the preliminary title report section.

24               Q    Is there a --

25               A    The final HUD-1.

1          Q     You have the HUD-1?

2          A     Yes, I do.

3          Q     Would you just let me see the HUD-1 that you

4    have.

5                May I approach the witness, Judge?

6          A     Here's this one.

7          Q     Okay.  Do you have more than one HUD-1 in your

8    file?

9          A     I do.

10         Q     May I see the other one, please.

11         A     That's the ...

12         Q     You only have --

13         A     The first page and the signed second page.

14         Q     Okay.  In your preparation for your testimony

15   and your review of your file, did you become aware of the

16   existence of two separate HUDs for this transaction, the Troy

17   address, 41 -- 147 Fifth Avenue, Troy, New York?

18         A     No.  I mean other than the not -- the one

19   that's not signed, and then the signed one.

20         Q     Is the nonsigned one the one that was received

21   by your company preliminarily before the closing?

22         A     I would assume so.

23         Q     Give these back to you.  In connection with

24   your preparation for your testimony here today, with respect

25   to this transaction involving Brian Haskins, specifically at

 1   a property known as 147 Fifth Avenue, Troy, New York, did you

 2   become aware of whether or not there was more than one HUD-1

 3   form prepared for that transaction, yes or no?

 4              A    No.

 5              MR. CASTILLO:  Those are all the questions I

 6   have, thank you.

 7              THE COURT:  Okay.  Redirect?

 8              MS. THOMSON:  Yes, your Honor.

 9              REDIRECT EXAMINATION BY MS. THOMSON:

10              Q    You were asked some questions about whether

11   the HUD-1 was done for the benefit of the buyer.  What is the

12   single most important document to Fremont to make sure that

13   their money is disbursed according to their instructions?

14              A    The final HUD-1 settlement signed by all

15   parties.

16              Q    Who is responsible for making sure that the

17   funds are distributed according to that HUD-1?

18              A    The closing agent.

19              Q    You were asked to look at some documents, both

20   titled Superior Data Services and we don't need to put them

21   up on the board, I just have a follow-up question for you.

22   The totals that you were shown, one was for $21,870, and one

23   was for $12,790; would you like to explain the relevance of

24   those numbers to Fremont and what you understand them to be?

25              A    Sure.  The assessed value that the title

1    company in -- or gives us, is, it could have been assessed 20

2    years ago when someone purchased the property, they're not

3    going to reassess it every time unless there's been major

4    improvements to the property, then they'll get permits and

5    reassess the property itself.  I believe at least one of

6    these transactions, the borrower was on the title since 1986

7    so it could have been the assessed value way back then.

8            Q    So does the assessed value indicate what the

9    current value is?

10           A    Absolutely not.

11           Q    When considering the value, does Fremont

12   obtain an appraisal?

13           A    Yes.

14           Q    You were asked questions about the legal fees

15   and where they came from.  The legal fees for this closing,

16   did they come out of the mortgage proceeds that Fremont

17   deposited into the escrow account of Michael Bouchard?

18           A    Yes, they did.

19           Q    And you were asked just now about your

20   knowledge about the HUD-1 for these properties; was Fremont

21   only provided one HUD-1?

22           A    They were provided a preliminary one and a

23   final one.

24                MS. THOMSON:  Thank you.

25                THE COURT:  Anything further?

1          MR. CASTILLO:  Just a couple questions.

2          RECROSS-EXAMINATION BY MR. CASTILLO:

3          Q    Tell me if you know whether the city of Troy,

4    New York is a full assessed value city.

5          A    I do not know.

6          Q    And tell me if you know when the city of Troy

7    updates its assessments on its property.

8          A    I do not know that information.

9          Q    If I told you that they do it every three

10   years, would you have information to contradict that?

11         A    No, I would not.

12         Q    And is it your testimony, ma'am, that your

13   company, when it's determining whether to approve a loan or

14   not, just simply does not look at the assessed value that the

15   municipality where the property is located in, that the

16   assessed value that the municipality has given to that

17   property, you don't even consider it, is that your testimony?

18         A    In my 23 years of lending --

19         Q    Ma'am, my question is do you consider that,

20   yes or no?

21         A    It is reviewed, but for actual value at the

22   time of the loan, it is not considered.

23         Q    So it's reviewed?

24         A    Correct.

25         Q    Why do you look at it?

1          A     Because we review all documents in the file.

2          Q     And you said that the most important document,

3     I think that's the question it was, as far as Fremont is

4     concerned, is the HUD-1, correct?

5          A     That is an important document because it's the

6     final accounting of the entire transaction.

7          Q     Okay.  So let's talk about important

8     documents, even before the final transaction, are things like

9     reports of information that tell you about the

10    creditworthiness of the loan applicant, correct?

11              MS. THOMSON:  Objection, your Honor, that's

12    beyond the scope of my redirect.

13              THE COURT:  I think it goes into what are the

14    important documents.  You opened that door, so he can

15    certainly ask a question about those.

16         A     All documents in the loan file provided by all

17    parties.

18         Q     Ma'am, right now I'm talking about the

19    creditworthiness of the loan applicant.  Is that a very

20    important document?

21         A     It's all important.

22         Q     Before you allow a loan to be approved, you

23    have to look at some information pertaining to the loan

24    applicant, correct?

25         A     That is correct.

1          Q    You never get to the point of having to get a

2     HUD form after a closing if you don't ever approve the loan,

3     correct?  Correct?

4          A    We -- it's a --

5          Q    Ma'am, my question is real simple.  You'll

6     never get a HUD document if there's never a closing, right?

7          A    That is correct.

8          Q    Correct?  So therefore there's a whole lot of

9     important documents that have to be received and reviewed by

10    your company before ever a HUD document would be prepared,

11    isn't that right?

12         A    It's -- they're all important.

13         Q    Okay.  So I guess that HUD-1 document that you

14    just said was the most important document, when you said that

15    then you didn't mean that, is that it?

16         A    It's the final most important document in the

17    entire transaction.

18         Q    Excuse me.  Are you done?

19         A    Yes.

20         Q    But you have to approve the loan first, right?

21         A    That is correct.

22              MR. CASTILLO:  That's all I have, Judge.

23              THE COURT:  Okay.  You're all set.  Thank you.

24              (Whereupon the witness was excused.)

25              MR. OLMSTED:  The government calls Kelly

1    Monahan.

2                    THE CLERK:  Good afternoon, sir.  If you can

3    please state and spell your full name for the record.

4                    THE WITNESS:  Kelly Monahan.  K-e-l-l-y,

5    M-o-n-a-h-a-n.

6                    THE CLERK:  Please raise your right hand.

7

8              K E L L Y   M O N A H A N , called as a

9    witness and being duly sworn, testifies as follows:

10                   DIRECT EXAMINATION BY MR. OLMSTED:

11        Q    Good afternoon, Mr. Monahan.

12        A    Hello.

13        Q    Could you introduce yourself to the jury, who

14   you are and where you live.

15        A    My name's Kelly Monahan, I live in California,

16   Irvine, California.

17        Q    And what's your occupation?

18        A    I'm semi-retired currently.

19        Q    Prior to your retirement, what did you do?

20        A    I did various things.  I worked at an

21   accounting firm, I worked for a real estate developer, and I

22   also was on the management team of BNC Mortgage.

23        Q    Were you ever an employee of Lehman Brothers

24   Bank?

25        A    Yes.

1          Q     What was your position there?

2          A     Lehman Brothers Bank owned BNC Mortgage, so I

3    was the CEO at BNC Mortgage but I also was a dual employee so

4    I was a vice president of the bank because we had to sign

5    documents as BNC Mortgage and then other documents as Lehman

6    Brothers Bank.

7          Q     All right.  Like to show you a document that's

8    been admitted into evidence already as Exhibit 1.2.  Ask if

9    you can look at that exhibit and identify it to the grand --

10   to the jury.  Particularly the last page.

11         A     It's showing that Lehman Brothers Bank is a

12   federally insured bank.

13         Q     Is and was Lehman Brothers Bank a federally

14   insured bank while you were working there?

15         A     Yes.

16         Q     And what does that mean, that it's a federally

17   insured bank?

18         A     What it means to me is that your deposits are

19   federally insured, but also any losses that the bank would

20   incur would be -- they're not insured, but they would be

21   losses potentially of the government.

22         Q     But the deposits are insured by the Federal

23   Deposit Insurance Corporation?

24         A     Yes.

25         Q     All right.  And you say you also worked for

1    BNC.  Can you describe to the jury a little bit about your

2    career at BNC; what did you do there?

3                A    Yes.  I was one of the founding members in

4    1995.  I'll give you kind of abbreviated history.  In 1997 --

5    1998 we became a publicly traded company, I was the CFO,

6    during that period of time.  In the year 2000, I decided to

7    lead part of the management team to buy out the publicly

8    traded company so we'd go private again, and I did that

9    with -- and then I partnered with Lehman Brothers as my

10   financial partner so we bought out the public.  I became the

11   CEO and I ran the company until I left in 2006.

12                Q    And were -- with respect to BNC, from 2002

13   through 2007, did BNC offer mortgages?

14                A    Yes.

15                Q    Would you describe to the jury how the

16   mortgages that are obtained through BNC affect Lehman

17   Brothers Bank, and whose money is used to fund the mortgages

18   provided by BNC?

19                A    Okay.  BNC Mortgage did not have the capital,

20   you know, at the peak, we were producing or originating

21   approximately a billion dollars a month in loans, and we

22   didn't have the capital for that as most mortgage -- all

23   mortgage companies really don't except for major banks, so we

24   go get what's called a warehouse line of credit.  And Lehman

25   Brothers provided pretty much an unlimited warehouse line of

1    credit.  So when we funded loans, we were using their funds.

2              Q    And after you funded the loans, did Lehman

3    Brothers assume many of them or purchase many of them?

4              A    Yes, they purchased many of them.

5              Q    And if the loans are fraudulent, who loses the

6    money, which, BNC or Lehman Brothers?

7              A    You mean who would have the loss?

8              Q    Yes.

9              A    It could be three different parties.  First

10   could be BNC Mortgage because if the borrowers don't make the

11   payments we may have to buy the loans back.  Could also be

12   Lehman Brothers because of one or two things.  If they're

13   holding them on the books and the loans are worthless, then

14   they'll take the loss, but it also could be another -- if

15   they securitize the loans, it also could be the security

16   holder.

17             Q    I'd like to take -- ask you to take the jury a

18   little bit through the loan process that BNC had.  Now was

19   BNC a wholesale or a retail mortgage lender?

20             A    We were wholesale mortgage lender.

21             Q    And what is the difference in -- from BNC's

22   perspective?

23             A    Retail means that you go to your bank, you

24   apply for a loan, and you go through the loan process with

25   your bank or directly to a mortgage bank.  Wholesale would be

1  when the borrower goes to a loan broker, or mortgage broker,

2  and the broker gathers all your information, your income

3  documentation, your application, your purchase to buy the

4  property, and then decides who, which, if they're dealing

5  with many mortgage bankers or banks and they decide where

6  would you fit and so that's what happened with us.  We, BNC

7  Mortgage would get the vast majority of our loans through

8  brokers.

9          Q    You, in preparation for your testimony today,

10  you have reviewed a variety of loan files, is that correct?

11  Not loan files, loan documents.

12          A    Yeah.

13          Q    And in those, were those obtained through the

14  brokers?

15          A    Yes.

16          Q    Okay.  Starting at the beginning of a loan

17  transaction, when someone wants to buy a house, can you just

18  explain to the jury kind of from the BNC perspective what

19  happens when a person -- or wants to buy in this case a

20  multi-family home, say a two-family home for investment

21  purpose.

22          A    I mean basically you find your home, and you

23  have a real estate broker, so you start negotiating the

24  price, and you can also, so you could either at that point go

25  to your mortgage lender, or you could go after you've made

1    your agreement to purchase the home.  And then you have to

2    apply for the loan, you have to provide income documentation.

3    Back when -- at this period of time there was actually, some

4    loans were stated income documentation and some were full

5    income documentation.  Then you -- that's really when you

6    start everything, and then in our case, the broker would then

7    get an appraisal on the property, so now you know what it's

8    worth, you have your income documentation that the lender is

9    looking at, they have the credit history to the borrower so

10   they've pulled the credit report and that's when it really,

11   kind of a preliminary determination is made of how much, you

12   know, what kind of loan you qualify for.  You know, it could

13   be a loan program, it also would be what -- LTV, so loan to

14   value, which would be, let's say it's $100,000 house and you

15   have bad credit, you may only qualify for a $50,000 loan so

16   you're going to have to have a rather large down payment, but

17   if you have really good credit, you may qualify for a $90,000

18   loan on that $100,000 property.

19            So you go through that whole process really,

20   with your broker, determining who's going to be your lender

21   and what you qualify for.

22            Q    And when the application comes to BNC, what

23   does BNC -- they look to the creditworthiness of the

24   borrower?

25            A    It's not just the application, it's the whole

1    loan file so the brokers will have gathered all the

2    information including the appraisal.

3           Q    Once the loan file -- what then does BNC do

4    when they have the whole loan file?

5           A    We go through, has to go through various

6    departments and it's all simultaneously -- simultaneous,

7    sorry.  It would go through the underwriting department which

8    would look at the creditworthiness of the borrower, it would

9    look at the income documentation, it would go through the

10   appraisal department.  The broker provides an appraisal so

11   then what BNC Mortgage would do is we would review that

12   appraisal and that's really -- that gets you 90 percent

13   there, prior to closing.

14          Q    Then what happens?

15          A    And prior to closing you may have 50

16   conditions that need to be met so there's lots of other

17   things that we're asking for.  Pardon me?

18          Q    Okay.  And so once you've decided to go

19   forward with the loan, then what happens?

20          A    Then it's really between the lender and the

21   broker who they're using for the closing agent so what's

22   prepared is, there's -- there's some documents that come from

23   funding of the requirements for the closing and then there's

24   also closing instructions that go from our loan doc.

25   department which is really your more standard, standard

1    conditions and all those conditions, so that's sent to the

2    closing agent --

3              Q    How does the closing agent get selected, does

4    BNC select the closing agent?

5              A    No, it was really between the broker and BNC.

6              Q    All right.

7              A    We had a list that was an exclusionary list,

8    who we wouldn't use so if they weren't on that, and we did a

9    very quick background check, then we would most likely

10   approve the person.

11             Q    And in the files that you're going to be

12   testifying about today --

13             THE COURT:  One more time, just, the closing

14   agent then is approved by who, the broker and --

15             THE WITNESS:  Well, it's suggested by the

16   broker then it would be -- yes, it would be approved by BNC

17   Mortgage.

18             THE COURT:  But there's a recommendation from

19   the broker?

20             THE WITNESS:  Yes.

21             THE COURT:  Okay.

22             Q    What do you expect then from the attorney who

23   serves as your closing agent?

24             A    Basically to follow the closing instructions

25   because it has various requirements and if those requirements

1   aren't met, then the loan shouldn't be closed.

2          Q    All right.  Once you've identified the

3   settlement attorney and approved the loan, what is a

4   preliminary HUD-1?  Can you describe the role that a

5   preliminary HUD-1 has in that context?

6          A    Well, HUD-1 basically describes the

7   transaction from the borrower's point of view and from the

8   seller's point of view.  So it's basically showing on the

9   borrower's side the loan that they have, the proceeds from

10  the loan, all the various expenses, and then the end result

11  will be how much money do they need to bring to the table

12  which is -- that's typically what we call their down payment.

13          And on the other side, it has the seller, the

14  seller's side will have the proceeds that are coming in from

15  the sale, what -- they probably have a loan on the property

16  so what they have to pay off on the loan and then various

17  fees and then the ending result for the seller would be what

18  profit or -- it would be profit, what profit they would have

19  from the loan.

20          Q    Do you send instructions to the closing agent

21  on how to handle a closing?

22          A    Yes.

23          Q    All right.  I'd like to show you a document

24  that's already admitted into evidence as Government

25  Exhibit 7.9.  If it could be shown to the jury at this time,

1    published to the jury.  Can you identify this document?

2              A    Yes, this is the closing instructions.

3              Q    And who's it sent from?

4              A    BNC Mortgage.  It's from the loan doc.

5    department.

6              Q    And who's it sent to?

7              A    In this case, it's to the Bouchard Law Firm,

8    which I believe is the closing agent.

9              Q    And does it identify the property for which

10   these are instructions?

11             A    Yes.

12             Q    What's the address of the property?

13             A    735 Burden Avenue, Troy, New York.

14             Q    And when is this -- does it have a date in the

15   top right-hand corner?

16             A    March 8th, 2005.

17             Q    All right.  Can you describe -- we'll get to

18   the language of the document in a moment.  Can you just tell

19   the jury what this document is intended to do?

20             A    It's basically telling the closing agent what

21   the requirements are to close this loan.

22             Q    And could you read the first paragraph which

23   begins, "Do not."

24             A    "Do not close or fund this loan unless all

25   conditions in these closing instructions and any supplemental

1    closing instructions have been satisfied.  The total

2    consideration in this transaction except for our loan

3    proceeds and approved secondary financing must pass to you in

4    the form of cash."

5              Q    Why is that important?

6              A    The cash or the whole --

7              Q    Yes, either -- either sentence, both

8    sentences.

9              A    Oh, well, because we have approved a loan, we

10   need to sell the loan after we've approved it and funded it

11   and if it doesn't meet our guidelines which everything in

12   here is, all these requirements make it, you know, help it

13   meet our guidelines and if that doesn't happen, then we will

14   have an unsellable loan and therefore, a loss.

15             Q    And why should all of the money other than the

16   loan proceeds be brought in cash?

17             A    That's the only thing we'd accept.

18             Q    Why?

19             A    Because -- well, number one, well, it's kind

20   of -- it's definitely related.  We required, we require a

21   down payment, unless the loan is 100 percent loan-to-value

22   loan, and has to be cash and the reason why is you really

23   want the borrower, to use more a buzz word, you want them to

24   have skin in the game because typically 100 percent loan has

25   to be a perfect borrower or they're not gonna make their

1    payments, and if someone doesn't have skin in the game,

2    they're probably not gonna make their payments either on a

3    timely basis which makes the loan worth less than it would be

4    otherwise.

5              Q    Now I just want to ask you to explain to the

6    jury kind of a term of art in there.  You used the term cash

7    in this document or BNC uses the term cash.  Would a

8    cashier's check of collected funds qualify as cash?

9              A    Yes.

10             Q    So it doesn't mean currency, it just means

11   collected funds cash?

12             A    Yes, some people do provide cash --

13             Q    Currency?

14             A    -- also, mm-hmm.

15             Q    But you would accept a cashier's check?

16             A    Absolutely.

17             Q    The next sentence in that paragraph?

18             A    Oh, beyond where I read?

19             Q    Yes, past the word cash.

20             A    Sorry.  "All proceeds must be disbursed upon

21   closing unless you have received specific written

22   authorization to the contrary from us.  Do not close or fund

23   this loan if you have knowledge of a concurrent or subsequent

24   transaction which would transfer the subject property."

25             Q    And why, why is that?

1          A    Well, definitely the concurrent transaction

2     would be that someone's getting a second mortgage on the

3     property.  So let's say we're requiring a $20,000 down

4     payment and we don't -- and we would not have approved that

5     loan unless they came in with cash.  They may be going and

6     getting a second mortgage on that property and getting their

7     cash back and yet they wouldn't have qualified because of

8     their credit history or their worthiness, so we would -- we

9     would not make that loan in that situation so that's why

10     that's really -- that's why that language is there.

11          Q    All right.  I'd like you to turn to the next

12     page of the document.  What is that?  What is that document?

13          A    Well, the first document was the general

14     closing instructions which will be very typical on any loan

15     you see, probably even one that you would make today.  The

16     second, the second document, I'll call it second document is

17     the specific closing instructions.  So this is for this, this

18     loan in particular, I don't know if you want me to go down

19     the page.

20          Q    Yeah.

21          A    But like for example, it shows which loan

22     documents are required for this loan.  For example,

23     condominium rider is not checked off because this wasn't a

24     condominium but if it was a condominium, it would have been

25     checked off.  It goes down to the loan terms, talks about

1  conditions.  Obviously title insurance is very important,

2  it's, you know, almost half a page of the first page.  You go

3  to the second page, it shows what fees are going to be.

4          Q    If you can show the jury the second page,

5  please.

6          A    Shows the fees that are going to be paid to

7  the lender, what fees are going to be paid to the broker,

8  this one happens to have, it's a contra fee because it's a

9  New York tax.  And then it shows about really -- shows a

10  total of the fees, it shows your per diem interest which

11  means what you're paying daily for interest and then your

12  impounds and escrows which may be required to be part of your

13  payment which covers basically property taxes and insurance.

14          Q    All right.  There is a paragraph that is in

15  bold, the entire language is in bold in that document.  Could

16  you read that to the jury.

17          A    It says, "HUD-1 settlement statement.  The

18  final HUD-1 settlement statement must be completed at

19  settlement and must accurately reflect all receipts and

20  disbursements indicated in these closing instructions and any

21  amended closing instructions subsequent hereto.  If any

22  changes to fees occur, documents may need to be redrawn and

23  resigned.  Send the certified final HUD-1 settlement

24  statement to us at the following address within 24 hours of

25  the settlement.  Quality Assurance, P.O. Box 16426, Irvine,

1    California, 92623 or fax to" --

2          Q    And then the telephone number.  Let's say if

3    they agreed, the settlement agent agrees to follow these

4    instructions, what happens then to funding the loan?

5          A    Well, actually the loan's already been funded

6    because in New York it's considered a wet state so we have to

7    actually have sent the funds already to the closing agent.

8    So they're not supposed to close the loan until all the

9    requirements have been met by the instructions, closing

10   instructions.

11         Q    And those instructions say that, don't close

12   this loan until you've done all this?

13         A    Yes.

14         Q    So you have already wired the money --

15         A    Yes.

16         Q    -- to the escrow account?

17         A    To the closing agent's escrow account.

18         Q    And whose money is that while it resides in

19   the escrow account?

20         A    BNC Mortgage.

21         Q    What's the obligation of the closing agent or

22   closing attorney to handle the money that's in the escrow

23   account?

24         A    Well, I believe their fiduciary duty is to not

25   release any funds or to close the loan until all the

1    requirements have been made, according to the closing

2    instructions.

3           Q    I'm going to show you a document that's been

4    previously marked and is admitted in evidence as Government

5    Exhibit 7.4.  And if you could publish that to the jury,

6    please?

7           A    Pardon me?

8           Q    I'm speaking to him, that they can publish it

9    to the jury.  Can you tell the jury what this document is?

10          A    This is a HUD-1 or settlement statement.

11          Q    And what property does it relate to?

12          A    It relates to 735 Burden Avenue, Troy,

13   New York.

14          Q    Is that the same property you were just

15   discussing with respect to Exhibit 7.9 of the instructions?

16          A    Yes.

17          Q    Does this document relate to a mortgage that

18   was provided by BNC?

19          A    Yes.

20          Q    Looking at -- is it signed on the second page?

21          A    Yes.

22          Q    Who signed it?

23          A    The borrower, Brian Haskins, the seller,

24   George Smith, and someone from the settlement agent.

25          Q    Which is listed as the Bouchard Law Firm?

1          A    Yes.

2               THE COURT:  What was the address again, 735

3     what?

4               THE WITNESS:  Burden Avenue.

5          Q    Why does BNC want a signed copy of the HUD

6     before the attorney can disburse the funds?

7          A    Because everybody needs to have agreed that

8     this was the transaction that was being made.

9          Q    Now I'd like to turn to the first page of the

10    HUD-1.  Looking at the top of that document, little bit lower

11    than that, what is the sale price?

12         A    85,000.

13         Q    And where is that listed?

14         A    On line 101.

15         Q    And is that important to BNC to know what the

16    sale price is?

17         A    Yes.

18         Q    Why?

19         A    Well, it's -- part of it will be determining

20    the appraised value because typically we would use the lower

21    of the sales price or the appraised value as the loan --

22    sorry, as the fair market value.

23         Q    Why is that?

24         A    Because sometimes an appraisal can be wrong

25    and we believe that, you know, fair market value would be

1   more defined by what's a willing buyer and a willing seller

2   are willing to make the transaction or sell the property and

3   buy the property for.

4           Q     So you would look for the sales price as the

5   indicate -- as an indication of value?

6           A     Yes.  Especially when you're reviewing the

7   appraisal.

8           Q     All right.  Who is the borrower on this loan?

9           A     Brian Haskins.

10          Q     Is it important to know who the borrower is?

11          A     Yes.

12          Q     Does, looking at the bottom right -- left-hand

13  corner of the HUD-1, does it reflect that the borrower will

14  bring money to the closing?

15          A     Yes.

16          Q     And where is that?  What line?

17          A     303.

18          Q     And so it's, here it says cash, and then a

19  check box?

20          A     Yes.

21          Q     From the borrower.  And how much does it say

22  the borrower will provide?

23          A     $17,177.97.

24          Q     Now, there's handwritten language below that;

25  can you read that to the jury?

1      A    It says, "Need copy of certified funds prior

2  to disbursement."

3      Q    I'd like you to, like to show you -- no,

4  that's all right.

5           THE COURT:  Is that the certified check you

6  talked about earlier?  When you say --

7           THE WITNESS:  Yes.

8           THE COURT:  When you say certified funds?

9           THE WITNESS:  Yes.

10     Q    And again, why is that important to BNC that

11  he bring money to the closing?

12     A    Because it's required.

13     Q    Why would they require it?

14     A    I mean we're requiring on this loan, it looks

15  like it's approximately a 20 percent down payment and you

16  know, that basically, you have different programs or

17  different loans, one's going to be an 80 percent loan, one's

18  going to be 90 percent loan, one might be a 60 percent loan

19  so we're going to require different things so if this

20  borrower doesn't bring the down payment, then we have a 100

21  percent loan and they may not have qualified for that loan

22  amount.  Or that loan program.

23     Q    Would BNC have lent money under the terms of

24  this loan if the buyer didn't bring cash to the closing?

25     A    Not in this situation.  They may have but they

 1    would have to go through the whole loan process again.  So I

 2    don't really know without the whole loan file, but they would

 3    not have closed the loan.

 4         Q    Why not?

 5         A    If they did not bring the down payment.

 6         Q    So they wouldn't have done this loan?

 7         A    Correct.  Yes, correct, that's correct.

 8         Q    I mean that's ... and how does -- okay.  BNC

 9    requested the -- how does BNC insure that they actually did

10    bring money to the loan, to the closing?

11         A    I'm assuming that we get a copy of the

12    certified funds.

13         Q    All right.  We'll get past that assumption.

14         A    Because we're relying, we're relying on the

15    closing agent which are attorneys in the state of New York

16    and so we're relying on them.

17         Q    Right.  And was that in the instructions that

18    you looked at before?

19         A    The certified funds?

20         Q    Yes.  That they'd have to send them to you,

21    send you proof of them, that is.  And the language concerning

22    the HUD.

23         A    Well, it just basically says that has to

24    reflect all receipts and disbursements.

25         Q    All right.

1        A    Doesn't specifically say the down payment but

2   that's really what the -- so when we get the preliminary

3   HUD-1 which this is probably a final HUD-1, that would be

4   reflected on there.

5        Q    But there's a note on this, too?

6        A    Yeah.

7        Q    Okay.  You can't go mm-hmm, you have to say

8   yes or no.

9        A    I'm sorry, I'm sorry.

10       Q    Just because the court reporter's taking down

11  your answers.

12       A    Yes.

13       Q    I'd like to show you a document that's

14  admitted in evidence as Government Exhibit 7.91, and ask you

15  if you can identify that document.  And if you can't, you

16  can't.

17       A    Well, the first page is just a transmission

18  cover sheet from a fax, then this document is basically a

19  purchase -- contract for purchase and sale of real estate.

20       Q    For what property?  Where is the location?

21       A    Yes, 735 Burden Avenue, Troy, New York.

22       Q    And what's the sale price on that property?

23       A    35,000.

24       Q    If BNC had known that the property was being

25  sold for $35,000, would they have provided a mortgage of

1  $76,500 on this property?

2          A    No.

3          Q    Why not?

4          A    Because the appraised value would be the lower

5  of the appraisal -- the fair market value would be the lower

6  of the appraised value or the sales price and so therefore

7  would be $35,000 and if you did a loan for $76,000, that

8  would be over a 200 percent loan-to-value loan, and there's

9  no loan program that that would qualify for.

10         Q    I'd like you to go back to look at Government

11 Exhibit 7.4, which is the HUD-1.  Pull up page 2 of that.

12 Looking right above the signature line, could you read the

13 language that appears above the signature line of your

14 settlement agent?

15         A    Oh, of the settlement agent.  The HUD-1

16 settlement statement which I prepared is true, is a true and

17 correct account of this transaction.  I've caused or will

18 cause the funds to be disbursed in accordance with this

19 statement.

20         Q    All right.  And is that important to BNC?

21         A    Yes.

22         Q    I'd like you to look at the checks that were

23 actually distributed in this.  Could you look at Government

24 Exhibit 7.5.  I'm going to hand it to you.  And if you could

25 put -- yes, thank you.  Can you identify what that document

1    is?

2              A     Looks like a check made to Brian Haskins in

3    the same amount that was due from him to close this loan.

4              Q     All right.  Could you pull up Page 1 of the

5    HUD-1.  And you could zoom in on the bottom left-hand corner.

6    The amount that the borrower was supposed to bring in is how

7    much?

8              A     $17,177.97.

9              Q     And there's a Xerox copy of a certified check

10   for 17,000 -- for how much?

11             A     $17,177.97.

12             Q     Do you know if that check was actually ever

13   used, the money involved in that check was ever actually

14   used?

15             A     I do not know.

16             Q     All right.  To whom -- who do you rely on to

17   know that it's used?

18             A     The closing agent.

19             Q     I'd like to hand you a document that's

20   previously been marked and admitted in evidence as Government

21   Exhibit 7.6.  If you could pull that up, please.  Can you

22   identify what this document is.

23             A     It's a check made to Brian Haskins from

24   Michael Bouchard.

25             Q     If BNC had known that instead of receiving

1    $17,000, Brian -- from Brian Haskins, the settlement agent

2    was actually providing $33,000 to Brian Haskins, would you

3    have closed -- allowed this loan to close?

4              A    No.

5              Q    Why not?

6              A    Because it wouldn't have qualified under our

7    underwriting guidelines.

8              Q    Looking at the HUD-1, which was sent to your

9    company, does that accurately reflect the disbursements that

10   were made at closing?

11             A    No.

12             MR. OLMSTED:  I don't know when you want us to

13   break, your Honor.  I have --

14             THE COURT:  How about right now?

15             MR. OLMSTED:  Okay.

16             THE COURT:  See you in an hour, members of the

17   jury.

18             THE CLERK:  Court stands in recess.

19             (Luncheon recess, 12:40 p.m. to 1:45 p.m.)

20             (Open Court, Jury Out.)

21             THE COURT:  Before we bring the jury in, I

22   want to address an issue.  There's been a request by the

23   defense to not have court on Monday because of the death of

24   your aunt?

25             THE DEFENDANT:  Correct, your Honor.

1          THE COURT:  Okay.  I got into a problem,

2    you've got 12 witnesses already lined up to come?

3          MS. THOMSON:  Yes, your Honor.

4          THE COURT:  I looked up, it's Sister Clara

5    Gilmartin is your aunt, is that correct?

6          THE DEFENDANT:  (Gesturing affirmatively.)

7          THE COURT:  Okay.  My sympathy to you, but it

8    says the calling hours are going to be on Sunday, and there's

9    going to be a service after the calling hours and I think,

10   you know, with the weekend ahead of you, it should give you

11   plenty of time to share time with your relatives and

12   whatever.  So I'm going to deny your application, sir.  All

13   right.  Bring the jury in, please.

14              (Jury Present, 1:46 p.m.)

15         THE COURT:  Okay, the jury's back.

16         MR. OLMSTED:  Mr. Monahan, retake the stand.

17         THE COURT:  You may proceed, sir.

18         MR. OLMSTED:  Thank you, your Honor.

19    Q    Mr. Monahan, I'd like to pick up where we left

20   off but to start with a different closing, a different

21   property, all right?

22    A    Okay.

23    Q    Take you through some of the documentation

24   that was provided to BNC Bank.  I'm going to hand you a

25   document that's previously been marked and admitted as

 1    Government Exhibit 8.4.  Can you tell the jury what that

 2    document is?

 3              A    It's a HUD-1.

 4              Q    And what property does it relate to?

 5              A    262 Colonie Street, Albany, New York.

 6              Q    And does it relate to a mortgage that was

 7    provided by BNC?

 8              A    Yes.

 9              Q    What is the date of that closing?  I think you

10    could look on the signature page on the second page.  You

11    don't have to go there.

12              A    March 8th, 2005.

13              Q    And what's the sales price that is recited on

14    that HUD?

15              A    $80,000.

16              Q    And what is the mortgage amount?

17              A    $72,000.

18              Q    And then scroll down just a little bit.  And

19    is there a check mark next to the $72,000?

20              A    Yes.

21              Q    Prior to this closing, did BNC give the

22    Bouchard firm instructions on how to handle the closing?

23    Well, let me ask you this.  I'm going to give you Government

24    Exhibit 8.9, and ask if you can recognize that document.  Do

25    you recognize that document?

1          A     Yes.

2          Q     What is that?

3          A     Well, it's a little different than before

4    because it also has a closing authorization letter, which

5    would come from the funding department at BNC and then it has

6    what we've looked at before which was the general closing

7    instructions and the specific closing instructions.

8          Q     And where do they come from within BNC?

9          A     They're sent through the loan documentation

10   department.

11         Q     And that's the first two pages?

12         A     No, no, the first two pages, the --

13         Q     Okay.  Explain it to the jury.

14         A     Pardon me?

15         Q     Explain each page to the jury.

16         A     On the second document, correct?  Second

17   document?

18         Q     No, starting with the first page.

19         A     Sorry.  So the first document is the

20   settlement statement.

21         Q     Oh, no --

22               THE COURT:  That's the closing authorization

23   letter, isn't it?

24         Q     I'm just talking about 8.9.

25         A     Closing authorization letter is basically a

1    document that the funding department creates and it really

2    should tie in to the closing instructions which follow

3    thereafter.

4         Q    All right.  And so the first two pages are the

5    closing authorization letter?

6         A    Correct.

7         Q    And then the remaining pages are the general

8    and specific closing instructions?

9         A    Correct.

10        Q    Does it -- do these authorization letters and

11   closing instructions require a down payment, earnest money at

12   the time of closing?

13        A    Well, according to the HUD-1, it does.

14        Q    All right.  And looking at the first page of

15   the closing authorization letter, at the bottom, number 5?

16        A    Yes, proof of funds brought to close, copy of

17   cashier's check.

18        Q    I'm going to hand you a document that's

19   previously been marked and is now admitted in evidence as

20   8.5.  Can you identify what that document is?

21        A    Yes, it appears to be the down payment or the

22   funds that they had to bring at closing from the borrower.

23        Q    And can you tell me the amount of that check?

24        A    Yes.  $13,709.18.

25        Q    Does the HUD-1 -- can you switch to the HUD-1,

1   please, which is 8.4.  Does the HUD-1 require the purchaser

2   to bring that cashier's check?

3            A    Yes.

4            Q    And the closing instructions require the

5   settlement agent to send a copy of that cashier's check to

6   BNC?

7            A    Yes, the closing authorization letter does.

8            Q    And looking at the bottom left-hand part of

9   the HUD-1, how much was the buyer supposed to bring to the

10  closing?

11           A    $13,709.16 -- I'm sorry, it's 18 cents.

12           Q    And is that the amount of the cashier's check?

13           A    Yes.

14           Q    Do you know whether that money was actually

15  used or whether just the check was shown, or don't you know?

16           A    I don't know, I would assume that it was used.

17           Q    Why would you assume that?

18           A    I'm assuming because that's standard

19  practices.

20           Q    All right.  Is it part of what the HUD says?

21           A    Yes.

22           Q    So did someone tell you it was used?

23           A    Yes, according to the HUD-1.

24           Q    Who told you?

25           A    Gabriel Solomon, Charter One Bank, and the

1   Bouchard Law Firm.

2          Q    All three of them?

3          A    Yes.  Since they all signed it.

4          Q    And above the Bouchard Law Firm signature, can

5   you read the -- you don't have to go there, can you read the

6   statement that appears right before the signature on the

7   Bouchard Law Firm's signature?

8          A    Yes.

9               THE COURT:  What exhibit are you on right now?

10              MR. OLMSTED:  I'm showing him the bottom of

11  Exhibit 8.4.

12         A    "The HUD-1 settlement statement which I have

13  prepared is a true and correct account of this transaction.

14  I've caused or will cause the funds to be disbursed in

15  accordance with this statement."

16         Q    Okay.  And your instructions, which you've

17  talked about in connection with -- that are on Exhibit 8.9,

18  do they require that the HUD-1 be accurate?

19         A    Yes.

20         Q    Why?

21         A    If they're not accurate, then the loan should

22  have not been made.

23         Q    Show you a document that's been previously

24  marked and admitted in evidence as Government Exhibit 8.6.

25  No, stay where you are.  What is that document?

1          A    This document is a check from Michael Bouchard
2     to Gabriel Solomon.
3          Q    Could you put up 8.6 on the other side.  How
4     much is that check for?
5          A    $27,140.82.
6          Q    If you had known that instead of bringing to
7     the closing $13,000 plus, the buyer was actually walking away
8     from the closing with a check for $27,000 plus, would
9     Fremont -- excuse me, would BNC have allowed this loan to
10     close?
11          A    No.
12          Q    Why not?
13          A    Because it did not meet -- probably would not
14     have met the guidelines of the loan program.
15          Q    When you say probably, doesn't it -- he's
16     taking $27,000 out without telling you?
17          A    Yes, I mean it wouldn't have met it.
18          Q    Okay.  Because if you're -- okay.
19          A    Because it's required, requiring down payment
20     and if -- and that's not what happened.
21          Q    How much is the seller supposed to receive on
22     the bottom right-hand corner of the HUD-1?
23          A    $75,205.47.
24          Q    Is it important that the seller actually
25     receive the money?

1           A    Yes.

2           Q    I'd like to show you a document that's

3    previously been admitted in evidence as Government

4    Exhibit 8.91.  Can you identify what that document is?

5           A    It's a contract for purchase and sale of real

6    estate.

7           Q    And what's the sales price that appears on

8    that contract?

9           A    $40,000.  It actually has two.  It's, in

10   writing it's 35,000, and then it's been crossed out and

11   initialed and input was $40,000.

12          Q    And on the HUD-1, what was the sale price?

13          A    $80,000.

14          Q    Had you known -- had BNC known that the

15   property was being sold that day for either 35 or $40,000,

16   would you have issued the loan based on $80,000 sale price?

17          A    We would not have approved a $72,000 loan.

18          Q    And is that difference important both to BNC

19   and to Lehman Brothers?

20          A    Yes.

21          Q    Okay.  I'm going to take you through several

22   other -- if I can retrieve those.  I'm going to take you

23   through some other transactions that appear on the

24   indictment.  Starting with Exhibit 2.9, which is in evidence.

25   If you'd pull up 2.9.  What is this document?

1          A     There's several documents here.  There's a

2     final conditional loan approval.  There's a general closing,

3     there are general closing instructions and there are specific

4     closing instructions.

5          Q     And what is the purpose of these documents?

6          A     Well, again, the general closing -- well,

7     first one?  First one is the conditional loan approval.

8          Q     Yes.

9          A     Is something that's really an in-house

10    document that shows the final loan approval, that's been

11    input into the loan origination system.  The general closing

12    instructions are similar to what we've looked at before which

13    is the instructions to the closing agent, you know, what

14    needs to be -- what's required to close the loan.  Same with

15    the specific closing instructions.

16         Q     And then following that, you have the general

17    and the specific closing instructions.  Who's the borrower?

18         A     I'm sorry, and then there's also a temporary

19    payment coupon letter.

20         Q     And what is that?

21         A     It's basically your stub for your payment

22    prior to getting it from the loan servicer.

23         Q     Looking at the next to the last page of that

24    document.  All right.  In all bold, what is that?  You don't

25    have to read it entirely, what does that bold paragraph say?

1        A     Basically says that the final HUD-1 must

2    accurately reflect all receipts and disbursements related to

3    the loan.  And if not, then the loan shouldn't have been made

4    and they may have to redraw and resign new loan documents.

5        Q     I'd like to show -- I'm sorry, you were

6    saying?

7        A     I was saying, in other words, the loan

8    shouldn't close if there's a material change.

9        Q     Try to keep your voice up just so they can

10   hear.

11       A     Sorry.

12       Q     I'm showing you Government Exhibit 2.4.  What

13   is that exhibit?  It's admitted in evidence already.

14       A     This is a HUD-1.

15       Q     Who is the purchaser on that HUD-1?

16       A     The borrower is -- I can't say the name,

17   Lelautie Ramroop.  This is related to a different property.

18       Q     Oh, is it, 2.9?

19       A     Than the other document, yes.

20       Q     Then let's focus on this one.  On 2.4, who is

21   the seller?

22       A     Oh, 2.4, the seller is Joann Sifo.

23       Q     And what is the contract price?

24       A     $88,000.

25       Q     And so what is the mortgage amount?

1          A      $79,200.

2          Q      Okay.  Can you go to the bottom right-hand

3     corner -- left-hand corner of that document.  How much does

4     it say the buyer will bring to the closing?

5          A      $16,551.45.

6          Q      Does it say that the buyer will get any money

7     from the closing?

8          A      No.

9          Q      I'm going to hand you a document previously

10    marked as Government Exhibit 2.6.  If you could pull up 2.6.

11    What is that document?

12         A      This is a check from Michael Bouchard escrow

13    account to Lelautie Ramroop.

14         Q      If you had known that instead of bringing

15    money to the closing, the purchaser would receive $28,000

16    plus from the closing, would BNC have allowed this loan to

17    close?

18         A      No.

19         Q      I'm going to hand you a document that's marked

20    Exhibit 2.91.  Can you identify what that is?

21              THE COURT:  Just back up.  The last check, was

22    that the 28,458.59?

23              MR. OLMSTED:  Yes, it was.  Yes, it was, your

24    Honor.

25              THE COURT:  What exhibit are we on now?

1          MR. OLMSTED:  We're still on 2.91, your Honor.

2     A    This is a contract for purchase and sale of

3 real estate.

4     Q    And for what property?

5     A    For 27 Catherine Street.

6     Q    And who is the seller?

7     A    Seller is -- that's the broker.  It's Joann

8 Sifo.

9     Q    And what is the sales price?

10     A    $44,000.

11     Q    And if, excuse me, if BNC had known that the

12 property was being sold by Joann Sifo for $44,000, would it

13 have authorized a loan for $79,200?

14     A    No.

15     Q    Retrieve those documents, please.  Like to

16 move to another property, identified in this.  We're going to

17 move from 2 to 3.  I'd like to show you an exhibit previously

18 marked as Government Exhibit 3.91.  3.91.  What is that

19 document?

20     A    It's a combination of the closing

21 authorization letter --

22     Q    Excuse me, did I -- I gave you 3.9, I'm sorry,

23 3.9.

24          THE COURT:  Not 3.91?

25          MR. OLMSTED:  Correct, I pulled up the wrong

1   document on the screen, your Honor, I misspoke.  What's that

2   document?

3           A    It's a combination of the closing

4   authorization letter, general closing instructions, and

5   specific closing instructions.

6           Q    And are these essentially the same as the

7   closing instructions and the authorization letters about

8   which you've already testified with respect to the other

9   properties?

10          A    Yes.

11          Q    All right.  And who is the borrower on this

12  property?

13          A    Brian Haskins.

14          Q    And what is the location of the property?

15          A    526 North Brandywine Avenue in Schenectady,

16  New York.

17          Q    All right.

18          A    Said it wrong.

19          Q    Those are the directions on how to handle the

20  closing?

21          A    Yes.

22          Q    Do they require an accurate HUD-1?

23          A    Yes.

24          Q    I'm going to hand you a Government Exhibit

25  3.4.  Can you identify that document?

1          A     This is a HUD-1.

2          Q     And who's the buyer?

3          A     Brian Haskins.

4          Q     And the location of the property?

5          A     526 North Brandywine Avenue.

6          Q     Can you show the contract price, the sales

7    price?

8          A     $92,000.

9          Q     And what is the mortgage amount?

10         A     $82,800.

11         Q     Looking at the bottom left-hand corner of the

12   document, how much is the buyer supposed to bring to the

13   closing?

14         A     $17,725.44.

15         Q     Is the buyer supposed to take away money from

16   the closing?

17         A     No.

18         Q     Handing you Government Exhibit 3.6.  Can you

19   identify that document?

20         A     It's a check from Michael Bouchard to Brian

21   Haskins.

22         Q     For how much?

23         A     For, excuse me, $30,700 -- $30,774.56.

24         Q     Now referring back to --

25               THE COURT:  What exhibit number was that you

1    just referred to?

2                    MR. OLMSTED:  3.6, your Honor.

3                    THE COURT:  Thank you.

4            Q    Referring back now to the HUD which is

5    Exhibit 3.4?

6            A    Yes.

7            Q    How much was the defendant supposed to bring?

8            A    $17,725.44.

9            Q    So if BNC had known, instead of bringing

10   $17,000 plus he was getting a check for $30,774, would you

11   have -- would BNC have allowed this loan to go forward?

12           A    No.

13           Q    Why not?

14           A    Because it wouldn't be the loan programs --

15   program.  In fact the closing authorization letter shows that

16   it was a 90 percent loan-to-value loan so therefore there was

17   a required down payment.

18           Q    Okay.  I'm going to show you a document now

19   that's marked as 3.91.  Can you tell the jury what that

20   document is?

21           A    Contract for purchase and sale of real estate.

22           Q    What property -- what's the location of the

23   property?

24           A    526 to 528 North Brandywine Avenue.

25           Q    And how much, what's the sale price?

1          A     $44,000.

2          Q     And who's the seller of that property?

3          A     Mary Shaw.

4          Q     Comparing that to the HUD-1, which is

5     Government Exhibit 3.4, who is the seller on the property?

6          A     Mary Ann Shaw and Muriel Tupacz.

7          Q     If you had known that the property was being

8     sold for the amount shown on the sales contract which was

9     what amount again?

10         A     $44,000.

11         Q     Would you have authorized a loan that is

12    reflected on the HUD-1?

13         A     No.

14         Q     Let me collect those.

15               THE COURT:  And that was what, 82,000?

16               THE WITNESS:  Yes, 82,800.

17               THE COURT:  Okay.  And this property was

18    44,000, right?

19               THE WITNESS:  That's the purchase price.

20               THE COURT:  Okay, all right.  Thank you.

21         Q     Turning to the next property relating to

22    Count 5 -- excuse me, 4.  I'm going to show you an exhibit

23    previously -- well, I'll bring them all up at once.  Show you

24    an exhibit marked as Government Exhibit 4.9.  Can you

25    identify that document?

1          A    This is a closing authorization letter,

2    specific closing instructions, general closing -- and general

3    closing instructions.

4          Q    All right.  And is that similar to the

5    documents that you have already testified about with respect

6    to the earlier counts?

7          A    Yes.

8          Q    And in each case, does it require an accurate

9    HUD-1?

10         A    Yes.

11         Q    And in each case does it require that the down

12   payment be brought in cash, that there be a down payment?

13         A    Yes.

14         Q    Okay.  And that all that be reflected

15   truthfully on the HUD-1?

16         A    Yes.

17         Q    Hand you an exhibit marked as 4.4; can you

18   identify what that document is?

19         A    HUD-1.

20         Q    And does it describe a sales price?

21         A    Yes.

22         Q    What is the sales price?

23         A    $90,000.

24         Q    And who was the purchaser?

25         A    Joseph --

1        Q    The borrower.

2        A    Joseph Ruiz.

3        Q    And what is the name of the seller?

4        A    National City Home Loan Services.

5        Q    And what's the amount of the mortgage?

6        A    $81,000.

7        Q    How much money was the purchaser supposed to
8    bring to the closing?

9        A    $17,146.27.

10        Q    I'm going to hand you a document that's been
11    marked as Government Exhibit 4.6 and already admitted in
12    evidence.  Can you identify what that document is?

13        A    It's a check to -- well, it's copy, can't
14    really tell because it's not a check.

15        Q    Is it a check stub?

16        A    I don't know.

17        Q    Okay.  If you don't know, that's fine.  Let me
18    ask you this then, it's in evidence.  If the evidence shows
19    that a check was written to Joseph Ruiz for $42,677 instead
20    of him actually bringing $17,146 to the closing, would
21    that -- would BNC have allowed that mortgage to close?

22        A    No.

23             MR. CASTILLO:  Objection to the form of the
24    question.

25             THE COURT:  Well, it's -- it's already in

1   evidence, right?

2                   MR. OLMSTED:  Yes, it is.

3                   THE COURT:  The exhibit?

4                   MR. CASTILLO:  Well, he's asking if, that's my

5   objection.

6                   THE COURT:  Sustained as -- rephrase your

7   question, please.

8        Q    Well, let me just ask this.  Putting aside the

9   exhibit, the check stub exhibit, if Joseph Ruiz did not bring

10  $17,000 to the closing, would you have allowed this, would

11  BNC have allowed this mortgage to close?

12       A    No.

13       Q    If Joseph -- in addition to that, if Joseph

14  Ruiz received over $30,000, would you have allowed this

15  mortgage to close?

16       A    No.

17       Q    I'm going to show you a sales contract,

18  Government Exhibit 4.91.  Can you identify what that document

19  is?

20       A    Contract for purchase and sale of real estate.

21       Q    And what is -- what's the property location?

22       A    27 St. Mary's Avenue.

23       Q    And what's the sales price?

24       A    32,000 -- $32,552.

25       Q    And had BNC known -- excuse me. Had BNC known

1    that the -- that there was a contract for sale for 32,552,

2    would you have authorized the loan that appears on the HUD of

3    $81,000?

4         A    No.

5         Q    Why not?

6         A    Because the fair market value would be

7    $32,552.

8         Q    Okay.  Turning to the exhibits relating to

9    Count 5, I'd like to show you a document already in evidence,

10   Government Exhibit 59 -- excuse me, 5.9.  What is that

11   document?

12        A    It's a combination of general closing

13   instructions and specific closing instructions.

14        Q    And is the text of those documents comparable

15   to the text of the closing instructions, the general closing

16   instructions and the specific closing instructions you've

17   testified about with respect to the other counts?

18        A    Yes.

19        Q    And in each case, does it require that the HUD

20   be provided, that it be accurate, and that it reflect that

21   there was cash brought to the closing?

22        A    It required -- requires that they be accurate

23   reflecting all receipts and disbursements.

24        Q    All right.  And that elsewhere it requires

25   that there be proof that the money was -- that all the

 1    receipts were obtained, is that right?

 2              A    Yes.

 3              Q    I'm going to hand you Government Exhibit 5.4.

 4    Can you tell the jury what that document is?

 5              A    It's a HUD-1.

 6              Q    Who's the purchaser?

 7              A    Beesham Ramroop.

 8              Q    And who's the seller?

 9              A    John Brunette.

10              Q    And what is the location of the property?

11              A    779 Eastern Avenue.

12              Q    And what is recited as the sales price?

13              A    $85,000.

14              Q    And according to -- what is the loan amount?

15              A    $76,500.

16              Q    And moving down to the bottom of that

17    document, how much money was supposed to be brought by the

18    purchaser to the closing?

19              A    $15,496.64.

20              Q    I'm going to hand you Government Exhibit 5.6,

21    already in evidence, and ask if you can identify that

22    document.

23              A    Check from Michael Bouchard's escrow account

24    to Beesham Ramroop.

25              Q    And how much was that for?

1          A    $31,203.36.

2          Q    Had BNC known that, instead of bringing

3    $15,496 to the closing, actually Beesham Ramroop would leave

4    the closing with $31,203.36 --

5               THE COURT:  What is the figure again?

6          Q    $31,203.  If you had known that, would you

7    have allowed, would BNC have allowed this loan to close?

8          A    No.

9          Q    And why is that again?

10         A    Because it wouldn't have met the loan program.

11         Q    I'm going to show you a document marked as

12   5.91.  Can you identify what that document is?

13         A    Contract for purchase and sale of real estate.

14         Q    And what does it show -- where is the location

15   of the real estate?

16         A    779 Eastern Avenue.

17         Q    And who's the seller?

18         A    John Brunette.

19         Q    And what's the sales price?

20         A    $37,000.

21         Q    If BNC had known the sales price of this

22   property was $37,000, would it have authorized a loan in the

23   amount of $76,500?

24         A    No.

25         Q    And again, why not?

1          A     Because it wouldn't have met the loan program.

2          Q     What do you mean by that?  Just explain.

3          A     Because the loan program, because the maximum

4     you'd ever lend is 100 percent, and this would make it close

5     to 200 percent.

6          Q     Just to be clear, there are loans you're

7     saying that exist at BNC for 100 percent loan of the value?

8          A     Yes.

9          Q     Are -- are any of those involved in this case?

10          A     Not that I -- I wouldn't know.

11          Q     Of the BNC ones that you reviewed in

12     preparation of your trial --

13          A     No, because they always required a down

14     payment.

15          Q     Did you do 100 percent on purchases of

16     multi-family properties?

17          A     I don't believe so, I think 90 percent was

18     probably the maximum.

19          Q     All right.  I'd like to turn to the documents

20     related to Count 6.  Again, starting with 6.9.  Can you

21     identify these documents?

22          A     It's several documents, specific closing

23     instructions, general closing instructions, and the contract

24     for purchase and sale of real estate.

25          Q     Okay.  Now, the contract for sale, purchase of

1    real estate, in that document, what's the sale price?

2         A    $40,000.

3         Q    All right.

4              THE COURT:  40,000?

5              THE WITNESS:  40,000, yes.

6         Q    Yeah, I think that -- I may have given you

7    6.91, as well as 6.9, but okay.  So the closing instructions,

8    the general and specific closing instructions, are they

9    comparable in language and requirements to the closing

10   instructions that you've testified about already with respect

11   to the earlier counts?

12        A    Yes.

13        Q    All right.  I'd like to show you the document

14   that's been previously marked as Government Exhibit 6.4.  Can

15   you tell the jury what that is?

16        A    It's the HUD-1.

17        Q    And what -- for what property, what's the

18   location of the property?

19        A    33 Jefferson Street, Troy, New York.

20        Q    Who's the borrower?

21        A    Rosely Dafna.

22        Q    And what is the contract price?

23        A    $75,000.

24        Q    And what's the mortgage amount?

25        A    $67,500.

1                    THE COURT:  And what was the purchase amount?

2                    THE WITNESS:  $75,000.

3            Q     According to the -- according to the HUD-1,

4      how much money was the purchaser supposed to bring to this

5      closing?

6            A     14,2 -- there you go, $14,263.53.

7            Q     I'm going to hand you a document that's marked

8      Government Exhibit 6.6.  Can you identify what this document

9      is?

10           A     It's a check from Michael Bouchard's escrow

11     account to Rosely Dafna.

12           Q     So if BNC had known that instead of bringing

13     the $14,000 that is reflected in the HUD to the closing,

14     instead Rosely Dafna would be written a check for $21,736,

15     would BNC have allowed the loan to go forward?

16           A     No.

17           Q     Going back to the HUD-1, how much -- what's --

18     how much money was supposed to be paid to the seller?  Bottom

19     right-hand corner of the HUD-1 which is Exhibit 6.4.

20                   THE COURT:  What's the question, how much?

21           Q     How much is supposed to be paid to the seller?

22           A     I may be incorrect on one number but

23     $74,638.30.

24           Q     I'm going to hand you a document that's been

25     previously marked and admitted as Government Exhibit 6.3.

1    Can you identify that document?

2          A    This is a check from Michael Bouchard escrow

3    account to Jerald Palma for $28,838.30 [sic].

4          Q    Remind the jury who Jerald Palma is.

5          A    He's the seller of the property.

6          Q    If BNC had known that instead of sending him

7    $74,000, he was only getting $20,800, would BNC have allowed

8    this closing to go forward?

9          A    No.

10          Q    I'd like to turn to the documents relating to

11    the exhibit relating to Count 9.  Show you a document that's

12    previously been marked and admitted as Government

13    Exhibit 9.9.  Can you tell the jury what that is?

14          A    Closing authorization letter, general closing

15    instructions, and specific closing instructions.

16          Q    And who's the borrower?

17          A    Ronald Dawson, III.

18          Q    And what's the property address?

19          A    8 Clemenshaw Avenue in Troy, New York.

20          Q    And after the closing authorization, are there

21    any general and specific instructions on the closing?

22          A    Yes.

23          Q    And are they in substance -- here, let me

24    just -- that goes somewhere else.  Do they require accurate

25    HUD-1 to be sent to the BNC?

1          A    Yes.

2          Q    And the funds to be delivered at the closing

3     by the buyer?

4          A    Yes.

5          Q    I'd like to show you a document that's

6     previously been marked and admitted into evidence as

7     Government Exhibit 9.4.  What is that?

8          A    This is the HUD-1 for the same property.

9          Q    And what does it show the sales price to be?

10         A    $135,000.

11         Q    And what is the mortgage amount?

12         A    $114,750.

13         Q    And looking at the bottom left-hand corner of

14    the document, how much money was Ronald Dawson supposed to

15    bring to the closing?

16         A    $26,623.82.

17              THE COURT:  26,6 what?

18              THE WITNESS:  $623.82.

19         Q    I'd like to hand you Government Exhibit 9.6.

20    Can you identify that document?

21         A    It's a check from Michael Bouchard escrow

22    account to Ronald Dawson.

23         Q    Now, if BNC had known that instead of bringing

24    money to the closing, actually Ronald Dawson received a check

25    for $24,000, in excess of $24,000, would BNC have allowed the

1    loan to close?

2              A    No.

3              Q    Is that payment disclosed anywhere on the HUD?

4              A    The $24,739?

5              Q    Yes.

6              A    No.

7              Q    Should it have been if it was paid out of the

8    proceeds of the loan proceeds?

9              A    Yes.

10             Q    I'd like to turn to the documents related to

11   Count 10.  And I bring you and put while I'm up there, I'm

12   handing you Exhibit 10.9.  Can you identify that document to

13   the jury?

14             A    Closing authorization letter, general closing

15   instructions and specific closing instructions.

16             Q    And are they in substance the same as the

17   closing authorization letter, the general closing

18   instructions and the specific closing instructions that you

19   testified about with respect to all of the other counts?

20             A    Yes.

21             Q    What property do they relate to?

22             A    5 Backus Street.

23             Q    And who is the borrower on that property?

24             A    Brian Haskins.

25             Q    And who is the seller?  It may not be in the

1    instructions.  What is the purchase price?

2              A    $70,000.

3              Q    I'm going to hand you Government Exhibit 10.4.

4    Can you identify that document?

5              A    This is the HUD-1 for the same property.

6              Q    And what is -- what is identified as the

7    purchase price on that HUD-1?

8              A    $70,000.

9              Q    And what is the loan amount?

10             A    $63,000.

11             Q    And does it disclose that the buyer has to

12   bring money to the closing?

13             A    Yes.

14             Q    How much?

15             A    $14,078.97.

16             Q    I'm going to hand you Government Exhibit 10.6.

17   Can you identify what that document is?

18             A    It's a check from Michael Bouchard escrow

19   account to Brian Haskins.

20             Q    In the amount of what?

21             A    $15,921.03.

22             Q    Had BNC known that Brian Haskins was not

23   bringing money to the closing but in fact would leave the

24   closing with $15,921, would BNC have allowed this loan to

25   close?

1          A     No.

2          Q     And again, why not?

3          A     Because the HUD-1 wasn't accurate and it would

4    not have met the underwriting guidelines.

5          Q     I show you a document that's admitted in

6    evidence as Government Exhibit 10.91.  Can you identify what

7    that is?

8          A     It's the contract for purchase and sale of

9    real estate.

10         Q     And who's the seller?

11         A     Sharon Latal.

12         Q     And who is the seller on the HUD that you

13   identified as Exhibit 10.4?

14         A     Sharon Latal.

15         Q     What is the sales contract price on -- that

16   appears on Government Exhibit 10.91?

17         A     $41,000.

18         Q     And what is the contract price that appears on

19   the HUD-1 that was sent to you by the settlement agent?

20         A     $70,000.

21         Q     And had you known that the property was being

22   sold for $41,000, would BNC have allowed this loan to close?

23         A     No.

24         Q     I'd like to turn to Count 11, and I'm bringing

25   you Government Exhibit 11.9.  Can you identify that document?

1          A     This is the general closing instructions and

2    specific closing instructions.

3          Q     And do they require the same accuracy and

4    activity that was -- you testified about with respect to the

5    other closing instructions?

6          A     Yes.

7          Q     And what property does it relate to?

8          A     11 Charles Street.

9          Q     And who is the borrower?

10         A     Scott Brault.

11         Q     Like to show you a document marked as

12   Exhibit 11.4.  Can you identify that document?

13         A     HUD-1.

14         Q     And who is the borrower?

15         A     Scott Brault.

16         Q     What is the location?

17         A     11 Charles Street.

18         Q     And what is the contract price?

19         A     $90,000.

20         Q     And what is the loan amount?

21         A     $81,000.

22         Q     I'm going to show you a document, you may not

23   be able to identify it, show you a document, 11.6.  Which is

24   in evidence.  Can you identify that document?

25         A     No.

1          Q    All right.  Looking back on the exhibit of

2    11.4, the final HUD.  If BNC had known that instead of

3    bringing $15,210 to the closing, Scott Brault would have

4    received 27,000, in excess of $27,000 from the closing, would

5    you have -- would BNC have allowed this loan to go forward?

6          A    No.

7          Q    I'd like to turn to Count 12.  Looking at

8    Exhibit 12.9.  What is that document?

9          A    A combination of the closing authorization

10   letter, general closing instructions, and specific closing

11   instructions.

12         Q    And are they by text the same as the -- or I

13   mean what property do they relate to?

14         A    506 18th Street.

15         Q    Eighteenth or Eighth?

16         A    I'm sorry, 506 Eighth Street.

17         Q    All right.  And who's the borrower?

18         A    Gary Cuoco.  I don't know how to pronounce it.

19         Q    Cuoco.  He's not here, we can settle on that

20   pronunciation unless we're asked.  Purchase price, what's the

21   purchase price?

22         A    $85,000.

23         Q    And what's the loan amount?

24         A    $76,500.

25         Q    I'd like you to turn to Government

1    Exhibit 12.4.  What is that document?

2              A    It's the HUD-1 for the same property.

3              Q    Does it recite what the purchase price is?

4              A    $85,000.

5              Q    And the mortgage amount?

6              A    $76,500.

7              Q    All right.  And down on the bottom left-hand

8    corner, does it say how much the buyer will bring to the

9    closing?

10             A    $14,478.63.

11             Q    And by sending this HUD-1 to BNC at the end of

12   the closing, is the settlement agent certifying that that

13   money was in fact brought to the closing?

14             A    Yes.

15             Q    I'd like to show you a document marked as

16   Government Exhibit 12.6.  Can you identify that document?

17             A    Check from Michael Bouchard escrow account to

18   Gary Cuoco.

19             Q    Had BNC known that, that the purchaser, Gary

20   Cuoco, was receiving $26,000 plus, rather than bringing in

21   money to the closing, would you have allowed this to go

22   forward?

23             A    No.

24             Q    And is that disbursement reflected anywhere on

25   the HUD-1?

1          A     No.

2          Q     I'd like to show you a document marked as

3    Government Exhibit 12.91.  Can you identify that document?

4          A     It's a contract for purchase and sale of real

5    estate.

6          Q     And what does it recite the sales price to be?

7          A     $45,000.

8          Q     And what is the sales price that's recited on

9    the HUD-1?

10         A     $85,000.

11         Q     And had you known that there was a contract

12   for sale for $45,000 for this property on this day, would BNC

13   have authorized the mortgage that is reflected in the HUD-1?

14         A     No.

15         Q     I'd like to turn to Count 13.  Handing you

16   Exhibit 13.9, can you identify what that is?

17         A     Closing authorization letter, general closing

18   instructions and specific closing instructions.

19         Q     And by substance, do they require -- and

20   language do they require the same things as the prior general

21   and specific closing instructions and closing authorization

22   letters about which you've already testified on the earlier

23   counts?

24         A     Yes.

25         Q     And what property does this relate to, what

1    location?

2            A    385 Elk Street.

3            Q    And who was the purchaser?

4            A    Or the borrower, Gary Cuoco again.

5            Q    And what is the purchase price?

6            A    $85,000.

7                 THE COURT:  Where is that, 385 Elk Street,

8    where?

9                 THE WITNESS:  In Albany, New York.

10           Q    And what is the loan amount?

11           A    It is $76,500.

12           Q    Handing you 13.4.  Can you identify that

13   document?

14           A    This is the HUD-1.

15           Q    What property --

16           A    Same property, 385 Elk Street, Albany,

17   New York.

18           Q    So is this the HUD-1 that is called for in the

19   instructions that you've just identified in Exhibit 13.9?

20           A    Yes.

21           Q    And does that HUD-1, what does it recite the

22   sales price to be?

23           A    $85,000.

24           Q    And the mortgage amount?

25           A    $76,500.

1      Q    And how much is the purchaser, the borrower

2 supposed to bring to the closing?

3      A    $14,590.15.

4      Q    I'm handing you Government Exhibit 13.6.  Can

5 you identify that?

6      A    This is a copy of the check from Michael

7 Bouchard escrow account to Gary Cuoco.

8      Q    And what is the amount?

9      A    $28,259.85.

10      Q    Had BNC known that instead of bringing to the

11 closing $14,590, Mr. Cuoco would have a check issued to him

12 in the amount of $28,259, would BNC have allowed this loan to

13 close?

14      A    No.

15      Q    And why not?

16      A    Because the HUD-1 would be inaccurate and the

17 guidelines would not have been followed.  Or it would not

18 have met the underwriting guidelines.

19      Q    I'd like to show you Government Exhibit 13.91.

20 What is that?

21      A    This is a contract for purchase and sale of

22 real estate.

23      Q    And how much, what's the sales price on that

24 property?

25      A    $42,500.

1    Q    And what's the location of that property?

2    A    380 -- 385 Elk Street.

3    Q    So that's the same property we just were

4    talking about?

5    A    Yes.

6    Q    Had BNC known that this property was being

7    sold that day for $42,500 by the seller, would they have

8    authorized a loan of $76,500 to Mr. Cuoco?

9    A    No.

10    Q    Is any of this lower price disclosed anywhere

11    on a HUD to you?

12    A    No.

13    Q    I'd like to show you 14.9.  What is that?

14    A    This is the general closing instructions and

15    specific closing instructions.

16    Q    And are they in substance identical to the

17    closing instructions about which you've already testified

18    with respect to other properties?

19    A    Yes.

20    Q    And what property do they relate to?

21    A    10 Paulding Street.

22    Q    In Schenectady?

23    A    Schenectady, New York.

24    Q    And who's the borrower?

25    A    Borrower is Beesham Ramroop.

1          Q     What's the sales price?

2          A     Sales price is $85,000.

3          Q     And so what's the loan amount?

4          A     $76,500.

5          Q     Like to hand you Exhibit 14.4.  Can you tell

6     the jury what that document is?

7          A     The HUD-1.

8          Q     Relating to what property?

9          A     The same property.

10         Q     Which is 10 Paulding?

11         A     Yes.

12         Q     And what's the sales price?

13         A     $85,000.

14         Q     What's the mortgage amount?

15         A     $76,500.

16         Q     According to the HUD-1 that was sent to BNC,

17    how much money did the buyer bring to the closing in

18    collected funds?

19         A     $16,113.85.

20         Q     I'd like you to look at Exhibit 14.6.  What is

21    that document?

22         A     This is a check from Michael Bouchard escrow

23    account to Beesham Ramroop in the amount of $27,236.15.

24         Q     Bottom left-hand corner of the memo field,

25    what does it say?

1          A     Ramroop, 10 Paulding.

2          Q     And is that the address that's identified in

3     Government Exhibit 14.4?

4          A     Yes.

5          Q     All right.  If you had known that instead of

6     bringing a cashier's check to the closing, Beesham Ramroop

7     would have a check issued to him in the amount of $27,236.15,

8     would you have -- would BNC have allowed this loan to close?

9          A     No.

10         Q     Like to show you Government Exhibit 14.91.

11    What is that?

12         A     It's the contract for purchase and sale of

13    real estate for 10 Paulding Street.

14         Q     And what's the sale price?

15         A     $42,000.

16         Q     And had BNC known that the property was being

17    sold for $42,000, would it have issued a check -- I mean

18    would it have issued a mortgage in the amount disclosed on

19    the HUD-1, which is 14.4, Exhibit 14.4?

20         A     The problem on this one is I don't have the

21    last page, so I don't know the date because I'm comparing

22    dates to make sure they're --Couple years before that.

23         Q     Who's the seller on that property?

24         A     The seller is -- the seller's not filled in

25    also.

1          Q     Is there a fax sheet on the fax dates on the

2    top?

3          A     Yes.

4          Q     What's the fax date on the top?

5          A     February 15th, 2005.

6          Q     And that's -- all right.  If you had known

7    that the property was sold on or about February 15th of 2005

8    for that amount, would you have authorized the loan of

9    $76,500 to close on March 28 of 2005?

10         A     No.

11         Q     Why not?

12         A     Because the fair market value would have been

13   the lower of the purchase price.

14         Q     That's the amount you would have relied on to

15   issue the loan?

16         A     Or the appraised amount, it would be the lower

17   of the two.

18         Q     And looking, just to go back to the HUD-1 for

19   a moment which is 14.4, page 2 at the bottom, is it dated,

20   the signatures?

21         A     Yes.

22         Q     What date?

23         A     March 20th, 2005 -- no, March 28, 2005.

24         Q     All right.  Like to move to Count 15.  I'm

25   handing you Exhibit 15.9.  Could you identify what that is?

1          A     Specific closing instructions, closing agent's

2     acknowledgment, a closing authorization letter, a memorandum

3     showing where you should wire the mortgage proceeds to, a

4     loan document worksheet, and a final conditional approval,

5     and general closing instructions.

6          Q     And do the closing instructions contained in

7     that document repeat the same closing instructions about

8     which you've already testified?

9          A     Yes.

10          Q     Do they require that the HUD-1 be accurate and

11     accurately disclose the disbursements made with the mortgage

12     funds?

13          A     Yes.

14          Q     Does it also require that any money brought to

15     the closing should be brought in cash, or in collected funds?

16          A     Yes.  Yes, it does.

17          Q     Like to show you Exhibit 15.4.  Can you

18     identify that to the jury?

19          A     This is a HUD-1 on the same property which is

20     930 Strong Street.

21          Q     And what -- who's the borrower?

22               THE COURT:  Schenectady?

23               THE WITNESS:  Yes.

24          Q     And who is the borrower?

25          A     The borrower is Lelautie --

1          Q     Try this, Lelautie.

2          A     Lelautie Ramroop.

3          Q     And what is the sales price?

4          A     $80,000.

5          Q     And what is the mortgage amount?

6          A     $72,000.

7          Q     And how much money is Lelautie Ramroop

8    supposed to bring to the closing?

9          A     $14,499.88.

10         Q     All right.  It's been awhile so could you

11   remind the jury why you need somebody to bring money to the

12   closing?

13         A     Because that's their down payment on the

14   purchase of the home.

15         Q     And why do you require a down payment?

16         A     Well, we required it, according to this HUD-1,

17   there was a required down payment because it didn't meet the

18   guidelines to have 100 percent mortgage.

19         Q     Okay.  So why do you want a down payment?  I

20   mean what's the difference between having a down payment and

21   not having a down payment?

22         A     Well, you want a down payment for certain

23   borrowers which is the vast majority of the population.

24         Q     Why?

25         A     So there's skin in the game, otherwise they

1    may not -- they're not as -- they're not as motivated to make

2    their payments.

3            Q    Skin in the game.  Could you just describe

4    that?  Because they've heard that phrase a couple times and

5    they may not be in your business to know what it means.  What

6    do you mean by skin in the game?

7            A    Well, it's -- I can even relate it to an auto

8    loan.  I mean you typically don't go and get hundred percent

9    loan on an auto, you, you know, it just, proven statistical

10   fact that the more down payment you put on buying an asset, a

11   home or an automobile, the more likelihood that you're going

12   to be paying your payments.  We're in the business to have

13   performing loans.  Otherwise, there's really no reason to be

14   in business.

15           Q    How much --

16           THE COURT:  What did you say was the amount he

17   was to bring to the closing?

18           THE WITNESS:  $14,499.88.

19           THE COURT:  Thank you.

20           Q    And I'm showing you 15.6.  Can you tell the

21   jury what that document is?

22           A    It's a check from Michael Bouchard escrow

23   account to Le -- I forgot.

24           Q    Lelautie?

25           A    Lelautie Ramroop.

1          Q     And does it relate to a particular property in

2     the memo field?

3          A     930 Strong.

4          Q     And is that the same property that was just

5     being described in the HUD-1?

6          A     Yes.

7          Q     And if you had known that instead of bringing

8     money to the closing, Lelautie Ramroop was getting a check

9     made payable to her from the closing, would you have allowed

10    this loan to close?

11         A     No.

12         Q     I'm showing you Exhibit 15.91.  Can you

13    identify that?

14         A     This is a contract for purchase and sale of

15    real estate.

16         Q     And what's the location of the real estate?

17         A     930 Strong Street.

18         Q     And what's the sales price?

19         A     $40,000.

20         Q     Had you known the property was being sold for

21    $40,000, would BNC have authorized the loan to go forward in

22    the amount of what is it, 76,500?

23         A     No.

24         Q     Why not?

25         A     Because it wouldn't have met the guidelines,

1    our underwriter guidelines.  It was a risk of, based on the

2    appraised value of the property, because we would use the

3    lower of the appraised value or that purchase price, so the

4    loan would have ended up being over 100 percent loan to

5    value.

6           Q    Let's turn to 18.  I'd like to hand you

7    Government Exhibit 18.9.  Can you tell the jury what that

8    document is?

9           A    Closing authorization letter, general closing

10   instructions, specific closing instructions for a loan to

11   Brian Haskins and the property is 395 Livingston Avenue in

12   Albany, New York.

13          Q    And the amount of the loan -- amount of the

14   purchase price is?

15          A    $105,000.

16          Q    And the amount of the loan?

17          A    Is $85,500.

18          Q    Like to hand you Government Exhibit 18.4.  Can

19   you identify what that document is?

20          A    It's the HUD-1 for 395 Livingston Avenue,

21   Albany, New York.  Brian Haskins is the borrower.

22          Q    And what's the sales price?

23          A    $105,000.

24          Q    And the amount of the mortgage loan?

25          A    $85,500.

1          Q     And how much money on the bottom left-hand

2     corner of that document is Brian Haskins supposed to bring in

3     the closing?

4          A     $27,940.86.

5                THE COURT:  940.86?

6                THE WITNESS:  $27,940.86.

7                THE COURT:  Okay.

8          Q     And I'm handing you 18.6.  Can you tell the

9     jury what that is?

10          A     A check from Michael Bouchard escrow account

11     to Brian Haskins.

12          Q     In the amount of?

13          A     $47,004.14.

14          Q     So adding the 27,000 that he doesn't bring in

15     and the 47,000 that is written out to him and that's a

16     difference of $74,000?

17          A     Yes.

18          Q     On a purchase price of $105,000?

19          A     Yes.

20          Q     Would you have allowed that loan to go through

21     if you had known that these were the transactions that were

22     being done with your proceeds?

23          A     No.

24          Q     And I say you, I mean BNC.

25          A     Yes.

1          Q     Okay.  Look at 18.91.  Can you identify what
2    that is?

3          A     It's a contract for purchase and sale of real
4    estate.

5          Q     And what's the purchase price?

6          A     $30,950.

7          Q     And that appears on page 2 of that document?

8          A     Yes.

9          Q     Had you known that the purchase price was
10   $30,950, would you have authorized a loan based upon sales
11   price of $105,000?

12         A     No.

13         Q     For the same reasons you've already described,
14   with respect to the other loans?

15         A     Correct.

16         Q     All right.  Let me take those back and I'll
17   bring in the next.  I'd like to show you 19.9.  Can you
18   identify that document?

19         A     Specific closing instructions and general
20   closing instructions related to 4 Kaatskill Way in Ballston
21   Spa, New York.

22         Q     Who is the purchaser?

23         A     The borrower was Nickole Riley.

24         Q     And what was the sales price?

25         A     It was $240,000.

1          Q     And I'm handing you Government Exhibit 19.4.
2    Can you identify what that is?

3          A     It's the HUD-1 related to the same property.

4          Q     And what does it disclose the sales price to
5    be?

6          A     $240,000.

7          Q     So what does that make the amount of the
8    mortgage?

9          A     Oh, $228,000.

10         Q     $228,000, right?

11         A     Yes.

12         Q     How much money was Nickole Riley supposed to
13   bring to that closing?

14         A     $16,781.55.

15         Q     All right.  And to make that closing happen,
16   she would bring that money and that BNC would wire $228,000?

17         A     Yes.

18         Q     All right.  Like to show you a document that's
19   marked as 19.91.  Can you identify what that is?

20         A     Contract for purchase and sale of real estate.

21         Q     And who's the purchaser?

22         A     Nickole Riley.

23         Q     And what's the property, where is the
24   property?

25         A     4 Kaatskill Way, Ballston Spa, New York.

1          Q    What is the sale price?

2          A    220 -- $224,000.

3          Q    All right.  Had you known that the purchase

4    price was 224,000, would you have authorized the mortgage of

5    228,000?

6          A    No.

7          Q    20.9.  Can you identify what this document is?

8          A    General closing instructions, specific closing

9    instructions, and the closing authorization letter related to

10   332 Sheridan Avenue in Albany, New York.

11         Q    And what's the sales price?

12         A    $85,000.

13         Q    And what's the mortgage amount?

14         A    $76,500.

15         Q    I'd like to show you Government Exhibit 20.4.

16   Can you identify that document?

17         A    This is the HUD-1, related to 332 Sheridan

18   Avenue in Albany, New York.

19         Q    Up at the very top of that HUD-1 above the

20   language, is there a fax banner sheet, a fax banner?

21         A    Yes.

22         Q    And who's it from?

23         A    Bouchard Law Firm.

24         Q    And what's the date?

25         A    May 2nd, 2005.

1          Q     On that document, what's the amount of the

2     mortgage?

3          A     $76,500.

4          Q     And who's the purchaser?

5          A     Byron Alling.

6          Q     And how much money was Byron Alling supposed

7     to bring in the closing based on the HUD-1 that was faxed to

8     BNC?

9          A     I can't make it out completely but it looks

10    like $15,952.94.

11         Q     And is there a stamp on that that says best

12    copy available?

13         A     Yes, best only copy.

14         Q     Okay.  I'd like to hand you 20.6; do you have

15    any idea what that document is?

16         A     It's a check from Michael Bouchard escrow

17    account to Brian [sic] Alling for $31,570.45.

18         Q     And had you known that instead of bringing

19    15,000, or in excess of 15,000 to the closing, Brian [sic]

20    Alling got a check issued to him for $31,000, in excess of

21    that, would BNC have authorized this closing to go forward?

22         A     No.

23         Q     All right.  Now what was the sales price

24    listed on the HUD-1?

25         A     $88,000.

1          Q    I'd like to hand you a document that's marked
2     as 20.91.  Is that -- what is that document?
3          A    This is contract for purchase and sale of real
4     estate.
5          Q    For what property?
6          A    For 332 Sheridan Avenue in Albany.
7          Q    Is that the same property we've been talking
8     about with respect to the other 20s?
9          A    Yes.
10         Q    What's the sales price there?
11         A    It is $38,500.
12         Q    And had you known that sales price, would you
13    have authorized this sale to go forward?
14         A    The loan, no.
15         Q    The loan to go forward?
16         A    No, we would not.
17         Q    Okay, I'll take those.  21.  Like to show you
18    Exhibit 21.9.  What is that document?
19         A    Closing authorization letter, general closing
20    instructions, specific closing instructions for 18 Benjamin
21    Street in Albany, New York.
22         Q    And is this -- okay.  And they're from BNC to
23    whom?
24         A    To the Bouchard Law Firm.
25         Q    All right.  And who's purchasing the property?

1          A     Brian [sic] Alling.

2          Q     And what's the sale price?

3          A     $90,000.

4          Q     And what's the loan amount?

5          A     $81,000.

6          Q     I'm handing you Exhibit 21.4.  Can you

7     identify what that document is?

8          A     It's the HUD-1 for 18 Benjamin Street in

9     Albany, New York.

10         Q     And it shows who as the purchaser?

11         A     Byron Alling.

12         Q     And the purchase price?

13         A     $90,000.

14         Q     And the amount of the mortgage?

15         A     $81,000.

16         Q     How much money was Byron Alling supposed to

17    bring to the closing?

18         A     $17,414.99.

19         Q     I'd like to hand you a document that's marked

20    Exhibit 21.6.  Can you identify that?

21         A     It's a check from -- copy of the check from

22    Michael Bouchard escrow account to Brian or Byron Alling in

23    the amount of $27,435.01.

24         Q     If BNC had known that instead of bringing in

25    excess of $17,000 to the closing, Brian [sic] Alling was

1    having a check issued to him in excess of $27,000 from the

2    closing, would you have allowed this to go forward?

3              A    No.

4              Q    Is that $27,000 check disclosed anywhere on

5    that HUD?  The check to Brian [sic] Alling?

6                   THE COURT:  It was Brian, then it went to

7    Byron.  Where are we at now?

8              A    It's Byron.  B-y-r.  I did that midstream, I

9    apologize.

10             Q    Had you known that the purchase -- what's the

11   purchase price on the sales contract?

12             A    No, we would not have made the loan.

13             Q    Count 22.  Like to show you exhibit marked

14   22.9.  Can you identify what this document is?

15             A    Closing authorization letter, general closing

16   instructions, specific closing instructions for a loan on --

17   secured by 179 Main Street in --

18             Q    Cohoes?

19             A    Cohoes, New York.

20             Q    And who's the borrower?

21             A    Daniel Friebel.

22             Q    And what's the purchase price?

23             A    $95,000.

24             Q    And what's the amount of the loan?

25             A    $85,500.

1          Q    I'd like to hand you 22.4.  What is that

2    document?

3          A    The HUD-1 related to 179 Main Street in

4    Cohoes, New York.

5          Q    And what is the purchase price reflected in

6    that document?

7          A    $95,000.

8          Q    And what's the loan amount?

9          A    $85,500.

10          Q    And how much was Daniel Friebel supposed to

11    bring to the closing?

12          A    $18,981.92.

13          Q    And according to this HUD, how much money --

14    did he actually do that, according to this HUD?

15          A    Yes.

16          Q    I'd like to hand you a document 22.6.  Can you

17    identify what that document is?

18          A    I do not -- no, I can't.

19          Q    Okay.  If Daniel Friebel did not bring the

20    $18,000, $18,981 in collected funds, would you have allowed

21    this to go forward, this closing?

22          A    No.

23          Q    How much is supposed to be paid to the seller

24    in this?

25          A    $83,264.50.

1        Q    And who are the sellers?

2        A    Robert and Elizabeth Marion.

3        Q    And I'm handing you a document that's in

4    evidence as Government Exhibit 22.3.  Can you identify that

5    document?

6        A    This is a check from Michael Bouchard escrow

7    account to Robert Marion and Elizabeth Marion in the amount

8    of $47,293.49.

9        Q    So if instead of getting $83,000, they got

10   $47,000, would that have made a difference to BNC?

11       A    Yes.

12       Q    Why?

13       A    Because the HUD-1 is incorrect and therefore

14   the loan probably doesn't meet the underwriting guidelines.

15   For the program.

16       Q    I'm going to show you a document that is a

17   duplicate of a document that's already in evidence but it's

18   marked with a separate number.  24.4.  Could you identify

19   what that document is?

20       A    The HUD-1.

21       Q    For what property?

22       A    735 Burden Avenue, Troy, New York.

23       Q    All right.  Do you recall testifying about

24   this document before?

25       A    Yes.

1          MR. OLMSTED:  All right.  I'd like to move the

2    admission of Exhibit 24.4, it's a duplicate, your Honor, of

3    Exhibit 7.4, but it relates to Count 24.

4               THE COURT:  Any objection?

5               MR. CASTILLO:  No.

6               THE COURT:  Received.

7          Q    Looking at that document and recalling your

8    testimony with respect to the property at the sale at 735

9    Burden Avenue, do you recall that testimony?

10         A    Yes.

11         Q    Was that HUD-1 true or false?

12         A    False.

13         Q    In what way?

14         A    The borrower did not bring to the table or the

15   closing $17,177.  Instead they received cash, I don't recall

16   the amount.

17         Q    And is the purchase price correct?

18         A    No.

19         Q    And is that meaningful?

20         A    Yes.

21         Q    Okay.  Just a moment.

22              If I can just have one second, your Honor.

23              I have no further questions of this witness.

24              THE COURT:  All right.  We'll take a recess at

25   this time, members of the jury.

1          THE CLERK:  Court stands in recess.

2          (Court in recess, 3:12 p.m. to 3:36 p.m.)

3          (Open Court, Jury Out.)

4          THE COURT:  All set?  You ready to cross-exam?

5          MR. CASTILLO:  Yes, Judge.

6          THE COURT:  All right.  Get the jury.

7   Witness, come back up.

8          (Jury Present.)

9          THE COURT:  Okay, we're all set.  Okeydoke,

10  Mr. Castillo.

11          MR. CASTILLO:  Thank you.

12          <u>CROSS-EXAMINATION BY MR. CASTILLO</u>:

13     Q    Good afternoon, sir.

14     A    Hello.

15     Q    As I understand your testimony, sir, you're

16  the founding partner, founding person of BNC Mortgage, is

17  that right?

18     A    I was one of the founding members.

19     Q    What does BNC stand for?

20     A    Nothing really, except for it was kind of a

21  play on B and C paper, B and C.

22     Q    Doesn't stand for anything, the letter B and

23  the letter C doesn't stand for anything?

24     A    No.

25          THE COURT:  I'm still --

1          A    B and C Paper, so we were a sub-prime

2    originator so conforming paper is also called A paper a lot

3    of times, so it's B and C paper, we produced B and C paper.

4          Q    So the name somehow --

5               THE COURT:  Go ahead.

6          Q    So the name somehow referred to the fact that

7    BNC specifically was a sub-prime lender, correct?

8          A    Correct.

9          Q    And a sub-prime lender is different than a

10   prime lender, correct?

11         A    Correct.

12         Q    And the prime lender is the type of lender

13   that has very strict requirements I shall say for the

14   processing and approving of loan applications; is that fair

15   to say?

16         A    No, I would say that they're the same

17   requirements, they just have different underwriting

18   guidelines.

19         Q    Okay.  The underwriting guidelines for a

20   sub-prime lender are looser and less strict than those of a

21   prime lender, would you agree with that?

22         A    Correct.

23         Q    And the -- you mentioned in your testimony

24   that one type of requirement, or one type of approach in the

25   sub-prime lending process is something called stated income,

1    correct?

2              A    Yes.

3              Q    And BNC did utilize stated income as one of

4    the processes for loan applicants, is that right?

5              A    Borrowers that only had stated income could

6    qualify for several loan programs.

7              Q    Right.  And BNC had those type of loan

8    programs, correct?

9              A    Yes.

10             Q    And stated income basically means, sir, that

11   the applicant for the loan says, this is how much money I

12   have, and your company will accept that statement, is that

13   right?

14             A    They basically say this is how much money I

15   make.  This is what my income level is.

16             Q    And based upon that statement, you would

17   accept that statement, correct?

18             A    You, the underwriter would look at

19   reasonableness for the occupation of that person.

20             Q    But would not require things like pay stubs or

21   even income tax returns, correct?

22                  MR. OLMSTED:  Your Honor, I just object to the

23   line of questioning because it's not relating to these

24   mortgages --

25                  THE COURT:  Oh, I think it's just

1    informational.  You may proceed.

2            Q    Correct?

3            A    Yes, that's what stated is.

4            Q    Now, sir, the process for applying for a loan

5    from BNC Mortgage would require a borrower to send to your

6    company certain documents, is that fair to say?

7            A    They would send them through their broker.

8            Q    Okay.  But BNC Mortgage would get documents

9    that related to the borrower from some person whether it's

10   the borrower directly or the broker, correct?

11           A    Correct.

12           Q    And one of those documents that would be

13   relevant and important for the processing of a loan

14   application by BNC Mortgage would be the contract for the

15   purchase of that property, correct?

16           A    Yes.

17           Q    Because you would look to the price that's

18   reflected in the contract for the purchase of property in

19   determining what loan amount might be considered to be

20   approved, correct?

21           A    Yes.

22           Q    And in the course of your testimony here

23   today, you were shown a lot of documents, right?

24           A    Yes.

25           Q    And in fact prior to your testimony today, in

 1   preparation for your testimony today, you reviewed a lot of

 2   documents, correct?

 3           A     Correct.

 4           Q     And did you bring files with you that relate

 5   to these loans of the various people that you've testified to

 6   here today?

 7           A     No.

 8           Q     All the documents that you looked at were

 9   documents that were provided to you by representative of the

10   government, is that right?

11           A     Yes.

12           Q     Now I noticed that in your testimony today,

13   and I'm gonna make a general statement about the various

14   persons that you've testified to and the various properties

15   that you testified about.  You were shown contracts for the

16   purchase of those various properties that were lower in price

17   than the loan that BNC approved, correct?

18           A     Yes.

19           Q     Did you have occasion to look at the actual

20   contract, the one that BNC would have received either from

21   the borrower, on behalf of the borrower from the broker in

22   approving the various loans that you've testified about here

23   today?

24           A     I don't understand the question.

25           Q     Okay.  With respect to all the people that you

1    talked about, those are people that BNC received loan

2    applications from, correct?

3               A    Yes.

4               Q    And ultimately loans that were approved,

5    correct?

6               A    Yes.

7               Q    And with respect to every single one of those

8    borrowers that you talked about and the properties that they

9    purchased, BNC would have received a copy of the contract for

10   the purchase of the property that pertained to that

11   particular transaction, correct?

12              A    Yes.

13              Q    Did you look at those contracts, the actual

14   contracts that BNC received in preparation for your

15   testimony?

16              A    The only contracts I saw is the ones that were

17   presented to me today.

18              Q    In addition to the actual contract for the

19   purchase of the property in question, you would have

20   additionally received other documents from the borrower on

21   behalf of the borrower in determining whether to approve the

22   loan application, correct?

23              A    Yes.

24              Q    And one of the processes that would have been

25   followed is that a credit check would have been done of the

1    applicant, correct?

2         A    Yes, we would have, we would have received a

3    credit report from the broker, and we also would have pulled

4    our own credit report.

5         Q    Okay.  That's an important piece of

6    information in determining whether or not to approve a loan,

7    correct?

8         A    Yes.

9         Q    You would have also looked to receive

10   information about the value of the appraisal of the

11   particular property that the borrower was looking to

12   purchase, correct?

13        A    Yes.

14        Q    That would be information that would be

15   pertinent in deciding whether or not to approve a loan,

16   correct?

17        A    Yes.

18        Q    That's all information that you receive in

19   determining whether or not to approve a loan, correct?

20        A    Pardon me, I didn't hear the --

21        Q    That type of information and the other

22   information you receive is all designed to give you all the

23   information you need so that you could decide whether or not

24   to approve the loan, correct?

25        A    Yes.

1        Q    And you don't contact a settlement agent --

2   when I say you, I don't mean you personally but a settlement

3   agent, a lawyer isn't contacted in order to make his office

4   available for that particular transaction until your company

5   has already decided in the first instance to approve the

6   loan, correct?

7        A    Yes, that's correct.

8        Q    The lawyer, whoever that lawyer is that is

9   contracted with to be the settlement agent, isn't involved in

10  that initial process of deciding whether or not to approve

11  the loan or not, isn't that right?

12       A    That's correct.

13       Q    Now, your company has computers, right?

14       A    BNC had computers.

15       Q    Yes.

16       A    Yes.

17       Q    And you would, as a company, maintain records

18  of all borrowers, correct?

19       A    Yes.

20       Q    And it is not necessarily unusual for your

21  company to receive more than one loan application from the

22  same borrower, correct?

23       A    That's correct.

24       Q    But if you did receive more than one loan

25  application from the same borrower, you would take that

 1    information into account, correct?

 2            A    The -- oh, absolutely, yes.

 3            Q    In other words, and I'm sorry I wasn't clear

 4    in that question.  For example, if a man like Brian Haskins

 5    applies and gets approved for loan number one, right?

 6            A    Yes.

 7            Q    And then applies for loan number two, in

 8    determining whether to approve loan number two, you will look

 9    at whatever information you received regarding loan number

10    one, correct?

11            A    Probably not.

12            Q    No?

13            A    We probably look at a completely new loan

14    file.  The only thing we look at is to make sure there's not

15    too many loans to Brian Haskell [sic] because we can't sell

16    them if there's over a certain number.

17            Q    Okay.  So it would have been normal, ordinary,

18    and routine for your company to at least make note and

19    consider whether a borrower already has a loan with your

20    company, is that fair to say?

21            A    Absolutely.

22            Q    And if that borrower, that same borrower

23    applies for loan number three, you will consider loans number

24    one and two, correct?

25            A    I don't know what you mean by consider.

1          Q    Well, you would want to take into

2     consideration because you've already said that you are

3     selling these loans, correct?

4          A    Yes.

5          Q    So you would take into consideration the fact

6     that the same borrower has two loans, correct?

7          A    It would actually be more of a negative than a

8     positive.

9          Q    A negative meaning what?

10         A    We would tend to, as one borrower had too many

11    loans with us, we would not want to make any more loans.

12         Q    Okay.

13         A    Unless we had other buyers to -- I'm sorry,

14    buyers of the loans to sell them to.

15         Q    Now do your requirements change at all when

16    you have the same borrower applying for a subsequent loan?

17         A    Not really.

18         Q    Do you get any stricter in your scrutiny or

19    review of the loan application?

20         A    No.

21         Q    Okay.  And you know from the course of your

22    testimony today that, I'm talking specifically now about

23    Brian Haskins, that at least from your testimony here today,

24    he had four loans with your company, correct?

25         A    Yes.

1          Q    That's information you were aware of, correct?

2          A    I wasn't aware till I testified today.

3          Q    Okay.  Well, your company, at the time that he

4     applied for loan number two, would have been aware of the

5     fact that Haskins already had a loan with your company,

6     correct?

7          A    Yes.

8          Q    And your company would have been aware of the

9     fact when he applied for loan number three that he had

10    already had two loans with your company, correct?

11         A    Yes.

12         Q    And your company would have been aware when he

13    applied for loan number four that he already had three loans

14    with your company, is that fair to say?

15         A    Yes.

16         Q    Are you able to tell us now if, in the case of

17    Brian Haskins with those four loans that were approved,

18    whether or not those were stated income loans or some other

19    type of loans?

20         A    No.

21         Q    According to your testimony, Mr. Monahan,

22    Mr. Haskins was approved for a loan for $82,800 in connection

23    with the purchase of 526 North Brandywine Avenue in

24    Schenectady, New York; remember testifying about that?

25         A    Yes.

1          Q      Mr. Haskins was also loaned by your company

2    $76,500, in connection with his purchase of 735 Burden Avenue

3    in Troy, New York; do you remember testifying about that?

4          A      Pardon me, what street number, I mean street?

5          Q      735 Burden Avenue, Troy, New York.

6          A      Yes.

7          Q      And that loan was $76,500, do you recollect

8    that?

9          A      Roughly, yes.

10          Q      Okay.  And Mr. Haskins was given another loan

11    by your company for $70,000 in connection with his purchase

12    of 5 Backus Street, Schenectady, New York; remember

13    testifying about that?

14          A      Yes.

15          Q      Mr. Haskins was also approved for an $85,500

16    loan in connection with his purchase of 395 Livingston

17    Avenue, Albany, New York; do you remember testifying about

18    that?

19          A      Yes, I believe so.

20          Q      And you recollect from your testimony that all

21    of those loans were purchased close in time, those loans were

22    approved close in time?

23          A      Yes.

24          Q      Now you testified, Mr. Monahan, that the HUD-1

25    is an important document in terms of your company's lending

1    of money to potential borrowers, is that right?

2          A    Yes.

3          Q    And when you received a HUD-1 form in

4    connection with any transaction, what does your company do

5    with the HUD-1 form?

6          A    What do they do?  They make sure, they make

7    sure that it's -- they make sure that the HUD-1 reflects

8    what's been approved for the loan, including fees, interest

9    rate, the loan amount, and fees and charges is very important

10   because some are going to brokers, some, you know, obviously

11   property tax, et cetera, et cetera.

12         Q    So your normal course and practice at BNC was

13   upon receipt of the HUD-1 form, for somebody in your company

14   to review the HUD-1 form, correct?

15         A    Oh, absolutely.  There's the pre-HUD-1,

16   though, and the HUD-1 because we would fund the loan based

17   upon the pre-HUD-1 and then when the HUD-1 came in, we had to

18   make sure it matched the pre-HUD-1 and that it matched what

19   we were funding.

20         Q    I see.  So your company actually did two

21   reviews in relation to the HUD forms.  You did the review of

22   the preliminary HUD, correct?  Yes?

23         A    Yes.  Yes, at funding.

24         Q    And then you did the review of the, I'll call

25   it the final HUD, correct?

1          A    Yes, at post-funding.

2          Q    Okay, thank you.  So pre-funding and

3    post-funding, you would review the HUD form, correct?

4          A    Yes.

5          Q    And if you -- when I say you now I mean your

6    company, your company upon review post-funding of the HUD

7    form noticed any type of irregularity, if you noticed

8    something that didn't make sense or jibe with whatever the

9    loan was all about, your company would take some action,

10   correct?

11         A    Yes, that was very unusual.

12         Q    And action you might take would be to contact

13   at least the settlement agent, correct?

14         A    Yes.

15         Q    And perhaps other persons, correct?

16         A    Yes.  We might even unwind the loan.

17         Q    What does that mean?

18         A    You basically defund the loan.  I mean because

19   it was -- it was incorrect.

20         Q    Okay.

21              THE COURT:  What's the number, Counsel?

22              MR. CASTILLO:  7.4, your Honor.

23         Q    Mr. Monahan, you can see that?

24         A    I can't read it but I can see it.

25         Q    Now, the purchase price, first of all --

1          THE COURT:  I think, they can bring it up

2     closer, he can magnify it, if there's an area in particular

3     you're talking about.

4          MR. CASTILLO:  Okay.

5          THE COURT:  Like if there's a line number,

6     101, 203, whatever.

7          MR. CASTILLO:  All right, thank you, Judge.

8     Q     Tell me if you can tell who the borrower is

9     from what you can see.  If not I'll have him magnify it.  Oh,

10    okay.  Who's the borrower?

11    A     Brian Haskins.

12    Q     And what's the property address?

13    A     735 Burden Avenue, Troy, New York.

14    Q     And what's the purchase price and the loan

15    amount in connection with this transaction?

16    A     I can't see those.  They're actually -- should

17    be on the other page.  I still can't read it.  Sorry.  The

18    sales price, 65,000?

19          THE COURT:  85.

20    A     85?  It's not clear.

21    Q     And what's the loan amount, please?

22    A     76,500.

23    Q     Now if you could magnify the second page,

24    specifically the top, top three lines.  Now, can you see the

25    purchase price on the second page of Exhibit 7.4?

1          A    No.  On the second page, no.

2          Q    See that line, 700?

3          A    Yes.

4          Q    And what's the purchase price reflecting on

5     the second page of 7.4?

6          A    I'm assuming it says 85,000.

7          Q    Okay.  And that's the same price that was on

8     the first page of 7.4, correct?

9          A    Correct.

10         Q    Now if you could I'd like to --

11              THE COURT:  Counsel, where are you pointing to

12    right now?

13              MR. CASTILLO:  Line 700 on the second page of

14    Exhibit 7. --

15              THE COURT:  Oh, I see up here at the top.

16         Q    You agree that it does say $85,000?

17              THE COURT:  85,000.

18         A    Yes.

19         Q    Okay.

20              MR. CASTILLO:  Just have one moment, Judge,

21    please.

22              (A discussion was held off the record.)

23         Q    Let me show you what's -- may I approach the

24    witness, Judge?

25              THE COURT:  Yes.

1          Q    Let me show you what's premarked as Government

2     Exhibit 7.2.  Exhibit 7.2 is a HUD-1 form, is that right?

3          A    Yes.

4          Q    And the borrower reflected on 7.2 is Brian

5     Haskins, correct?

6          A    Yes.

7          Q    And the property that's indicated on

8     Exhibit 7.2, the HUD-1 form, is 735 Burden Avenue, Troy,

9     New York, correct?

10         A    Yes.

11         Q    And the lender that's reflected on Exhibit 7.2

12    is your company, BNC Mortgage, correct?

13         A    Yes.

14              MR. CASTILLO:  I'm going to offer 7.2.

15              THE COURT:  Any objection?

16              MR. OLMSTED:  None, your Honor.

17              THE COURT:  Received.  7.2.  Wasn't there

18    already testimony --

19              MR. OLMSTED:  No, your Honor, this is the

20    second of the two HUDs.

21              THE COURT:  Oh, excuse me.

22              MR. OLMSTED:  And we obtained this not from

23    BNC, but from the seller who then made a copy of it.  That's

24    why we couldn't put it in through this witness.

25              THE COURT:  Guess what?  It's in.

1          MR. OLMSTED:  But that's -- I couldn't put it

2    in.

3          Q    Now sir, are you able to see this document?

4          A    Yes.

5          Q    Exhibit 7.2.  And the contract price that's

6    reflected on this HUD form, Exhibit 7.2 is 35,000, correct?

7          A    Yes.

8          Q    And the other form that we were just talking

9    about just before this one, which is Exhibit 7.4 reflected a

10   contract price of 85,000, correct?

11         A    Yes.  And then this one on line 700 said

12   85,000 also.

13         Q    Yeah, I was going to get to that.

14         A    Oh.

15         Q    Can you turn to the second page.  Can you

16   highlight line 700, please?  Now Mr. Monahan, as you already

17   said, line 700 of page 2 of Exhibit 7.2 indicates that the

18   purchase price is 85,000, correct?

19         A    Yes.

20         Q    Contradicting the first page which indicates

21   the purchase price is 35,000, correct?

22         A    Yes.

23         Q    And if your company had received this

24   Exhibit 7.2, someone at your company would have taken some

25   action, is that fair to say?

1          A    I would hope so.

2          Q    Okay.

3               THE COURT:  Which exhibit number?

4               MR. CASTILLO:  This is 10.4, Judge.

5               You recall testifying previously about this

6    exhibit, 10.4, correct?

7          A    10.4?

8          Q    Yes.

9          A    I believe so.

10         Q    Let's go back to the beginning.  Highlight the

11   top portion showing the borrower and the address.  Do you

12   recall testifying about Exhibit 10.4 previously involving

13   this loan by Brian Haskins for a property located at 5 Backus

14   Street, Schenectady, New York?

15         A    Yes.

16         Q    And this was a loan that was granted by your

17   company, correct?

18         A    Yes.

19         Q    Could you highlight line 100, please.  And the

20   contract price in connection with this transaction is

21   $70,000, correct?

22         A    Yes.

23         Q    Turn to the second page, please.  Line 700.

24               THE COURT:  This is on 5 Backus Street, right,

25   Schenectady?

 1            MR. CASTILLO:  Yes, your Honor.

 2       Q    And Mr. Monahan, page 2 of Exhibit 10.4 and

 3  specifically line 700, consistent with the first page,

 4  reflects a purchase price of 70,000, correct?

 5       A    Yes.  Excuse me, yes.

 6       Q    Could you turn to 10.2, please.

 7            MR. OLMSTED:  That's also not in.

 8            MR. CASTILLO:  Approach the witness, Judge.

 9            I'm going to hand you what's marked for

10  identification as Government Exhibit 10.2.  Now Exhibit 10.2

11  is another HUD-1 form, correct?

12       A    Yes.

13       Q    And it reflects the borrower that we've been

14  talking about, Brian Haskins, correct?

15       A    Yes.

16       Q    And it relates to that same address, 5 Backus

17  Street, correct?

18       A    Yes.

19       Q    And that's a loan approved by your company,

20  BNC Mortgage, correct?

21       A    No.

22       Q    No?

23       A    No, the lender is Sovereign Bank.

24       Q    Okay, I'll take that back then.  You did

25  approve the loan on 5 Backus Street that we just talked

1   about, though, right?

2          A    I would have to see the HUD-1 that I testified

3   about before.

4          Q    You want to see it again?

5          A    The one that showed -- yes.

6          Q    Can you put up 10.4, please.

7          A    Yes, that one's BNC Mortgage so obviously one

8   was -- one says BNC Mortgage, one says Sovereign Bank.

9          Q    Okay.

10              MR. CASTILLO:  Judge, may I have a moment,

11  please.

12              THE COURT:  Yes.

13              (Pause in Proceedings.)

14         Q    Mr. Monahan, you recall testifying about a

15  transaction involving a Rosely Dafna, correct?

16         A    Yes.

17         Q    And --

18              THE COURT:  Is it Dafina or Dafna?  I thought

19  it was Dafina.

20              MR. OLMSTED:  Dafna.

21              THE COURT:  Dafna?

22              MR. OLMSTED:  D-a-f-n-a.

23              THE COURT:  Okay.

24         Q    Are you able to see Exhibit 6.2?

25         A    Yes.

1            MR. OLMSTED:  That's in by stip, that came

2    from their office.

3            Q    Okay.  And Exhibit 6.2 refers to a transaction

4    involving a borrower by the name of Rosely Dafna, correct?

5            A    Yes.

6            Q    Regarding a property known as 33 Jefferson

7    Street, Troy, New York, correct?

8            A    Yes.

9            Q    Where your company BNC Mortgage gave a loan,

10   correct?

11           A    Yes, according to -- mm-hmm.

12           Q    And could you show line 100.  And this shows,

13   line 100 on Exhibit 6.2 shows a contract price of 40,000,

14   correct?

15           A    Yes.

16           Q    Turn to the second page.  Highlight line 700.

17   Can you see line 700 on page 2 of Exhibit 6.2?

18           A    Yes, I see there 75,000 or 78,000.

19           Q    Seventy something thousand?

20           A    Yes.

21           Q    Way more than the amount listed on the

22   contract price, line 100 on page 1 of Exhibit 6.2, correct?

23           A    Yes.

24           Q    Can you put up 6.4, please.  Are you able to

25   see Exhibit 6.4?

1          A     I can see it is a BNC Mortgage loan.

2          Q     Okay.

3          A     Contract sales price is roughly what was on

4     the last one on line, I believe 700, is that 700?

5          Q     You can see that 6.4 relates to the same

6     borrower, Dafna, correct?

7          A     Yes.

8          Q     Same property, 33 Jefferson Street, Troy,

9     New York, correct?

10         A     Yes.

11         Q     And that your company funded the loan,

12    correct?

13         A     Yes.

14         Q     Excuse me, your company gave that loan,

15    correct?

16         A     Yes.

17         Q     And highlight line 100, please.  You can see

18    that line 100 on Exhibit 6.4 reflects a contract sales price

19    of 75,000, correct?

20         A     Yes.

21         Q     Turn to the second page, please.  Line 700.

22    And you can see that line 700 on the second page of

23    Exhibit 6.4 reflects, consistent with the first page, a

24    contract price of 75,000, correct?

25         A     Yes.

1          Q     Are you able to see Exhibit 6.4 and 6.2, sir?

2          A     I can -- I can barely make out the numbers but

3     they're both BNC Mortgage loans.  One has a contract sales

4     price of 40,000, one has one at 75,000.

5          Q     Now you can see by looking at the top portion

6     of Exhibit 6.4 and 6.2 that they relate to the same borrower,

7     Dafna, correct?

8          A     Yes.

9          Q     Same property, 33 Jefferson Street, Troy,

10    New York, correct?

11         A     Yes.

12         Q     And loan given by your company, BNC Mortgage,

13    correct?

14         A     I would believe the one on the left would

15    probably -- I think that's a loan number under the borrower's

16    name.  But both HUD-1s reflect that it would be a BNC

17    Mortgage loan.

18         Q     And would you go to 100 on both.  And

19    Mr. Monahan, looking at line 100 of the second page of both

20    Exhibit 6.4 and 6.2, you can see -- sorry, I said line 100,

21    line 101, you can see that the contract price on Exhibit 6.4

22    is 75,000, correct?

23         A     Yes.

24         Q     And the contract price on line 101 for

25    Exhibit 6.2 is 40,000, correct?

1          A    Yes.

2          Q    Involving the same borrower, correct?

3          A    Yes.

4          Q    Same property location, correct?

5          A    Yes.

6          Q    Same loan, right, at least your company is

7     reflected as being involved in --

8          A    As the lender, yes.

9          Q    Thank you.  Turn to Exhibit 8.4, please.

10              MR. OLMSTED:  8.2 is not stipulated because we

11    got it from the seller.

12         Q    Mr. Monahan, you were shown in connection with

13    the different transactions that you've testified about copies

14    of various checks that appear to be issued by the law firm of

15    Michael Bouchard, correct?

16         A    Yes.

17         Q    And you were shown checks in connection with

18    the various transactions that you testified to, checks that

19    were actually issued to the buyer, borrowers, correct?

20         A    Yes.

21         Q    And I think you said that that would be

22    information that you would not find to be appropriate in

23    connection with any of the transactions that you've talked

24    about, correct?

25         A    Correct.

1          Q    And the payments of these moneys to the

2     purchase of borrower and different loan transactions that

3     you've talked about, those are actual checks written by, or

4     on behalf of the Michael Bouchard Law Firm, correct?

5          A    That's what it -- they appear.

6          Q    That's what it looked like to you?

7          A    They're copies.

8          Q    You looked at those before you testified,

9     right?

10         A    No, not before I testified.

11         Q    You just saw them while you were the witness

12    stand?

13         A    I probably saw one or two.

14         Q    Okay.  You weren't shown any documents that

15    would have demonstrated to you that there were payments made

16    by the Bouchard firm to some of the borrowers that you've

17    testified to in cash, in actual U.S. currency, correct?

18         A    Correct.

19         Q    You weren't shown any documents or any other

20    evidence that the borrowers in the transactions that you've

21    testified to received moneys, whatever the amounts were, in

22    some underhanded way, correct?  What I mean by that is you

23    were shown checks?

24         A    Yes, I was always shown checks, that the

25    checks that we all saw today.

1          Q     Yeah, with the name right on top in big bold

2    letters Michael Bouchard Law Firm, correct?

3          A     Correct.

4          Q     Now BNC Mortgage, is it in existence today?

5          A     No.

6          Q     When it did it cease to be in existence?

7          A     I believe, I wasn't there when they -- when it

8    was closed down by -- I believe Lehman Brothers closed it

9    sometime in 2007.

10         Q     When did you leave the company?

11         A     I left, I stayed with Lehman, I transferred to

12   another Lehman Brothers company at the end of 2006.

13         Q     Now, that, Mr. Moynihan, sometime in 2005,

14   going into 2006 and continuing, was the start of a whole

15   series of lawsuits that were initiated against BNC Mortgage

16   over their lending practices, isn't that right?

17         A     I do not believe that.

18         Q     You don't believe that, you're aware of the

19   lawsuits though, aren't you?

20         A     Absolutely not.

21         Q     You're not aware of the lawsuits?

22         A     No.

23         Q     Not aware of any of the litigations?

24         A     Nope.

25         Q     Haven't read about them?

1          A     Against BNC Mortgage, absolutely not.

2          Q     You haven't seen any of the --

3          A     No.

4          Q     -- litigation reflected on the internet even,

5     or on Google, anything, you haven't looked at any of that?

6          A     You can look at Google and people criticize

7     Lehman -- sorry, BNC.

8          Q     I'm not talking about criticize.

9          A     I would --

10          Q     No, you're telling me no?

11          A     Yes, absolutely.

12          Q     All right.  Now sir, I just asked you about

13     litigation against BNC Mortgage and you said you're not

14     aware?

15          A     Yes, that's correct.

16          Q     Are you aware of litigation against Lehman

17     Brothers because of their association with BNC Mortgage?

18               MR. OLMSTED:  I object to the relevance of

19     this question, your Honor.

20               THE COURT:  Sustained.

21               MR. CASTILLO:  May I just have one moment,

22     Judge, please.

23               That's all I have, Judge.

24               THE COURT:  All right, sir.  Any further?

25               MR. OLMSTED:  May I just consult briefly?

1          THE COURT:  Yes.

2          MR. OLMSTED:  I have no redirect, your Honor.

3          THE COURT:  You're all set, sir.

4          THE WITNESS:  Thank you.

5          (Whereupon the witness was excused.)

6          THE COURT:  Next witness for the government.

7          MR. OLMSTED:  United States calls Tom

8    Disonell.  He's outside.

9          THE CLERK:  Stand right here, please.  State

10   your full name for the record and spell your last name.

11          THE WITNESS:  Francis T. Disonell.

12   D-i-s-o-n-e-l-l.

13

14          F R A N C I S   D I S O N E L L , called

15   as a witness and being duly sworn, testifies as

16   follows:

17          <u>DIRECT EXAMINATION BY MR. OLMSTED:</u>

18          Q    Mr. Disonell, good afternoon.  Could you

19   introduce yourself to the jury, your name and whereabout you

20   live.

21          A    My name is Tom Disonell and I'm from Albany,

22   New York.

23          Q    What's your occupation?

24          A    I'm self-employed.

25          Q    All right.  Doing what kind of work?

1          A     Right now I'm doing distribution in the city.

2          Q     City being?

3          A     New York City.  I have a food distribution

4     route right this second.

5          Q     Do you know Michael Bouchard?

6          A     I do.

7          Q     Could you point him out to the jury?

8          A     He's sitting right there.

9          MR. OLMSTED:  I'd like the record to indicate

10    that he has identified the defendant, your Honor.

11          THE COURT:  The record will reflect.

12          Q     Have you ever been involved in the real estate

13    business?

14          A     Yes, sir.

15          Q     What made you want to enter that line of

16    business?

17          A     To make money.

18          Q     What were you doing before you did real

19    estate?

20          A     I was in the Marines for six years and then I

21    was working with the United States Postal Service as a HR

22    manager for about another six years.

23          Q     And what stimulated you to want to start

24    getting into real estate?

25          A     There was just a buzz about real estate and I

1    bought a course called Carleton Sheets no-money-down course.

2              Q    And what did that tell you?

3              A    It told me I could buy properties with no

4    money down and walk away with cash at closing.

5              Q    And so you decided that you wanted to do that?

6              A    Sounded like a really good idea.

7              Q    So what did you do?

8              A    I studied the course for a couple of weeks,

9    went out, found a property, bought it, made $18,000, had no

10   clue what I did, called my best friend and said --

11             Q    Who's your best friend?

12             A    My best friend is Matt Kupic.

13             THE COURT:  Matt who?

14             THE WITNESS:  Kupic, sir.  K-u-p-i-c.

15             Q    How do you know him?

16             A    We played baseball together since we're seven

17   and we've just been friends since, you know, sports, went to

18   high school together, everything.

19             Q    So how did you arrange to buy a property, get

20   $18,000 at closing?

21             A    My first deal I used a seller second mortgage

22   which they term a silent seller second mortgage.

23             Q    Could you explain to the jury how that works?

24             A    In a nutshell, you promise to pay -- did my

25   mike just go?  You promise to pay a seller 20, 30,000, they

1  hold it on a second mortgage, but then at closing, you just

2  satisfy it, the seller says I just want 80,000 so they

3  satisfy a second mortgage and then there's proceeds left in

4  the closing which you pay the bank closing costs and then

5  there's cash left over.  It was kind of like doing a cash-out

6  refinance at purchase.

7        Q    Okay.  And does the bank that's lending you

8  the money know you're doing that?

9        A    Um, well, I believe they do but that's at a

10 much higher level so I would say --

11       Q    Does the bank --

12       A    -- the bank, it's not disclosed on the HUD-1

13 statement.

14       Q    So after you got -- you called your friend

15 Matt Kupic and said what?

16       A    Said they just -- I just made $18,000 buying a

17 house, and we got together and he was like, do you think we

18 can do it again?  I was like, I have no idea.  And then

19 within probably 60 days I bought 10 or 12 houses, Matt bought

20 10 or 12 houses, and we thought we had stumbled onto

21 something, you know, proprietary that him and I figured out

22 and we had a real business that can make a lot of money.

23       Q    And how did you buy those houses?

24       A    Everything from using my baseball card

25 collection as collateral to just finding sellers that were

1    creative, you know.

2          Q     When you say creative, what does that mean?

3          A     Basically to sum it up, the seller wanted X

4    for his house at closing and didn't really care what else

5    happened, as long as they got their money, they were

6    satisfied.

7          Q     And so with respect to all of those

8    transactions, there were side deals that were not disclosed

9    on the HUD-1; is that a fair way to say it?

10         A     Sometimes the seller seconds were disclosed

11   but, you know, they were supposed to be real seller seconds,

12   they were actually satisfied at the closing table which, yes,

13   the banks didn't know what was happening, so -- so I'd say,

14   yes, every deal there was something going on that was not

15   disclosed on the HUD-1 statement.

16                THE COURT:  What do you call, the HUD what?

17                THE WITNESS:  It's called the HUD-1, sir.

18                THE COURT:  Oh, yeah, right.  I understand.

19         Q     Did you decide to start a company?

20         A     Um, I did -- I didn't decide to, actually Matt

21   and I, Matt was a state employee, once again, I had like 12,

22   13 years in the federal government, I had my house paid off,

23   my cars, my furniture, was married, my son was about

24   one-and-a-half years old, and we stopped because we had

25   everything.  We had no desire of being, you know, realtors or

1   real estate brokers and we stopped and then one of my

2   attorneys called me and said, you know, what are you guys

3   doing because there was -- obviously the business stopped

4   coming into their office.

5           Q     And was that Michael Bouchard?

6           A     That wasn't Michael, that was another attorney

7   of ours.

8           Q     All right.

9           A     And he -- and then we were like we don't like

10  being landlords, we have 30 houses now and a hundred tenants

11  and we just didn't like being landlords.  So one attorney

12  that we had done a lot of deals with, he was like, let's open

13  up a consulting firm and let's just start teaching people

14  what you and Matt are doing.  So we opened a company called

15  Real Estate Consultants and, you know, that was the -- that

16  was the company.

17          Q     All right.  And what did that company do?

18          A     Basically that same scenario, we taught people

19  how to do what we were doing and we charged a consulting fee.

20          Q     Okay.  What did you teach them you were doing?

21          A     Buying properties with no money down and

22  putting cash in our pocket.

23          Q     Okay.  Could you just tell the jury how --

24  what you would have said, say to the jury what you would have

25  said to a potential customer or purchaser that Real Estate

1    Consultants was working with?

2              A    Well, I mean at that time real estate was the

3    buzz, and people heard of Carleton Sheets, it was on TV on

4    every infomercial at night, it was there every single night.

5    And in a nutshell, you know, we were -- we had bought the

6    course and figured it out, and we were giving people the

7    opportunity to really just work with somebody who did it.  It

8    was very simple, like do you want to do this, you know, would

9    you rather go home and study Carleton Sheets course and fail

10   or, you know, we're doing it.

11             Q    And so what would you do as part of that

12   process?

13             A    Um, well, when me and Matt were getting going,

14   we didn't have any money to start so we had to do things such

15   as figure out how to collateralize baseball cards and every

16   other scenario in the world to look like we had money to the

17   banks, so in this particular scenario, we would make it very

18   easy if you wanted to buy houses, and you came in, I'd say,

19   here's $50,000, go put it in our bank, open up an account,

20   and you know, how many houses do you want, you want 5, 10,

21   20?  We'll find them for you.

22             Q    And the $50,000, what was that for?

23             A    It was for everything from prepaids which

24   would be homeowner's insurance, there was things you had to

25   pay before you could close a house, but more specifically it

1    was so the banks would see you had money to buy properties

2    because that was obviously a requirement by the banks and

3    typically the people that wanted to get into this business,

4    that was their biggest hurdle, they wanted to get into the

5    business because they wanted to make money and they didn't

6    have money.  So --

7              Q    And so you provided them money?

8              A    Yeah, we would give them loans.

9              Q    Then would you get a verification of deposit

10   in their names?

11             A    Yes.

12             Q    And that would go as part of their loan

13   application?

14             A    Um --

15             Q    To show --

16             A    Yeah, I think they would do -- banks would do

17   a verification of deposit at the application stage as well.

18   They would probably have to show bank statements or something

19   like that to the banks.

20             Q    And then would you take your money back?

21             A    No, we would take it back after the

22   relationship -- by the end of the relationship they would

23   have paid us plus consulting fees.  So we would, you know,

24   most -- everybody that we did business with bought multiple

25   houses so we would just take our money back plus fees over

1    time.

2              Q    And did you get into -- what is a repair

3    rebate?

4              A    Well, as we evolved --

5              Q    Can you explain to them how you evolved,

6    that's what I'm trying to get to.

7              A    We started out with seller second mortgages

8    and that means I would say I'm buying your house for 100,000,

9    you're holding a $20,000 seller second mortgage, but we would

10   just rip that up at the closing table to my partner and I.

11   My partner's an accountant so he was like, the people that

12   are selling the houses are claiming they're selling them for

13   100,000 but they're only getting 60.  So one day the IRS is

14   gonna come looking saying, you know, hey, you sold your house

15   for a hundred, you owe capital gains on a hundred, not 60, so

16   we saw it as a problem for our sellers.  So we set down with

17   our core attorneys, and Michael was not one of them in case

18   you were gonna ask that next, and we decided to do this,

19   seller rebate which the banks, we would request anything, if

20   I was buying your house, it wouldn't be a repair, I would

21   say, what do you want for your house, 100,000, I'll give you

22   110 if you put on a new roof and then if you don't put on the

23   new roof by the time we close, you're going to rebate that

24   money back to me.  So that would generate an inflated sales

25   price, therefore then the banks would loan more money on the

1    sales price.  And then we thought, well, with the rebate, it

2    goes -- it made it all come back down to what the real deal

3    was so if you took all the credits and the rebate, in our

4    mind at the time, the seller was actually only showing on

5    paper what he actually got, or she actually got, at closing.

6         Q    So this different approach was designed to

7    help the seller not have to pay capital gains, is that right?

8         A    Yeah, it was simply just we thought we were

9    protecting our sellers at the time.  It had nothing to do

10   with facilitating the deal because we were already doing the

11   deals, you know, we were just trying to do them more

12   legitimately.

13        Q    Vis-a-vis the taxes, more legitimately as far

14   as taxes is concerned?

15        A    Yeah, we didn't want to hurt the buyers,

16   sellers, didn't want to hurt anybody.

17        Q    Let's go to the banks for a moment.

18        A    Yep.

19        Q    With respect to repair rebates, does that

20   involve side deals that are not disclosed in the HUD-1?

21        A    Well, I put a clause in our contract, an

22   article 10 that said there would be a rebate at closing if

23   the repairs and renovation -- if the renovations and upgrades

24   weren't completed.

25        Q    Right, but the HUD-1 that's disclosed, the

1    HUD-1 that's completed?

2         A    Yeah, I don't think the rebate ever made it to

3    the HUD-1, absolutely not.  It was a post-closing thing.

4         Q    So the banks were never told about that?

5         A    It was in the contract but it was -- I don't

6    believe our seller rebate that happened at closing ever made

7    the HUD-1.

8         Q    The HUD-1s that actually say how the money was

9    spent, did they ever reflect the rebate --

10        A    No, sir, no, sir.

11        Q    So they were false, the HUD-1s?

12             MR. CASTILLO:  Objection to the form of the

13   question.

14             THE COURT:  Overruled.

15        A    Um, I believe so.  They were not fully

16   disclosed.

17        Q    And how did you arrange to have the HUD-1s

18   completed?

19        A    That was pretty much the role of the closing

20   attorney.

21        Q    Did there come a time when you began to use

22   Michael Bouchard as your closing attorney?

23        A    Yeah.  I used Mike at closings from pretty

24   much day one, you know, all the way back until he had a

25   partner.  He had a partner, I think his name was Chuck

1    Rosenstein, it was Rosenstein and Bouchard and they did some

2    of our closings.

3         Q    And these are the closings that you've just

4    described?

5         A    I believe he was involved in -- from the very

6    beginning when it was seller seconds to rebates, you know,

7    the entire evolution.  As the closing attorney.

8         Q    How did you meet with him -- I mean how did

9    you meet him?

10        A    I been trying to think of how I met Mike and I

11   can't remember, but either our attorney referred him,

12   referred us into his office or one of the other investors

13   that we -- because it was like your competitors, you knew you

14   were competitors and we would talk and they would know, they

15   would just give you advice, like use this attorney, use this

16   appraiser, use this home inspection company, use this, so it

17   came one of those two ways, but I don't have a real

18   recollection of how Mike and I met.

19        Q    Did you describe to him what you were trying

20   to do?  How these transactions worked?

21        A    In my initial deals, we had some discussions

22   but it was -- I had other attorneys involved so what the

23   attorneys talked about --

24        Q    I'm just asking about what you talked about

25   with Mike Bouchard over the years.  Explain to the jury what

1    you told him about how you did these deals.  Starting with

2    the silent seller seconds, moving on to the repair rebates.

3          A     Yeah, I can't specifically recollect a

4    specific conversation I had with Mike about our seller

5    seconds, about our seller rebates.  Like I said, those are --

6    were other attorneys that were giving me that legal advice.

7    The only thing I can specifically say that I spoke to Mike

8    about was much later in our relationship when Matt and I had

9    decided not to do creative deals anymore.

10          Q     And by creative deals, what do you mean by

11    that?

12          A     Just, um, I mean I guess I would have -- well,

13    I'm trying to be polite by saying creative, but corrupt, you

14    know, there was a time where corrupt, creative financing,

15    Matt and I just came to the conclusion it was corrupt, it was

16    illegal, we weren't disclosing to the banks, we -- it was

17    just -- it was just a real culture of corruption and we were

18    caught up in it and it was so -- the culture was so corrupt,

19    it didn't look corrupt.  You had to really, you had to really

20    look for it.  It was that bad.  Everybody was doing it.  I

21    mean I would imagine a U.S. Attorney could walk into any

22    attorney's office in Albany and pull a file and put someone

23    in prison.

24          MR. CASTILLO:  I'm going to object to that,

25    Judge.

1                THE COURT:  Sustained.  Disregard it, members

2      of the jury.

3           Q    All right.  There came a time when you

4      decided -- that you did have a conversation with Mike

5      Bouchard on this subject?

6           A    Yeah, um, well, when Matt and I got out of the

7      consulting business teaching people how to buy and sell, we

8      didn't really know what to do.  We had quit our jobs, we had

9      made a lot of money so we had relationships in real estate,

10     so we just opened up a title company, we said we're gonna

11     just do title.

12          Q    And what was the name of the title company?

13          A    Team Title Abstractors, so -- because I had a

14     lot of relationships with lenders and bankers and realtors

15     and mortgage officers and mortgage brokers, and they would

16     send me a lot of business, and there was a mortgage broker,

17     her name's Nickole Riley and she called me, you know, because

18     I -- I was known to be a creative guy, I, you know, they

19     called me for advice.

20          Q    And when you say creative, is that fair to say

21     that you're still being polite and you mean that you'll do

22     deals that disguised the true transaction from the bank?

23          A    Well, the end game was walk away with cash at

24     closing, you know, so do I know today that it was completely

25     corrupt?  Yeah, so I was known to be corrupt.

1          Q     Okay.

2          A     So other corrupt people would call me and say,

3    Tom, we're doing things, what do you think, and on this

4    particular occasion, I got called and I had no idea, Nickole

5    called me and said, she was doing business with these new

6    guys and they were doing a ton of business.

7          Q     How did you know Nickole?

8          A     She was my loan officer, she was one of my

9    loan officers.

10         Q     And what does that mean she did for you?

11         A     I would just send my customers, my consultant,

12   my customers to her and she would do all their banking, she

13   would do all their mortgages, I would just send them to her

14   and Nickole facilitated all that.

15         Q     Before we go -- you're about to talk about PB

16   Enterprises?

17         A     Yes.

18         Q     Before we go to PB Enterprises, I want to go

19   through a series of transactions involving, excuse me, the

20   Real Estate Consultants.

21         A     Okay.

22         Q     I'd like to show you Government Exhibit 1.10,

23   previously marked as Government Exhibit 1.10 and it's

24   admitted in evidence by stipulation.  Can you ... Can you

25   identify what that document is?

1          A     This is a HUD-1 statement, settlement

2     statement.

3          Q     And who's -- what property does it relate to?

4          A     255 Fourth Street, Troy, New York.

5          Q     And who's the buyer?

6          A     Deryal Williams.

7          Q     Who's the seller?

8          A     John Donvito.

9          Q     Do you remember this transaction?

10          A     Deryal was one of my customers, he was one of

11     our clients.

12          Q     Can you describe how he purchased properties?

13          A     He basically, we found him properties, he took

14     out mortgages, he received cash at closing, we pretty much

15     facilitated the whole deal.  He just really inspected the

16     properties and said yes or no.  We probably lent Deryal money

17     to buy properties.

18          Q     And when you say lent him money, does that

19     mean you put money into his accounts to make it look like he

20     had more money than he did?

21          A     Yeah, I would imagine we did that with Deryal.

22          Q     Do you remember doing that?

23          A     I don't remember specifically but it probably

24     happened nine out of ten times, so --

25          Q     All right.  Once it came time to purchase this

1    property, do you recall where the closing was?

2            A    I don't physically recall but it says Bouchard

3    Law Firm.

4            Q    All right.  I'd like you to turn to the third

5    page of that document.  Can you identify what that document

6    is, if it's the one on the screen if you --

7            A    Okay.

8            Q    What is that document?

9            A    Looks like, it looks like --

10           Q    Who's handwriting is that?

11           A    That's my handwriting.

12           Q    So what is this?  Tell the jury.

13           A    This would be the proceeds of the money from

14   closing and how I wanted them disbursed after closing.

15           Q    And to whom did you give that?

16           A    I would typically give this to Mike if I was

17   in Michael's office.

18           Q    Michael who?

19           A    Michael Bouchard.

20           Q    So who superintendent -- who handled the

21   closings for Real Estate Consultants when you were doing

22   these and for Team Title?

23           A    We use a lot of settlement agents but this

24   one, Mike, I had like four or five attorneys I worked with, I

25   would let the buyers and sellers pick where they wanted to do

certain things so this one ended up in Mike's office.

Q    And this is your handwriting?

A    Yes, sir.

Q    And who did you give it to?

A    I mean I don't remember physically giving it
to, but it would have, a lot of times --

Q    Well, explain to the jury how these closings
came to happen.  I mean you walk in, what happens?

A    I wouldn't go in the closing, I would kind of
just wait for it to be over and then my job when it was over
was just to make sure everybody was paid the way they were
supposed to be paid.

Q    So you gave this list to whom?

A    Many times Michael.

Q    Okay.  And each of the closings you would give
them a comparable list?

A    Yeah, lot of times it would be, I'd have it
worked out before closing but so much stuff changed at
closing that they typically ended up, just meet me at the end
working out numbers with everybody to make sure everything
was covered and everybody was paid.

Q    And when you handed him this, what did he say?

A    He would probably just tell one of the girls
to cut checks.

Q    All right.  I'd like you to look at the checks

1   that are cut with respect to this closing, which are the

2   following documents.  Can you turn to the next page.

3   Actually can you put that up on the left and then pull the

4   next pages up on the right or whatever, one side or the

5   other.  All right.  What's the check on the left?

6          A    It looks like it's the title insurance payment

7   to the title company, Central Abstract.

8          Q    And is that reflected in your handwritten list

9   of how to cut checks?

10         A    Yes, it is.

11         Q    And what's the next check?

12         A    Check to Deryal Williams.

13         Q    And is that reflected in the way you asked the

14  checks --

15         A    Yes, it is.

16         Q    Right here in the middle?

17         A    Yeah, I see it.

18         Q    All right.  What's the next check?

19         A    That would be the check to the seller, that

20  would be what the seller received at closing.

21         Q    And does that comport with what you said, the

22  way the checks should be distributed?

23         A    Yes.

24         Q    Okay.  What's the next check?

25         A    That would be a consulting, that would be a

1    fee that went to my partner.

2              Q    All right.  Matt Kupic?

3              A    Yeah.

4              Q    Does that comport with your handwritten list

5    on how you wanted the checks cut?

6              A    Yeah.

7              Q    What's the next check?

8              A    Another check to Matt.

9              Q    And is that the same as you asked that be

10   done?

11             A    Yeah.

12             Q    Okay.  What's the next check?

13             A    That would have been the fee paid to the

14   mortgage broker.

15             THE COURT:  Which amount are you talking about

16   right now?

17             THE WITNESS:  2650.  That's what I'm looking

18   at on the screen, that's what I'm answering to.

19             Q    Check to MEM Financial Solutions for $2,650.

20   Is that on your handwritten list?

21             A    Yes, sir.

22             Q    Top entry?

23             A    Yes, sir.

24             Q    What is the next check?

25             A    Michael Bouchard.  That would have been the

1   settlement fee, attorney fee.

2            Q    And is that the second entry on the list?

3            A    Yep.

4            Q    What's the next check?

5                 THE COURT:  That's the 450, is that what that

6   would be?

7                 THE WITNESS:  Yes, sir.

8            Q    That's $450.

9            A    That would have been -- we paid people for

10  finding the property so that would have been like a referral

11  fee.

12           Q    So this is to Property Locater by Diz?

13           A    Yep.

14           Q    Thousand dollars?

15           A    Yep.

16           Q    Does that appear in your handwritten --

17           A    Yeah.

18           Q    Okay.  What's the next check?

19           A    Sean Williams.

20           Q    And how much is that check for?

21           A    7200.

22           Q    And is that also as you directed?

23           A    Yep.  And Sean and Deryal were basically, it

24  was, Sean -- Deryal was Sean's uncle and they were partners

25  so some -- one time Deryal took a loan, then Sean took loans

1    but they were partners.

2              Q    Okay.  What's the next check?

3              A    That would have been Thomas Disonell, that

4    would have been fees to me.

5              Q    And is that the bottom?

6              A    Yeah.

7              Q    I'd like you to go back to the HUD-1 which was

8    sent to the banks.  The checks that you've just gone through,

9    are they reflected in the HUD-1?

10             A    Not all of them.

11             Q    Are the checks to you and to Matt Kupic and to

12   Sean Williams and to Deryal Williams, are they reflected in

13   the HUD-1?

14             A    No.

15             Q    How much is reflected as having been paid to

16   the seller in that HUD-1?

17             A    $81,667 it looks like.

18             Q    How did you come to the figure of $34,003 to

19   John Donvito then in the actual checks?

20             A    That's what the actual deal was, that's what

21   he actually received for his house.  And I think if you -- on

22   the HUD on the next page, if you looked at the government

23   recording and transfer charges, I can't remember the

24   calculations but I'd imagine they work out to that sales

25   price as well, because the deed stamps and the mortgage tax

1    was done at the real sale price most of the time because

2    obviously the higher one cost more money.

3            Q    Okay.  Is it fair to say, or tell the jury,

4    did you get the money you were expecting to get at the end of

5    that closing?

6            A    Yes.

7            Q    Did the bank know that?

8            A    Absolutely not.

9            Q    Going back to the HUD-1, looking at the bottom

10   left-hand corner of the first page of the HUD-1, it says that

11   the buyer was to bring $21,528.50 to the closing.

12           A    Yep.

13                THE COURT:  Are you going to 1.10 now?

14                MR. OLMSTED:  I am looking at the first page

15   of 1.10.

16           A    Right down there, at the very end.

17                THE COURT:  21,528.50.

18           A    Yeah.

19           Q    Can you tell the jury what happened with

20   respect to that entry?

21           A    Um, I can't tell the jury what happened with

22   respect to that specific entry but typ --

23           Q    You had a business practice that you did with

24   Deryal Williams, what was it?

25           A    Typically, depending on what the bank's

1    requirements were, we would either have brought in certified

2    funds or just a personal check or, you know, one of those.

3            Q     And what would happen to that check?

4            A     It would be handed back to me after closing.

5            Q     So anybody make a copy of it?

6            A     I'd imagine it had to get faxed to the lender

7    for approval.

8            Q     So do you understand why you had to bring the

9    check in in the first place?

10           A     Yes, sir.

11           Q     But in each instance, you kept the check after

12   the closing?

13           A     If I was the one who brought it in, yes, or

14   had gave it to my customer to bring it in, yes.

15           Q     All right.  What's flash money?  You ever use

16   that phrase?

17           A     I mean, to me flash money is you're just

18   showing it but you're not giving it.

19           Q     Was this flash money?

20           A     Yes, sir.

21           Q     Who gave you the checks that we've just been

22   through?

23           A     Who gave them to me?

24           Q     Yes.

25           A     My bank.

1              Q    No, okay.  I'm going back --

2              A    Okay.

3              Q    -- to the ones that you got at the end of the

4    closing.

5              A    It would probably be physically handing me the

6    checks, you know, one of Mike's employees.

7              Q    Did Michael Bouchard ever give you the checks?

8              A    Sometimes.

9              Q    What distinguished -- why would it sometimes

10   be him and sometimes be his employees?

11             A    I just think they were the paralegals, that

12   was what they did, that was their job, they did the closing.

13             Q    Did this match up with what you had asked

14   Michael Bouchard to do before the closings?

15             A    We had a really good relationship, I wouldn't

16   even tell him this until right at -- as soon as the closing

17   was over I would just walk in and say do this.  It wasn't a

18   lot of preparation, it was just cut the checks this way, it

19   was known, he -- you know, it was just known that's what we

20   did.

21             Q    Okay.  The jury doesn't know that, though,

22   because they weren't around, so you have to explain this to

23   them.  How does that work?

24             A    We just --

25             Q    Just trying to get a picture.

1          A     We did so many deals together, we just knew

2     that at the end of my closings, I was going to walk in and

3     give him a list of checks to cut, and as long as he only

4     disbursed what the bank sent in, he just did what I asked him

5     to do.  If the bank sent in a hundred dollars and I told him

6     break this hundred thousand up these 35 different ways, he

7     would just do it.

8          Q     Okay.  Well then that answers that question.

9     Let me ask you this.  Did you do other closings with him?

10    Beyond the one you just talked about?

11         A     Yeah, I did many closings.

12         Q     All right.  I'm going to take you through

13    another one.  Government Exhibit 1.11.  What's that document?

14         A     Excuse me, sir?

15         Q     Can you identify what that document is for

16    the --

17         A     It's a HUD-1 statement I have in front of me,

18    I have all the same documents.

19         Q     And what property does that relate to?

20         A     129 Henry Johnson Boulevard in Albany.

21         Q     And who is the purchaser on that property?

22         A     It would be Deryal again.

23         Q     And what's the purchase price?

24         A     It's saying 76,000.

25         Q     All right.

1          A    That would be the contractual sales price.

2          Q    Okay.  But the real sales price is what, do

3    you know?

4          A    If you have a check in here for Deryal, or for

5    Lucinda, the seller.  It was $14,341.

6          Q    Right.  And the HUD-1, however, shows that she

7    should have received $69,582?

8          A    Well, the HUD-1, she should have received

9    76,000, that was the contract price, but she might have had

10   back taxes or something so she should have been walking out

11   of closing with 69,000 as per the HUD-1.  But she was getting

12   76,000 for the property but there's adjustments obviously

13   that brings her down to 69,000.

14         Q    And those are listed and the 69,000 figure is

15   right in the bottom right-hand part of that?

16         A    Yeah.

17         Q    But in fact, you have the checks in front of

18   you?

19         A    I do.

20         Q    And how much is the check that she gets?

21         A    It was 14,000 something.

22         Q    All right.

23         A    14,341.72.

24         Q    Okay.  Looking at the bottom left-hand part of

25   the HUD-1, it says that Deryal Williams would have brought in

1    $21,106?

2           A    Yes.

3           Q    92 cents.  Can you describe to the jury how

4    that would have worked?

5           A    He would have probably brought in a bank

6    check.

7           Q    And how would he have obtained that bank

8    check?

9           A    I would have probably lent him money.  He

10   would have gone to our bank, opened up an account, came back,

11   put the money in, and then, you know, the bank check would

12   have probably come back to me or sometimes Matt and I would

13   just go get our own bank check.

14          Q    But in any case it was not used to purchase

15   the property?

16          A    No.  Well, it was used to facilitate the fraud

17   I guess you would call it, to get the bank to release the

18   funds, approve the deal and then it would get handed back to

19   us later.

20          Q    Okay.  So the money wasn't used, just the

21   physical check was used as flash money?

22          A    Yes, sir.

23          Q    And with respect to this, is this another

24   closing where you would come in with a handwritten list

25   saying here's how to distribute the money?

1          A     Handwritten or typed, depending on --

2          Q     I'd like to take you through the checks that

3     were issued as a result of this closing.

4          A     Next couple pages.

5          Q     What is that check?

6          A     That's recording fees to Albany County.

7          Q     Next check?

8          A     New York State mortgage tax.  Back taxes.

9          Q     You can keep going.

10               THE COURT:  Well, you know what, it's getting

11    after 5 right now.

12               MR. OLMSTED:  Okay.  We'll just go -- if I can

13    go through these checks and then I'll stop?

14               THE COURT:  All right.

15          Q     Deryal Williams?

16          A     Yep, that would have been cash to Deryal.

17               THE COURT:  Is that on this transaction you're

18    talking about, these checks?

19               THE WITNESS:  Excuse me, sir?

20               THE COURT:  Is this, are these checks for this

21    transaction you're talking about with Exhibit 1.11?

22               MR. OLMSTED:  Yes.

23               THE COURT:  Is that what we're talking about?

24               MR. OLMSTED:  They're all part of

25    Exhibit 1.11.

1              THE WITNESS:  Yep.  Yes.

2              THE COURT:  This is 129 Henry Johnson

3    Boulevard?

4              THE WITNESS:  Yes, I believe so, sir.

5         Q    If you could keep -- we'll just continue a

6    couple more checks.  Matt Kupic, can you -- what is that

7    check for?

8         A    That would have been cash to Matt.  Broker fee

9    to the mortgage broker.  Mike's closing fee.  Finder's fee.

10        Q    Next check?

11        A    That would have been a fee to our company.

12        Q    $7,000?

13        A    Yeah.  Cash to the buyer.

14        Q    Next check?

15        A    That would have been probably the seller's

16   attorney.

17        Q    Next check?

18             THE COURT:  I thought the buyer was Deryal

19   Williams.

20             THE WITNESS:  The buyer is Deryal Williams but

21   Sean and Deryal were partners so they would just have me

22   write checks the way they wanted them and I would ask Mike to

23   do it and he would just write checks.  Didn't necessarily

24   matter who was in the transaction.

25             THE COURT:  Okay.

1          Q     Next check?

2          A     That would be a tax escrow.

3          Q     And the next check?

4          A     Money to me.

5          Q     It says Francis Disonell, the last one was

6     Thomas Disonell.

7          A     I go by Thomas, Tom, I'm the third so I've

8     never went by Francis so that's just --

9          Q     So that's a check to you?

10         A     Yes.  More money to the seller, and that

11    might -- we might have noticed at the end we made a mistake

12    so we just gave her more money.

13         Q     You had a $7,000 check to the Real Estate

14    Consultants and then individual checks; how did you decide

15    among you and Matt Kupic how to divvy up money?

16         A     We didn't really, we were just -- we didn't

17    really have a formal relationship.  If we put some money in

18    the company for operating and we take whatever money we

19    wanted any which way we want it.  I was married with kids so

20    I take more money sometimes and, you know, Matt was -- it

21    would just depend on what we were doing that month.

22         Q     And so you would -- and how would Michael

23    Bouchard know how to cut those checks?

24         A     I would probably have told him, Matt or I.

25              MR. OLMSTED:  Before I go to the next topic

1    I'll stop for the night.

2                    THE COURT:  All right, fine, members of the

3    jury, Judi, can we start at 9 tomorrow?  Can you come in at

4    9?  Is there anything you need in the jury room?  What do you

5    need?

6                    A JUROR:  Our coats and purses are in there.

7                    THE COURT:  Oh, no, no, no, in the morning.

8                    A JUROR:  You mean for the jury room?  No,

9    we're good.

10                    THE COURT:  All right.  Remember your rules of

11    conduct.  I'll see you all in the morning.

12                    (Jury Excused, 5:07 p.m.)

13                    THE COURT:  You're all set, sir.  See you all

14    at 9:00.

15                    THE CLERK:  Court's in recess.

16                    (Court Adjourned, 5:08 p.m.)

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T I O N

2

3

4          I, JODI L. HIBBARD, RPR, CRR, CSR,

5   Official Court Reporter in and for the United States

6   District Court, Northern District of New York, DO

7   HEREBY CERTIFY that I attended the foregoing

8   proceedings, took stenographic notes of the same,

9   and that the foregoing is a true and correct

10  transcript thereof.

11

12

13

14

15

16

17

18                    _____

19                    JODI L. HIBBARD, RPR, CRR, CSR
                      Official U.S. Court Reporter
20

21

22

23

24

25