U.S. DISTRICT COURT
N.D. OF N.Y.
FILED

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

OCT 1 7 2017

~~LAWRENCE K. BAERMAN, CLERK~~
ALBANY

UNITED STATES OF AMERICA,

-against-            Civil Case Number _____

MICHAEL G. BOUCHARD,

　　　　Movant.

---

Criminal Case No. 1:12-CR-381 (NAM)


## MOTION TO VACATE, SET ASIDE, OR CORRECT A SENTENCE BY A PERSON

## IN FEDERAL CUSTODY

## (MOTION UNDER TITLE 28, UNITED STATES CODE, SECTION 2255)


Dated:  October 3, 2017


Submitted By:


Michael G. Bouchard
Movant, Pro Se
Federal Register # 19905-052
Federal Prison Camp, Canaan, P.O. Box 200
Waymart, Pennsylvania 18472


　　　　This Motion complies with Rule 2(c) of The Rules Governing Section 2255 Cases in that it

substantially follows either the form appended to The Rules or a form prescribed by a local

district-court rule (the form that is available to the public on the web-site for The United States

District Court for The Northern District of New York).

## TABLE OF CONTENTS

PRELIMINARY STATEMENT                          Page:  4

STANDARD OF REVIEW                             Page:  5

SATISFACTORY PLEADING REQUIREMENTS             Page:  5

NOTICE TO READER                               Page:  6

GROUND 1                                       Page:  8

THE JURY'S GENERAL VERDICT OF GUILTY ON COUNT ONE DOES NOT INDICATE WHETHER IT CONVICTED ON THE BASIS OF CONSPIRACY OR THE ALTERNATE BASIS OF AIDING AND ABETTING A CONSPIRACY. BECAUSE OF THIS UNCERTAINTY AND THE FACT THAT THE JURY INSTRUCTIONS ON THE AIDING AND ABETTING BASIS WERE LEGALLY INSUFFICIENT, THE CONVICTION MUST BE VACATED.

GROUND 2                                       Page: 18

THE EVIDENCE INTRODUCED AT TRIAL ON THE COUNTS REVERSED ON APPEAL POISONED THE JURY'S DELIBERATIONS IN DECIDING TO CONVICT ON COUNT 1 - CONSPIRACY, THEREBY RESULTING IN PREJUDICIAL SPILLOVER. ACCORDINGLY, THE CONVICTION ON THE LAST REMAINING COUNT 1 MUST BE REVERSED.

GROUND 3                                       Page: 23

THE INDICTMENT VIOLATES THE EX POST FACTO CLAUSE OF THE UNITED STATES CONSTITUTION. THEREFORE, THE CONVICTION ON COUNT 1 MUST BE VACATED AND THE INDICTMENT MUST BE DISMISSED WITH PREJUDICE.

GROUND 4                                       Page: 30

THIS TRIAL COURT'S INSTRUCTION TO THE JURY ON THE CONSPIRACY COUNT WAS ERRONEOUS AND VIOLATED DUE PROCESS BECAUSE IT OMITTED MENTION OF ESSENTIAL ELEMENTS OF THE CONSPIRACY ALLEGED IN THE INDICTMENT.

GROUND 5                                       Page: 37

THE JURY'S GENERAL VERDICT ON THE CONSPIRACY COUNT DOES NOT INDICATE WHETHER IT CONVICTED BASED ON THE POTENTIALLY LEGALLY-SOUND FREMONT TRANSACTION OR THE LEGALLY-UNSOUND CITIMORTGAGE TRANSACTION. BECAUSE OF THIS UNCERTAINTY, THE CONSPIRACY CONVICTION MUST BE VACATED.

**GROUND 6**                                              **Page:  42**

THE CONSCIOUS AVOIDANCE JURY INSTRUCTIONS WERE LEGALLY ERRONEOUS, ESPECIALLY
VIEWED IN LIGHT OF THE SECOND CIRCUIT'S DECISION IN THIS CASE. ACCORDINGLY, THE
CONSPIRACY CONVICTION MUST BE SET ASIDE.

**GROUND 7**                                              **Page:  48**

DEFENSE COUNSEL GASPAR CASTILLO'S PERFORMANCE WAS DEFICIENT AND INEFFECTIVE,
THEREBY CAUSING PREJUDICE TO MICHAEL BOUCHARD AND DEPRIVING HIM OF THE EFFECTIVE
ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES
CONSTITUTION.

**MOTION QUESTIONNAIRE**                                  **Page: 89**

## PRELIMINARY STATEMENT

On July 25, 2012, a grand jury returned a 24 Count indictment charging Michael G. Bouchard with conspiracy to submit false statements to financial institutions, or, in the alternative, aiding and abetting conspiracy (Count 1), bank fraud, or, in the alternative, aiding and abetting bank fraud (Counts 2-23) and submitting a false statement to a financial institution (Count 24). On November 30, 2012, following a 12 day trial, Bouchard was convicted of Counts 1, 7, 19 and 24, and acquitted on the remaining 20 counts. The government's fabricated case was largely rejected by the trial jury. In fact, Bouchard's trial lawyer learned from a Court employee that the jury, which was "hung" for almost 3 days of deliberations, had been 11 to 1 in favor of acquitting Bouchard on all 24 Counts in the indictment. Unfortunately, one lone holdout juror led to the baseless trial convictions. On October 22, 2014, this Court sentenced Bouchard to 48 months imprisonment.

On July 7, 2016, the United States Court of Appeals reversed the convictions on Counts 7, 19 and 24, affirmed the conviction on Count 1, and remanded the case to this Court for resentencing. On October 20, 2016, this Court again sentenced Bouchard to 48 months imprisonment.

The movant, Michael G. Bouchard, submits the within motion pursuant to 18 U.S.C. 2255 to vacate the judgment of conviction and sentence.

## STANDARD OF REVIEW

Because Michael G. Bouchard is proceeding pro se in this motion, his submissions must be "liberally construed in his favor", Simmons v. Abruzzo, 49 F.3d 83, 87 (2d Cir. 1995), and will be read "to raise the strongest arguments that they suggest." Green v. United States, 260 F.3d 78, 83 (2d Cir. 2001). A proper analysis of the facts of this case and the law will lead to one and only one conclusion: the conviction and the sentence must be set aside.

## SATISFACTORY PLEADING REQUIREMENTS

This motion satisfies the pleading requirements of Section 2255, for the Seven Grounds set forth herein demonstrate that:

(1) the sentence was imposed in violation of the Constitution or laws of the United States; and/or

(2) the sentence is otherwise subject to collateral attack.

This motion also sets forth "the facts supporting each ground" for relief. See Section 2255(b). Collateral relief under Section 2255 is available "for constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice". United States v. Bokun, 73 F.3d 8, 12 (2d Cir. 1995); Hill v. United States, 368 U.S. 424, 428 (1962).

NONE of the Grounds for relief have been waived.

## NOTICE TO READER

All readers of this Motion must beware of the prosecutors' standard operating procedure that will be followed in response to this Motion. The prosecutors will never address the real facts of this case. Instead, the prosecutors will rely upon their own fake facts and they will also use one or more tactics in response to the Motion, such as:

1) the prosecutors will claim that Bouchard's arguments are "wholly without merit";

2) the prosecutors will claim that "Bouchard has failed to accept responsibility in this case"; and

3) the prosecutors will claim that "Bouchard is blaming his paralegals".

All such claims by the prosecutors are diversionary tactics used by them to obfuscate the truth and to deflect attention away from their own prosecutorial misconduct.

With respect to the innocent paralegals Laurie Hinds and Malissa Edgerton, the prosecutors' assertion that Bouchard has "blamed the paralegals" is false. That falsehood originated from the mouth of prosecutor Michael Olmsted at trial when he cross-examined Michael Bouchard with an accusatory line of questioning regarding the paralegals:

(Document 54, Page 89, Lines 8-12):

> *Question by Olmsted: "In the ensuing year, you did not raise this with anyone until after you were indicted, is that right?"*
>
> *Answer by Bouchard: "I did not -- I don't understand the question."*
>
> *Question by Olmsted: "Blame-the-paralegal defense."*
>
> *Answer by Bouchard: "I did not blame my paralegals at all."*

Later on, the falsehood was repeated by the prosecutors' in their first sentencing memorandum:

*"The defendant has not accepted responsibility for his criminal actions, nor has he taken any responsibility for having made his employees, Malissa Edgerton and Laurie Hinds, complicit in his criminal conduct. Instead, the defendant, a licensed attorney in the State of New York, obliged as all ordinary citizens are to follow the law, and further obliged as a lawyer to adhere to strict rules of ethics and professional responsibility, committed fraud and now blames the offense conduct on his employees."* (Document 60, Page 5).

That lie is inconsistent with the facts. Michael Bouchard always defended the innocent

Laurie Hinds and Malissa Edgerton. In fact, in a section of a post-trial motion entitled "Targeting

of Laurie Hinds and Malissa Edgerton", Michael Bouchard told this Court the following:

*"Both Laurie Hinds and Malissa Edgerton were subpoenaed by the government and both freely testified in front of the grand jury on June 22, 2011. Assistant United States Attorney Thomas Capezza was displeased with the fact that the testimonies of Laurie Hinds and Malissa Edgerton pointed to their innocence and the innocence of Michael Bouchard. Shortly thereafter, AUSA Capezza engaged in prosecutorial misconduct by improperly targeting without any legitimate reason two innocent persons, Laurie Hinds and Malissa Edgerton. AUSA Capezza abused the grand jury process to intimidate and torture those two former employees of The Bouchard Law Firm, and, that intimidation and torture was continued by IRS Agent Thomas Fattorusso, IRS Agent Bryan Haag, AUSA Michael Olmsted and AUSA Tamara Thomson."* (Document 96, Page 40).

Prosecutor Tamara Thomson's callously indifferent response was as follows:

*"The defendant argued that the government targeted innocent persons. Hinds and Edgerton pled guilty; neither asserts innocence."* (Document 101, Page 38).

This disturbing response by Thomson ignores the real fact that Laurie and Malissa, two

young mothers with children at home, always professed their innocence but only pled guilty

after they were coerced into their fake guilty pleas by the government.

Prosecutor Tamara Thomson then repeated the lie at the first sentencing hearing on

October 22, 2014, telling this Court:

*"The defendant exploited ... his paralegals, the paralegals who worked tirelessly and diligently for him, Laurie Hinds and Malissa Edgerton." ... "he blames Laurie Hinds and Malissa Edgerton."* (Document 120, Pages 3-4; Page 5).

Two years later, Prosecutor Tamara Thomson repeated the lie again at the second sentencing hearing on October 20, 2016, telling this Court:

> "The defendant ... throughout the trial testimony, throughout these submissions, still blames the paralegals. ... It's shameful. It is shameful." (Document 151, Page 13)

What is really shameful here is that the lawless prosecutors can repeatedly make and get away with such outrageously false accusations.

Finally, the Court of Appeals decision in this case poses significant legal and ethical problems for the prosecutors. Even if the prosecutors continue to rely upon their false fact pattern, they cannot ignore the law. The Court of Appeals explained the law applicable to an alleged violation of 18 U.S.C. 1014 (submitting a false statement to an FDIC insured bank). And that law demonstrates that the coerced guilty pleas of Laurie Hinds and Malissa Edgerton are legally erroneous and must now be vacated. (See Ground 3 herein and Ground 7 herein, Example 9). The law requires vacatur of the convictions, and so do the attorney rules of ethics applicable to prosecutors.

## GROUND 1:

**THE JURY'S GENERAL VERDICT OF GUILTY ON COUNT ONE DOES NOT INDICATE WHETHER IT CONVICTED ON THE BASIS OF CONSPIRACY OR THE ALTERNATE BASIS OF AIDING AND ABETTING A CONSPIRACY. BECAUSE OF THIS UNCERTAINTY AND THE FACT THAT THE JURY INSTRUCTIONS ON THE AIDING AND ABETTING BASIS WERE LEGALLY INSUFFICIENT, THE CONVICTION MUST BE VACATED.**

In Count 1 of the indictment, the government charged Bouchard with conspiracy to submit false statements to financial institutions in violation of 18 U.S.C. Sections 371 and 1014 - OR- in the alternative, aiding and abetting that conspiracy in violation of 18 U.S.C. 2(b). (Document 1, Pages 1-12).

Consistent with the indictment, the government prosecuted Count 1 on these two alternate theories of criminal liability: conspiracy -and- aiding and abetting the conspiracy. Section 2 of Title 18 codifies the aiding and abetting statute. Subdivision (b) provides: "Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." The government's main contention was that Bouchard "aided and abetted" the Team Title and PB Enterprises schemes to defraud mortgage lending institutions by causing false statements to be submitted to such institutions.

The words "aided and abetted" and the similar words "assisted" and "caused" that are descriptive of the offense of "aiding and abetting" are repeated over and over again by the government throughout the lengthy allegations in Count 1. For instance, paragraph 12 of the Indictment states: "In each transaction described in this Indictment, the HUD-1 provided by the Bouchard Firm to its client mortgage lender was false and aided and abetted PB Enterprises or Team Title in the schemes described below."

The words "assist" and "causing" along with a violation of subdivision (b) of the aiding and abetting statute, all appear in Paragraph 41 - the government's main charging paragraph in Count One. This paragraph reads as follows: "From in or about 2000, and, continuing thereafter until in or about 2007, in Albany, Rensselaer and Schenectady Counties, in the Northern District of New York, and elsewhere, in order to assist[1] the schemes described above, the defendant, MICHAEL G. BOUCHARD, did knowingly, willfully, and unlawfully conspire, combine,

---

[1] "Aiding and abetting" has now come to mean "assisting". Doyle, Charles - Senior Specialist in American Public Law, "Aiding, Abetting and the Like", Congressional Research Service, 2014, Page 3.

Page 9 of 97

confederate, and agree with others known and unknown to the Grand Jury to commit an offense against the United States, that is, knowingly making and causing to be made materially false statements for the purpose of influencing in any way the actions of financial institutions, the accounts of which were insured by the Federal Deposit Insurance Corporation, upon applications, commitments, and loans and deferment of actions, <u>in violation of Title 18, United States Code, Sections 1014 and 2(b)</u>". The Court read this passage from the indictment to the jury as part of the jury instructions. (Document 117, Page 22, Lines 11-25). This same passage is also in the government's pre-trial proposed jury charges, all with references to "assist", "causing" and subdivision "b" of the aiding and abetting statute - again, known as "causing the offense." (Document 14, Page 33).

The word "cause" appears in paragraph 42. Regarding Bouchard's alleged direction of other persons' activities, the words "others acting at his direction" appear in paragraphs 20, 36, 44 and 45. The word "caused" appears in the alleged overt acts described in paragraph 47 of the indictment.

The government's repetitious language in Count 1 of the indictment describes the alternate theory of criminal liability known as "aiding and abetting" in violation of 18 U.S.C. Section 2(b), more commonly known as "causing an offense."[2]

In his closing argument to the jury prior to the Court's jury instructions, Prosecutor Olmsted repeatedly drove home the government's theory that Bouchard "aided and abetted" and "caused" others to act. But, Prosecutor Olmsted lied in his argument to the jury - most of the statements that he attributes to witnesses were never said, and, the remaining statements

---

[2] The word "causing" is the operative word in subdivision "b" of the aiding and abetting statute - referred to as "Causing the Offense". Doyle at 7.

he mischaracterized and spun out of context. Here is what Olmsted told the jury: *"Laurie Hinds said, yes, that's the way I assume we were supposed to do these things, I checked with Michael. Malissa says I checked with Laurie or Michael and then on redirect she said, no, I would have checked with Michael, there's not a moment that a paralegal is going to do a closing without a down payment and writing checks that don't appear on the HUDs without checking with her boss and that's what she said she did"*. (Document 116, Page 14, Line 24 -to- Page 15, Line 6); *"Laurie says I checked with Michael Bouchard before I wrote these checks ..."* (Page 19, Line 7-9); *"And the judge said, what's the most important document, Crowley [of PB Enterprises] says, you can't do this crime without a false HUD-1 going to the bank. And so they [Crowley and O'Connell] had to get someone to do that [to aid and abet the crime of conspiracy] and they got Michael Bouchard"*. (Page 29, Lines 3-7); *"... Laurie Hinds says yes, he [Michael Bouchard] told me that I should do this ..."* (Page 31, Lines 2-3); *"Now Malissa Edgerton said she didn't do these on their own, she checked with Laurie or Michael, and on redirect she said there's no way I write these checks without checking with Michael. She saw Michael Bouchard do these closings, she saw Laurie Hinds do these closings, she checked, it was okay."* (Page 37, Lines 10-15); *"... Malissa is doing Michael's bidding ..."* (Page 61, Line 5); *"Basically, Malissa summed it up in a sentence which is, I knew what I was doing was false, I just didn't think it would matter. Why didn't she think it would matter? Because Michael Bouchard told her it wouldn't matter"*. (Page 65, Lines 1-5); *"He told Malissa that she could do it. He told Laurie Hinds that she could do it. You heard them testify. They said, oh, I didn't think I was doing a fraud. You know why they didn't think they were doing a fraud, because they checked with a lawyer, their boss, and said*

can we give false documents to the bank and he said the bank doesn't care ..." (Page 152, Lines 1-7).[3]

Before trial, the government filed its proposed jury instructions, which included two pages on 8th Circuit "aiding and abetting" jury instructions. (Document 14, Pages 51-52). As we will see below, the government's instructions were entirely erroneous.

At trial, the Court never read the aiding and abetting statute to the jury. But the Court did provide the jury with the following instructions relative to "aiding and abetting", which mirrored the government's charges referenced above:

"Let's talk about aiding and abetting. A person may be found guilty of an offense even if he personally did not do every act constituting the offense charged if he aided and abetted the commission of the offense. In order to have aided and abetted the commission of a crime, a person must, before or at the time the crime was committed, one, have associated himself with the unlawful venture; two, have participated in it as something he wished to bring about; and three, have sought by his actions to make it succeed". (Document 117, Page 31, Lines 1-11). This mirrored the government's jury charge for subdivision "a" of the aiding and abetting statute (except for the words "Let's talk about aiding and abetting"). (Document 14, Page 51).

The Court then continued: "In order to sustain the conviction of a defendant who has been charged as an aider and abetter, it is necessary that there be evidence showing an offense to have been committed by a principal and that the principal was aided and abetted by the

---

[3] The government has never backed off from its aiding and abetting theory, as that theory was most recently argued by Prosecutor Thomson in the Government's Resentencing Memorandum of October 3, 2016. Per Thomson:" Defendant committed and aided, abetted, counseled, commanded, procured and willfully engaged in mortgage fraud. As detailed in the presentence investigation report ("PSR") the conspiracy count alleged that defendant aided Team Title... and PB Enterprises...". (Document 138, Page 7).

*accused"*. (Document 117, Page 31, Lines 12-16). Here, the Court recited the government's legally insufficient proposed jury charge regarding a violation of subdivision (b) of the aiding and abetting statute as alleged in Count 1. (Document 14, Page 52).

The initial problem with the jury instructions is that the first paragraph quoted above applies to an "aiding and abetting" violation under 18 U.S.C. 2(a) - (See Government's Proposed Instructions, Document 14, Page 51). But, only subdivision (b) was charged in Count One, not both subdivisions (a) and (b). Although the government charged "aiding and abetting" 18 U.S.C. 2(a) & 2(b) as an alternate theory of criminal liability regarding the separate bank fraud charges in Counts 2 through 23, now all of those counts are gone. At trial, the jury acquitted Bouchard on Counts 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 20, 21, 22 and 23. On appeal, the Second Circuit vacated the other bank fraud convictions on Counts 7 and 19, along with the false statements conviction on Count 24. United States v. Bouchard, 828 F.3d 116 (2d Cir. 2016). Now that only Count 1 remains, the Second Circuit's decision brings to life the fact that the jury should have never heard the prejudicial jury instruction for 18 U.S.C. 2(a), which was not charged in Count One. At trial, the Court drew no distinction for the jury between the fundamentally different instructions for aiding and abetting under 2(a) as opposed to aiding and abetting under 2(b) - the jury was just generally told *"Let's talk about aiding and abetting"*, and the flawed instructions then followed. Nevertheless, the legally errant jury instructions still exist - those instructions crafted by the government were heard by the jury, they contaminated the jury pool during deliberations, and they provided a legally insufficient basis for the jury to decide Count One.

The erroneous and skeletal instructions also provided a legally insufficient basis for the jury to rest its verdict because: 1) the instructions do not accurately describe the essential elements of "aiding and abetting" under 18 U.S.C. Section 2(b) as charged in Count One; and 2) the instructions completely failed to instruct the jury on the additional essential elements related to "aiding and abetting a conspiracy" as charged in Count One. Apart from any examination of the separate conspiracy jury instructions, the aiding and abetting jury instructions stand alone as being fatal to the government's case. At trial, Bouchard's counsel Gaspar Castillo failed to object to the legally erroneous Section (b) jury instructions, thereby causing prejudice to Bouchard. (See Ground 7, Example 6 herein).

To convict a defendant under a theory of aiding and abetting a crime under 2(b), the government must prove: (1) commission of the underlying crime, (2) by a person other than the defendant, (3) a voluntary act or omission by the person charged as an aider and abettor, with (4) the specific intent that his act or omission bring about the underlying crime. United States v. Scotti, 47 F.3d 1237, 1246 (2d Cir. 1994). As to elements (1) and (2) above, the aider and abetter may not be convicted unless the underlying offense was committed by someone (not the defendant) beyond a reasonable doubt. United States v. Osorio Estrada, 751 F.2d 128, 132 (2d Cir. 1985). The jury instructions do not contain any of the 4 "Scotti" elements, and, they don't mention the required finding by the jury of "beyond a reasonable doubt". That is not surprising, because the erroneous jury instructions came from the government before trial. The Court was misled by the government's bad and legally insufficient instructions, and as a result, the jury was presented with those very same flawed instructions upon which to base its misguided verdict for Count One.

Furthermore, to find a defendant guilty of "aiding and abetting a conspiracy", the government must also prove beyond a reasonable doubt the following additional elements: (1) the existence of a conspiracy; (2) the defendant associated herself [or himself] with the conspiracy; and (3) the defendant acted with the intent to bring about the success of the conspiracy. United States v. Temple, 433 Fed. Appx. 630, 634 (10th Cir. 2011). These additional elements were not presented to the jury, further adding to the legal insufficiency of the instructions. Once again, the Court was misled by the government, and so was the jury.

A general verdict is invalid when one of the possible bases of the conviction is invalid. Griffin v. United States, 502 U.S. 46, 52, 112 S.Ct., 466, 474 (1991); United States v. Scotti, 47 F.3d 1237, 1246 (2d Cir. 1994). "The proper rule to be applied is that which requires a verdict to be set aside where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected". Yates v. United States, 354 U.S. 298, 312 (1957).

In Scotti, the Second Circuit affirmed the district court's order granting the co-defendant Rodriguez a new trial, observing that: "The problem in this case is that, given the form of the indictment, we do not know whether the jury found Rodriguez guilty as a principal or an aider and abetter. The jury merely returned a general verdict of guilty on Count Seven, and this did not indicate on what theory its verdict rested." Scotti 47 F.3d at 1247. Those words could very well have been written for Bouchard, as the problem in this case is that, given the form of the indictment, we do not know whether the jury found Bouchard guilty as a principal actor in a conspiracy, or as an aider and abetter of a conspiracy. The jury merely returned a general

verdict against Bouchard on Count One, and this did not indicate on what theory its verdict rested.

The jury's verdict most certainly could have rested on the alternate theory of aiding and abetting a conspiracy and its accompanying legally insufficient jury instructions. That theory was fronted by the government in the indictment - the theory then poured over into the government's case at trial - and, then after the close of evidence, the government's erroneous jury instructions on the theory were presented by the Court to the jury. Those jury instructions included a reading by the Court of the main charging paragraph of the indictment: "Count 1 of the indictment charges the defendant with conspiracy... Count 1 reads as follows ... in order to assist the schemes described above ... Bouchard did knowingly, willfully, and unlawfully conspire ... with others ... to commit an offense, ... that is ... causing to be made materially false statements for the purpose of influencing any way the actions of financial institutions, the accounts of which were insured by the Federal Deposit Insurance Corporation ... in violation of Title 18, United States Code, Sections 1014 and 2(b)". (Document 14, Page 37; Document 117, Page 22).

The poisonous errors in the jury instructions began to worm their way into this case even before trial with the government's filing on October 29, 2012 of its proposed jury charges (Document 14). The government's Instruction No. 28 begins with "The Indictment charges Michael Bouchard in the first count with conspiring with others to submit false documents to mortgage lending institutions." (Document 14, Page 37). Everything is wrong with that introduction, since it shows the prosecution's fundamental misunderstanding of the law and the indictment that it crafted. First, Section 1014 does not prohibit submitting "false

documents"; it prohibits submitting "false statements." Second, Section 1014 prohibits submitting "false statements" to "FDIC insured banks", not to "mortgage lending institutions." And, most importantly, Count One does not charge Bouchard with the one offense of conspiracy; it charges Bouchard with two alternate theories of criminal liability: 1) conspiracy to submit false statements to financial institutions; and 2) aiding and abetting a conspiracy to submit false statements to financial institutions. How the government's introductory sentence to Instruction No. 28 came to be so wrong is irrelevant. What does matter is that it is a fatal legal error involving a mistake about the law, and the jury heard it all.

This ambiguity in the verdict was not caused by Bouchard. The verdict form was the government's creation and it gave the jury no room to show a basis for its conviction on Count 1, notwithstanding that the government included in that Count two alternate theories of criminal liability. (Documents 15 and 38). Therefore, the jury's verdict on Count 1 could have rested on a finding that Bouchard was a principal in a conspiracy or the verdict could have rested on the "aiding and abetting" theory with a finding that Bouchard is deemed a principal in a conspiracy because he "caused" another person to perform conspiratorial acts. It was a fatal error for the jury to hear the legally erroneous instructions for 18 U.S.C. 2(a) on vacated bank fraud Counts 7 and 19 - the jury did not know that those flawed instructions did not apply to Count 1. And, on Count 1, the jury also heard other legally erroneous instructions for 18 U.S.C. 2(b). As the record stands, the verdict could potentially be deemed supportable on one ground, but definitely not the other, and it is impossible to tell which ground the jury selected. Accordingly, the conviction on Count 1 must be set aside. Yates, 354 U.S. at 312; Griffin 502 U.S. at 52 and Scotti 47 F.3d at 1246.

## GROUND 2

**THE EVIDENCE INTRODUCED AT TRIAL ON THE COUNTS REVERSED ON APPEAL POISONED THE JURY'S DELIBERATIONS IN DECIDING TO CONVICT ON COUNT 1 - CONSPIRACY, THEREBY RESULTING IN PREJUDICIAL SPILLOVER. ACCORDINGLY, THE CONVICTION ON THE LAST REMAINING COUNT 1 MUST BE REVERSED.**

On July 7, 2016, the Court of Appeals reversed the convictions on Counts 7, 19 and 24, all of which involved BNC Mortgage, Inc. Counts 7 and 24 related to the same transaction. Prejudicial spillover occurred because the evidence used to convict Bouchard in the counts that were reversed poisoned the jury's deliberations as to Count 1. Therefore, the only remaining Count against Bouchard must be reversed.

First off, we need to set the record straight regarding Prosecutor Tamara Thomson's disingenuous interpretation of the Second Circuit's Decision. In the Government's Resentencing Memorandum dated October 3, 2016, Thomson states: "On July 7, 2016, the Second Circuit reversed the two convictions for bank fraud and the one conviction for false statements to a financial institution, finding insufficient evidence that the institutions involved were federally insured financial institutions." (Document 138, Page 1). It is true that the convictions were reversed - but the corporation "involved" in the reversed Counts, BNC Mortgage, Inc., was never a "financial institution". That fictional "financial institution" argument was fronted at trial by Prosecutors Thomson and Olmsted, but it was flatly rejected by the Second Circuit. See Ground 3 herein for a discussion on how the Second Circuit applied the law to BNC. The undeniable fact is that BNC was never a "financial institution", it was never "FDIC insured" and it was never a "bank", and no amount of evidence could have proved otherwise. That salient point helps guide our analysis herein.

We know that the evidence on the vacated Counts 7 and 19 was definitely used by the jury to arrive at its guilty verdict on Count 1 - conspiracy. In fact, the trial Court has said exactly that: *"The evidence of defendant's involvement in the 735 Burden Avenue and 4 Kaatskill Way closings [Counts 7 and 19] provided the jury with a basis for finding that the defendant participated in the conspiracy".* (Document 89, Page 22). *"Defendant's attendance of the 4 Kaatskill Way closing and signatures on the HUD-1s for that closing, and the 735 Burden Avenue closing, provided the jury with adequate evidence from which it could find that defendant knew that the statements on the HUD-1s his office returned to the lenders contained inflated sales prices, falsely stated that the buyers made cash down payments and falsely reported how the mortgage proceeds were disbursed at closing. Defendant's personal involvement in these closings also provided the jury with sufficient evidence that he knowingly participated in the conspiracy".* (Document 89, Pages 22-23).

We also know that the jury was misled by the plain language of the Indictment that incorporated the vacated counts into Count 1 itself. The jury was given a copy of the Indictment during deliberations (Document 117, Page 20). In the section of the Indictment entitled "MANNER AND MEANS OF THE CONSPIRACY", the trial jury read the government's broad sweeping charge that all of the real estate transactions referenced in the Indictment were part of the alleged conspiratorial agreement under Count 1, as follows: *"It was part of the conspiracy that, in connection with the mortgage loans described above and listed in Counts 2 through 24 below, the defendant Michael G. Bouchard agreed with others to obtain mortgage loan proceeds based upon the mortgage loan applications that were submitted to the victim mortgage lenders, and to cause the victim mortgage lenders to deposit the mortgage loan*

*proceeds into the Bouchard Firm's escrow account".* (Document 1, Page 10, Paragraph 42). The government's Indictment falsely told the trial jury that the transactions in Counts 2-24 (and other unspecified transactions) were part of the alleged "conspiracy to submit false statements to financial institutions". But that is false - because again, BNC Mortgage, Inc. was not a financial institution. And the lender in Count 23, Citimortgage, Inc. was not a "financial institution". The real object of the alleged "conspiracy" was the supposed submission of false statements to "FDIC insured banks" for the purpose of influencing those banks. But that could not happen with BNC Mortgage, Inc and Citimortgage, Inc., because they were not "banks." The object of the alleged conspiracy could never have been attempted and/or completed as to the private corporation BNC Mortgage, Inc. and other like companies. The jury was a captive audience, and the prosecutors acted with unbridled authority to present inadmissible evidence that contaminated the jury pool. The ensuing prejudice was and still is immeasurable.

The jury was also misinformed on this subject by Prosecutor Michael Olmsted's intentionally deceptive statements in summations. Regarding vacated Count 19 involving the buyer, Nickole Riley Sutliff and the lender BNC, Prosecutor Olmsted refers to the HUD document for that transaction, saying: *"So, is this a false document, is this part of a conspiracy she made? Absolutely. With Michael Bouchard? Absolutely. How does she know that she can do this? Because he agreed".* (Document 116, Page 57, Lines 22-25). Later on in summations, without any basis whatsoever, Prosecutor Olmsted accused Bouchard of some unspecified "misdirections" to confuse the jury. But, ironically enough, in the same breath, it is Prosecutor Olmsted that deceives and misdirects the jury, saying: *"Speaking of misdirections, going back to the FDIC, look at the loan documentation, the loan applications and the approval letters and the*

instructions come from **BNC Bank**, they say you're getting a loan from **BNC Bank**, the statements go to **BNC Bank**". (Document 116, Page 156 Line 22 -to- Page 157, Line 1). Prosecutor Olmsted knows that BNC is not a bank, but he said it anyway to deceive the jury into believing the prosecution's falsehood that BNC was a "bank", "FDIC insured" and a "financial institution". This was not an honest mistake by Prosecutor Olmsted - it was a purposeful lie. And, Prosecutor Olmsted did the same thing with Argent Mortgage Company, falsely telling the jury in his conspiracy argument that this lender is named **"Argent Bank"** (Document 116, Page 155, Line 25). Prosecutor Olmsted summed up the government's view of the alleged conspiratorial agreement for the jury, which again included his false "bank" argument for all 24 counts in the indictment: *"He [Michael Bouchard] doesn't want you to focus on what this case is about, which is 24 false statements, an agreement that he is going to constantly give false information to a bank".* (Document 116, Page 153, Lines 7-10).

Prosecutors Olmsted and Thomson also purposefully misled the Court with their proposed jury instructions that falsely described BNC as a "financial institution" (Document 14, Page 42). That same instruction with its inherent mistake in the law was then unfortunately presented by the Court to the jury at trial. (Document 117, Page 31, Lines 17-19).

The problem with all of this is that the jury utilized the inadmissible and prejudicial evidence on vacated counts 7, 19 and 24 along with the erroneous instructions that BNC was a "financial institution" in order to convict on Count 1 - conspiracy. And all along the prosecution told the jury that all the transactions in Counts 2-24 were part of what is now the only remaining charge in the indictment, Count 1 - conspiracy. That is a horrendous miscarriage of justice. None of the BNC evidence should have been introduced to the jury: none of the

documents and none of the testimony, especially that of Mr. Kelly Monahan, the corrupt CEO and founder of the sub-prime mortgage lender BNC Mortgage, Inc. The law is clear on this subject: "in those cases in which evidence is introduced on the invalidated count that would otherwise be inadmissible on the remaining counts, and this evidence is presented in such a manner that tends to indicate that the jury probably utilized this evidence in reaching a verdict on the remaining counts, that spillover prejudice is likely to occur". United States v. Hamilton, 334 F.3d 170, 183 (2d Cir. 2003); United States v. Rooney 37 F.3d 847, 856 (2d Cir. 1994).

The acts from the BNC transactions that the government attributes to Bouchard were not within the scope of the alleged conspiracy to submit false statements to FDIC insured banks, because BNC was not FDIC insured, it was not a bank and it was not a financial institution. Simply put, BNC was not a covered party under 18 U.S.C. 1014, the false statements statute. With Counts 7, 19 and 24 now vacated on appeal, it goes without saying that no evidence from these counts would be admissible to prove the conspiracy count. But the jury heard that prejudicial and inadmissible BNC proof at trial on the now vacated counts, on the acquitted Counts and on other transactions. That compilation of bad proof, along with prosecution's prejudicial summations and the legally erroneous jury instruction that BNC was a financial institution all misled the jury to a guilty verdict on Count 1 - conspiracy.

As previously noted, this Court has already acknowledged the significant impact that the evidence on the now vacated Counts 7, 19 and 24 had on the jury, declaring that the evidence was sufficient for the jury to reach a guilty verdict on Count 1 - conspiracy. It is now undisputed that as a matter of law, such "evidence" was inadmissible and should have never been

introduced at trial. There is no doubt that prejudicial spillover occurred in this case.

Accordingly, the conviction for the sole remaining Count 1 of conspiracy must be reversed.

## GROUND 3

**THE INDICTMENT VIOLATES THE EX POST FACTO CLAUSE OF THE UNITED STATES CONSTITUTION. THEREFORE, THE CONVICTION ON COUNT 1 MUST BE VACATED AND THE INDICTMENT MUST BE DISMISSED WITH PREJUDICE.**

The Second Circuit's July 7, 2016 decision reveals that the indictment is fatally defective

because it violates the ex post facto clause of the United States Constitution. According to the

Second Circuit:

> At oral argument the Government urged that BNC itself may loosely be regarded as a bank or financial institution within the meaning of 18 U.S.C. Section 20 because "it is colloquially [a bank or financial institution] ... [insofar as] it lends money." We reject this novel argument. First, a "financial institution" is not a loose or colloquial term, but a term of precise definition that can lead to grave criminal consequences. Second, we are mindful that Section 1344(2) should not be read to "federaliz[e] frauds that are only tangentially related to the banking system," which is Section 1344's core concern. Loughrin 134 S. [Citation omitted]. For that reason, and particularly when bank subsidiaries may be engaged in activities far afield of the core functions of our federal banking system, it is important (absent legislative direction to the contrary) to distinguish subsidiaries of banks from the banks themselves. [Citations omitted].

See United States v. Bouchard 828 F.3d 116, 126 (2d 2016)

> The Second Circuit then continued:

> We also note that Congress has been willing and able to amend the bank fraud statute to cover new conduct by new actors that it determines does directly affect the banking system. For example, as we have already mentioned, in 2009 Congress amended both Section 20 and Section 1014 to cover mortgage lending institutions specifically. FERA, 123 Stat. 1617 (2009). In doing so, Congress appears to have understood that Section 1344 (through Section 20) and Section 1014 "only applie[d] to Federal agencies, banks, and credit associations and d[id] not necessarily extend to private mortgage lending businesses, even if they are handling federally-regulated or federally insured mortgages." See S. Rep. 111-10, 2009 U.S.C.C.A.N. 430, 432. As the Senate committee report on FERA explained, "the bill amend[ed] the definition of 'financial institution' in the criminal code ... in order to extend Federal fraud laws to mortgage lending

businesses that are not directly regulated or insured by the Federal Government. Id. at 432

See Bouchard at 126 – 127.

The grave criminal consequences associated with the term "financial institution" are evident here, for the 2012 indictment unconstitutionally applied the 2009 amendments retrospectively to alleged conduct from 2002-2007 involving generic mortgage lenders. And, the government's pre-trial Memorandum of Law furthered this retrospective and impermissible application of the new Section 1014 when it told this Court: "Count One charges Michael Bouchard with conspiracy to submit false statements to mortgage lending institutions in order to influence them in completing the closings for the properties brought to the Bouchard Law Firm by PB Enterprises and Team Title." (Document 17, PACER Pages 6-7). But prior to 2009, Bouchard's alleged conduct in the indictment involving "mortgage lending institutions" was not unlawful. Thus, it was the prosecution and not Congress that criminalized conduct in the indictment that was not criminal during the time period so alleged, and that is unconstitutional.

The Constitution forbids Congress and States from passing "Ex Post Facto" laws. See U.S. Const. art I, section 9, clause 3 (applicable to Congress). The ex post facto prohibition forbids Congress to enact any law "which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." Weaver v. Graham, 450 U.S. 24, 28 (1981); Calder v. Bull, 3 Dall 386, 390, 1 L Ed 648 (1798). "Two critical elements must be present for a criminal or penal law to be ex post facto: it must be retrospective, that it, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." Weaver at 29. Both critical elements are present here: 1) the false statements statute, 18 U.S.C. 1014 (as amended in 2009 to extend to a

"mortgage lending business") along with the definition of a "financial institution" in 18 U.S.C. 20 (as amended in 2009 to extend to a "mortgage lending business"), were both applied retrospectively to apply to events occurring in 2002-2007; and 2) Bouchard, the alleged offender, was disadvantaged by it.

Count 1 impermissibly alleged that ALL of the Team Title closings and ALL of the PB Enterprises closings (including the closings in the now dismissed Counts 2 to 24) were ALL part of the conspiracy: "It was part of the conspiracy that, in connection with the mortgage loans described above and listed in Counts 2 through 24 below, the defendant MICHAEL G. BOUCHARD agreed with others to obtain mortgage loan proceeds based upon the mortgage loan applications that were submitted to the victim mortgage lenders, and to cause the victim mortgage lenders to deposit the mortgage loan proceeds into the Bouchard Firm's escrow account." (Document 1, Paragraphs 29, 40 and 42). At trial, the government introduced "evidence" from these closings, almost all of which involved ordinary companies not covered by the 2009 Congressional amendments. The government's false and legally errant allegation in Count 1 formed the substance of an indictment that violated the Constitution's Ex Post Facto Clause. The indictment unconstitutionally criminalized conduct related to numerous uncovered companies throughout all 24 Counts in the indictment, including, but not limited to BNC Mortgage, Inc., Argent Mortgage Company, LLC, Citimortgage, Inc., Option One Mortgage Corporation, First Franklin Financial Corp., The CIT Group/Consumer Finance, Inc., and America's Wholesale Lender. Bouchard was unconstitutionally indicted, tried, convicted and punished for an alleged conspiracy, the object of which was the alleged submission of false statements in ALL closings to all ALL lenders. But under the law in 2002-2007, it was legally

impossible to submit false statements to these non-bank lenders in violation of 18 U.S. C. 1014, because these non-bank lenders were not covered parties under that statute. But the jury was told otherwise, and it then relied on the government's inadmissible evidence and false arguments in reaching a verdict on Count 1.

The government's unconstitutional criminalization of all closings infected the entire trial, including evidence to prove the elements of a conspiracy. For example, the government's "proof" that Bouchard learned about the conspiracy and knowingly joined the conspiracy came from the trial testimony of Thomas Disonell and Laurie Hinds regarding alleged discussions with Bouchard about the disbursement of checks on a specific Team Title closing. This Court said as much in its 2-10-14 Decision: while viewing the evidence from the testimony of Disonell and Hinds in "the light most favorable to the government" this Court then concluded that there "was sufficient evidence that the defendant knew of the existence of the scheme to make false statements to mortgage lenders and that he knowingly participated in it." (Document 89, Page 21). But, now with clarity from the Second Circuit, we plainly see that the prosecution's "evidence" from transactions involving "mortgage lenders" is inadmissible - the use of the "evidence" violated the Constitution's ex post facto clause. All of that inadmissible "evidence" and the government's related false arguments come from a 5-23-2002 closing involving the CIT Group/Consumer Finance, Inc., a private company that was not a bank and not FDIC insured. Therefore, this company was not a covered entity under the version of 18 U.S.C. 1014 in effect in 2002.

Disonell testified about a handwritten check disbursement list which he supposedly used to request checks at this closing for property located at 255 4th Street, Troy, New York

(Document 48, Pages 203-210; and Government Trial Exhibit 1.10). The HUD-1 Settlement Statement for this transaction is part of Exhibit 1.10, and the government used the documents from that exhibit and the testimony in its case-in-chief to prove the alleged conspiracy. In fact, Prosecutor Thomson thought that this closing was so essential to the government's proof of a conspiracy that she droned on and on about it in her opening statement (Document 114 at Pages at 211-215). Thomson summed up her legally errant view of this closing for the jury as follows: "His [Bouchard's] willingness to participate in a conspiracy, his willingness to submit those false statements to the lenders and to commit bank fraud allowed his clients, the lenders, to be deceived." (Document 114, Page 215, Lines 16-21).

But the government cannot label this closing as "conspiratorial", because the conduct that was alleged to have occurred was lawful conduct at that time under 18 U.S.C. 1014 and 18 U.S.C. 371.

Laurie Hinds, a paralegal at The Bouchard Law Firm, also testified regarding that same closing. Coached by Prosecutors Thomson and Olmsted, Laurie testified as follows:

Q: "Mrs. Hinds, were there disbursements that were made that were not noted on the HUD-1?"

A: "Yes, there were".

Q: "Going back to page 3, and if we could have that displayed, please. The checks that you've gone through, were those checks listed for disbursements on the instructions given to you by Thomas Disonell?"

A: "Yes."

Q: "The first time that you received a list from Thomas Disonell for disbursement of checks that were not on the specific closing instructions of the lender, did you check and obtain approval from anyone to make the disbursements according to that list?"

*A: "Yes, I would have asked Attorney Bouchard whether or not I could disburse checks on behalf of the seller that were not listed on the HUD".*

*Q: "Did you obtain his approval to disburse the checks consistent with a list provided you by Thomas Disonell?"*

*A: "Yes".* (Document 114, Page 113 Line 23 -to Page 114 Line 17). [4]

This 5-23-2002 closing was the lynchpin for the government's case, because it was allegedly Bouchard's entry point into the conspiracy wherein he supposedly gained knowledge of the conspiracy and also agreed to join it. This Court even emphasized Disonell's testimony about this closing in the charging conference: *"THE COURT: But this case is about what we've heard, it's about phony HUDs in his office, his name on them, particularly the proof is almost overwhelming about the checks that -- the thing with the -- here's the list that, I think Thomas Disonell gave him a list and there come the checks. That's what this case is about, whether he knew about the HUD forms and the things."* (Document 116, Page 3, Lines 18-24). Prosecutor Olmsted discussed this closing at length in summations, in particular saying: *"The bandits testified. Tom Disonell said, we agreed, we came to an agreement, I told him [Bouchard] where I wanted the checks to be written and he agreed to that. Now you can see these [the checks] in Exhibit 1.10."* (Document 116, Page 29, Lines 8-11).

However, the use of this 5-23-2002 closing by the prosecutors was a mistake about the law because it violated the Ex Post Facto Clause. And, the prosecutors also made a factual

---

[4] Years before trial, Laurie told the government in a May 2, 2007 interview that she "never checked with Bouchard when the disbursement checks were cut differently than stated on the HUD", that she "does not think that Michael Bouchard would knowingly do anything wrong" and that "no closings were held if something looked wrong." (See Document 95, Exhibit 14). Let the reader speculate as to how these truthful statements from Laurie's 2007 interview morphed into a false story at trial when she was forced into becoming a reluctant "government witness."

mistake by using this closing to establish the "conspiratorial agreement". Chronologically, this 5-23-2002 closing is the 9th out of the 20 Team Title closings. It would have made practical sense for the prosecutors to line up their coerced false testimony with the very first Team Title closing that occurred on 1-25-2002. Then they could have tried to argue that Disonell got the checks the way he wanted from the very beginning. But if the prosecutors did that, they would have again run head on into conduct that was lawful on 1-25-02, this time for a closing with the generic mortgage lender, FFFC f/n/o First Franklin Financial Corp.[5] According to the government, First Franklin, the lender, was a subsidiary of National City Bank, a "financial institution" (Indictment - Document 1, Page 1). First Franklin was not a covered party under the version of 18 U.S.C. 1014 in effect in 2002, so all of the alleged conduct involving the lender was not prohibited at that time.  Plus, the government never offered any proof at trial that First Franklin's alleged parent National City Bank was FDIC insured. And, as the Second Circuit ruled, a parent/subsidiary relationship of that nature cannot be used to pin criminality on Bouchard. The two closings from 1-25-2002 and 5-23-2002 involved alleged conduct with ordinary lenders that was not prohibited by 18 U.S.C. 1014 in the year 2002.  Therefore, these two transactions are irrelevant to the alleged "conspiracy". And, the introduction at trial by the government of any evidence pertaining to the transactions was unconstitutional.

---

[5] In their zeal to prove a conspiracy, the prosecutors used the out of sequence closing from 5-23-02 instead of the prior closing from 1-25-02 as "proof" of Bouchard's alleged entry into the conspiracy, thereby misreading their own convoluted list of the 20 Team Title closings (that list created by the government is in Defendant's Trial Exhibit AA-1; and also Document 95, Exhibit 20). The 5-23-02 closing is shown as closing #1 on the list, but it actually happened 4 months after the 1-25-02 closing, which is shown as closing #2 on the list. Again, emphasis on the constitutional violation is important: the alleged conduct from these closings did not violate the law as of 2002.

Therefore, the "object" of the alleged conspiracy does not even exist for these two closings. The 2009 amendments included the addition of "mortgage lending businesses" to 18 U.S.C. 1014 as parties to which false statements could be made. But this was not the law in effect in 2002-2007, so any HUD-1 statement submitted to these lenders before 2009 could not violate 18 U.S.C. 1014.

Unfortunately, Bouchard's trial counsel Gaspar Castillo never raised the Ex Post Facto Clause as a defense. (See Ground 7 herein, Example 9).

The Constitution was designed to serve as a buffer between the people and the actions of an overbearing federal government. Here, the government went beyond the outer limits of reason to violate the Ex Post Facto Clause and unconstitutionally apply 2009 amendments from the U.S. Code to conduct that was alleged to have occurred in 2002-2007. Accordingly, the conspiracy conviction in Count 1 must be vacated and the indictment must be dismissed, with prejudice.

### GROUND 4:

**THIS TRIAL COURT'S INSTRUCTION TO THE JURY ON THE CONSPIRACY COUNT WAS ERRONEOUS AND VIOLATED DUE PROCESS BECAUSE IT OMITTED MENTION OF ESSENTIAL ELEMENTS OF THE CONSPIRACY ALLEGED IN THE INDICTMENT.**

This trial Court charged the jury on conspiracy as follows:

*"The indictment charges Michael Bouchard in the first count with conspiring with others to submit false documents to mortgage lending institutions".* (Document 117, Page 21, Lines 16-18).

*"Count 1 of the indictment charges the defendant with conspiring with others to submit false documents to mortgage lending institutions".* (Document 117, Page 22, Lines 8-10).

"Count 1 reads as follows: From in or about 2000, and continuing thereafter until in or about 2007 in Albany, Rensselaer, and Schenectady Counties, in the Northern District of New York and elsewhere, in order to assist the schemes described above, the defendant, Michael G. Bouchard, did knowingly, willfully, and unlawfully conspire, combine, confederate, and agree with others known and unknown to the grand jury to commit an offense against the United States, that is, knowingly making and causing to be made materially false statements for the purpose of influencing in any way the actions of financial institutions, the accounts of which were insured by the Federal Deposit Insurance Corporation, upon applications, commitments, and loans and deferments of actions, in violation of Title 18, United States Code, Sections 1014 and 2(b)". (Document 117, Page 22, Lines 10-15).

"The heart of the conspiracy is the making of the unlawful plan itself, followed by the commission of any overt act. The government does not have to prove that the conspirators succeeded in carrying out the plan. The defendant can be found guilty of this crime only if all of the following elements of the crime are proved beyond a reasonable doubt: One, two or more persons in some way agreed to try to accomplish a shared and unlawful plan; Two, the defendant knew the unlawful purpose of the plan and willfully joined in it; Three, during the conspiracy, one of the conspirators knowingly engaged in at least one overt act as described in the indictment; and Four, the overt act was committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy." (Document 117, Page 24, Lines 4-24).

The above charges matched the government's pre-trial trial proposed jury charges. (Document 14, Pages 33-36). These instructions violated due process by omitting mention of essential elements of conspiracy as discussed below.

At trial, defense counsel, Gaspar Castillo, failed to object to this erroneous jury instruction. "To preserve an objection for appellate review, a defendant must articulate it to the trial court with sufficient distinctness to alert the court to the nature of the claimed defect". United States v. Gallerani, 68 F. 3d 611, 617 (2d Cir. 1995); See Fed. R. Crim. P. 30; See also United States v. Kwong, 14 F.3d 189, 195 (2d Cir. 1994). Gaspar's inexcusable failure to object to this instruction foreclosed the opportunity to raise this argument on appeal. Hence, this argument is now timely raised in this 2255 motion based on a constitutional due process violation and a Sixth Amendment "ineffective assistance of counsel" violation. First of all, Gaspar failed to file a "memorandum of law" as required by the pretrial order. (See Document 3, Page 5 Paragraph III(E) and Page 6 Paragraph VIII(e)). And, Gaspar's unusual joint filing of skeletal proposed jury instructions within his Voir Dire Requests neglected to mention the essential conspiracy and false statements elements discussed below. (Document 21). In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court held that a criminal defendant's Sixth Amendment right under the U.S. Constitution is violated if his trial attorney's performance falls below an objective standard of reasonableness and if there is a reasonable probability that the result of the trial would have been different absent the deficient act or omission. The first prong, "constitutional deficiency - is necessarily linked to the practice and expectations of the legal community: The proper measure of attorney performance remains simply reasonableness under prevailing professional norms". Strickland at 688, Padilla v.

Kentucky, 559 U.S. 356, 366 (2010). These deficient acts and omissions by Gaspar demonstrate a performance that "falls below an objective standard of reasonableness under prevailing professional norms" in violation of the Sixth Amendment. Strickland at 687-688. (1984). "An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under Strickland". Hinton v. Alabama, 134 S. Ct. 1081, 1089 (2014).

Having established that Gaspar's performance was constitutionally deficient, the second prong under Strickland requires Bouchard to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland at 694; Hinton at 1089. As we will see below, there is a reasonable probability in this case that is sufficient to undermine confidence in the outcome of the trial.

The indictment alleged that Bouchard "conspired with others to submit false documents to mortgage lending institutions" or to "financial institutions". That is not a crime – because for the time period of 2000 to 2007 as alleged in the indictment, 18 U.S.C. 1014 prohibited submitting false statements to FDIC insured banks (not submitting false documents to mortgage lending institutions or financial institutions). It was not until 2009 that Congress amended the statute to add a "mortgage lending business" as a covered party. See 2009 Fraud Enforcement and Recovery Act ("FERA"), 123 Stat. 1617. The 2009 amendment is inapplicable here because it was enacted years after the government's alleged "conspiracy". Gaspar never objected to this legally flawed indictment language, which this Court read to the jury as part of the instructions.

The jury instruction omitted at least three essential elements of conspiracy that must be proven by the government:

1) the specific object of the conspiracy charged under 18 U.S.C. 371;

2) specific intent to achieve the object of the conspiracy; and

3) the intended future conduct that the conspirators agreed upon includes all elements of the substantive crime.

Those three fundamental errors violated the Fifth Amendment's Due Process Clause. "Due process requires the trial court to charge the jury on all the elements of the crime alleged in the indictment". Gallerani at 617; Francis v. Franklin, 471 U.S. 307, 313 (1985). "A court's failure to instruct the jury on some of the elements of a charged crime has the effect of relieving the prosecution of part of its burden of proof in obtaining a conviction. Gallerani at 617; United States v. Rogers, 9 F.3d 1025, 1032 (2d Cir. 1993), cert. denied, 115 S.Ct. 95 (1994). The law is clear that "the complete omission of an element of an offense violates due process". Gallerani at 617.

Missing Element 1. The specific object of the conspiracy charged under 18 U.S.C. 371. "Without question, the object of a conspiracy constitutes an essential element of the conspiracy offense defined by 18 U.S.C. 371." Gallerani at 617-618; United States v. Roshko, 969 F.2d 1, 5 (2d Cir. 1992). Moreover, the Second Circuit has "emphasized the need for particular vigilance in enforcing the government's burden of proof in prosecutions under Sec. 371, in view of the broad range of conduct covered by federal fraud statutes and the risk that a defendant may be convicted of conspiracy based upon an agreement other than that specifically charged in the government's indictment." Gallerani at 618; see also United States v. Mollica, 849 F.2d

723, 729 (2d Cir. 1988). "A Court's failure to instruct the jury on the specific object of a conspiracy charged under Sec. 371 thus creates a "substantial risk" that the jury may convict the defendant of conspiracy without finding that he had any objectives alleged in the indictment". Gallerani at 618; See also Mollica at 729-30.

By reading a few small excerpts from the indictment as recited in the government's jury instructions, this Court also misled the jury by referencing "mortgage lending institutions" and "financial institutions". Again, a "mortgage lending business" was not a covered party under 18 U.S.C. 1014 until 2009. And, that statute does not at all mention "financial institutions". Throughout this case, the government has repeatedly used the erroneous language "federally insured financial institutions" - there is no such thing in the statute.

Missing Element 2. Specific intent to achieve the object of the conspiracy.

"Conspiracy requires proof of ... specific intent to achieve the object of the conspiracy". United States v. Pinckney, 85 F.3d 4, 8 (2d Cir. 1996). This essential element was not mentioned in the jury instruction. Once again, "the complete omission of an element of an offense violates due process". Gallerani at 617.

Missing Element 3. The intended future conduct that the conspirators agreed upon includes all elements of the substantive crime.

None of the elements of the substantive false statements crime were mentioned to the jury in the conspiracy instruction. That instruction also omitted mention of the related essential element that the intended future conduct that the conspirators agreed upon includes all elements of the substantive crime. See Pinckney at 8. Once again, "the complete omission of an element of the offense violates due process." Gallerani at 617.

The other erroneous jury instruction for the substantive false statements offense under Count 24 only makes things worse for the government. Under to the government's instruction used by this Court, the first element that must be proved is that "the defendant made a false statement or report". (Document 117, Page 33, Lies 5-6). That instruction is wrong - it fails to mention the recipient of the false statement. Under 18 U.S.C. 1014, what this element actually requires is that the government must prove that the false statement was made to a bank and that the defendant knows that it is a bank to which he has made the false statement. United States v. Sabatino, 485 F.2d 540, 544 (2d Cir. 1973); United States v. Bouchard, 828 F.3d 116, 127 (2d Cir. 2016). This element was not mentioned to the jury, and that omission violates due process. Gallerani at 617.

Next, the government tampered with the FDIC element of 18 U.S.C. 1014 to support its false legal theory that *"a fraud on BNC Mortgage, Inc. is a fraud which affected its parent company, Lehman Brothers Bank, FSB"*. The government's instructions used by this Court for this element said it must be proven that "the deposits of an affected institution were insured by the Federal Deposit Insurance Corporation". The word "affected" does not belong in this instruction, but it was inserted by the government to deceive this Court and the jury. The government's strange legal theory was based on an irrelevant case involving the wire fraud statute of limitations. In United States v. Bouyea, 152 F.3d 192 (2d Cir. 1998), a defendant was charged in a wire fraud scheme involving a subsidiary of a financial institution. The issue in Bouyea was whether a fraud on the subsidiary "affected a financial institution" (the parent company) for purposes of 18 U.S.C. 3293(2) (extending the statute of limitations from 5 years to 10 years for a wire fraud that affects a financial institution). The appellate court affirmed

Bouyea's conviction, relying upon the breadth of the word "affect" in conjunction with wire fraud. However, the Bouyea case has no bearing here. On Bouchard's appeal, the government's appellate counsel Thomas Booth agreed and abandoned the specious Bouyea argument (Appellate Document 46-1). This is another bad jury instruction on an essential element that results in a due process violation. Gallerani at 617.

It is evident that the jury convicted Bouchard of conspiracy without considering the elements of the offense. Based on the foregoing, the second prong of Strickland is established: there is a reasonable probability that but for Gaspar's ignorance of the law, failure to perform basic research, failure to file proposed jury instructions and failure to object to the legally flawed jury instructions, the result of the proceeding would have been different. That reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. Accordingly, the conviction on Count 1 must be vacated.

**GROUND 5:**

**THE JURY'S GENERAL VERDICT ON THE CONSPIRACY COUNT DOES NOT INDICATE WHETHER IT CONVICTED BASED ON THE POTENTIALLY LEGALLY-SOUND FREMONT TRANSACTION OR THE LEGALLY-UNSOUND CITIMORTGAGE TRANSACTION. BECAUSE OF THIS UNCERTAINTY, THE CONSPIRACY CONVICTION MUST BE VACATED.**

In reversing the convictions on Counts 7, 19, and 24, the Court of Appeals held that alleged conduct aimed at a non-insured subsidiary of an FDIC-insured bank does not violate the bank fraud statute (18 USC Section 1344) and the false statements statute (18 USC Section 1014). That conclusion was based on, among other things, the appellate court's review of the text of §1344, the Supreme Court's decision in Loughrin v. United States, 134 S. Ct. 2384 (2014), and the 2009 amendments to 18 USC §20 and 18 USC §1014. The remaining conspiracy count

was tainted by the same error that infected the substantive counts and should be vacated and remanded for a new trial.

The Indictment here charged four overt acts in furtherance of the conspiracy. (Document 1, paragraph 47). Those acts related to the submission of HUD-1 statements in connection with three transactions: First, a sale of property at 466 First Street in Troy involving a loan by Washington Mutual. Par. 47(a). Second, a sale of property at 147 Fifth Avenue in Troy involving a loan by Fremont. Par. 47(b).   And third, a sale of property at 1659 Becker Street involving a loan by Citimortgage. Par. 47 (c) and (d).

Although this Court ruled that Fremont is FDIC insured, it is undisputed that Washington Mutual and Citimortgage are not.  As such, the only potentially valid overt act was the one related to the Fifth Avenue property involving Fremont. Par. 47(b).  The problem here was that the government introduced evidence that Citibank, the alleged parent of Citimortgage, is also FDIC insured. But, the fact that Citibank is FDIC insured is irrelevant.  As discussed below, the evidence of Citibank's insured status quite likely led the jury impermissibly to rest the conspiracy conviction on the Citimortgage transaction and the overt acts in Indictment Paragraph 47(c) and (d). Accordingly, because the verdict may have been based on very theory the Court of Appeals found to be legally invalid, Bouchard is entitled to a new trial.

The Supreme Court's recent decision in McDonnell v. United States, 136 S. Ct. 2355 (June 27, 2016), outlines the proper analysis where, as here, one of several bases for conviction is tainted by an erroneous charge that is compounded by a prosecutor's similarly misguided argument.   In McDonnell, the defendant was convicted of honest services wire fraud, conspiracy, and related charges.  The Supreme Court held that the trial court's instruction on

"official act" was overly broad, as it included acts that were prohibited by the statute and acts that were not. As a result, there was a risk that the jury convicted him for "lawful conduct." McDonnell at 2373. For that reason, the Court vacated his convictions. It observed that "[t]he problem with the District Court's instructions is that they provided no assurance that the jury reached its verdict after [making proper] finding[s]." Id. at 2374. Thus, "the jury could have convicted Governor McDonnell without finding that he committed or agreed to commit an official act,' as properly defined." Id.

In concluding that the basis for the jury's verdict could not be discerned, the Court looked not only to the jury instructions, but also to the government's position at trial, including its summation. It observed that "[t]he Government told the jury in its closing argument that 'whatever it was' Governor McDonnell had done, 'it's all official action.")." Id. (alteration omitted); see also Id. ("based on that remark [in closing], and the repeated referenced to 'Bob's for Jobs' at trial, the jury could have thought that the relevant [standard] was something as nebulous as... the District Court itself concluded"). Thus, the prosecutor's arguments leant further support to the conclusion that it was "possible that the jury convicted Governor McDonnell without [a proper] finding." Id.

Here, too, a fundamental legal error permeated the trial and infected all of the counts, including the conspiracy charge. From its opening statement, the government sought to conflate uninsured subsidiaries with insured parents. Thus, in discussing the conspiracy count, Prosecutor Thomson told the jury:

> You'll hear testimony from the CEO of BNC, he'll tell you, provide testimony that BNC Mortgage is a wholly-owned subsidiary of Lehman Brothers and they are a federally insured institution and that mortgages given by BNC were then funded and purchased by Lehman Brothers so that a fraud on BNC is a fraud on Lehman Brothers. And you'll

also receive a document that has been stipulated to by the parties with regard to CitiMortgage, that CitiMortgage is a subsidiary of Citibank, and that the loan documents of CitiMortgage subsidiary, affect the parent corporation. (Document 114, Page 233, Lines 12-22, emphasis added).

The government's evidence followed that roadmap. Kelly Monahan, CEO of BNC testified at length about the relationship between his uninsured company and its insured parent Lehman. The government also introduced proof that only Citibank (and not CitiMortgage) was insured. (Government Trial Exhibit 1.3). Moreover, the government never sought to prove that Bouchard was aware of either insured parent.

Finally, the government told the jury in summation that Bouchard was guilty of conspiracy because CitiMortgage and Citibank were one and the same for purposes of the false statements statute, 18 USC §1014. Prosecutor Olmsted argued that Bouchard's paralegals had:

> sent a preliminary HUD-1 to the bank.... That's an overt act.... They have obtained the money from in this case CitiMortgage. There's a stipulation CitiMortgage is a -- owned by Citibank and that it's -- the mortgages issued by CitiMortgage are mortgages in effect financial institution [sic], that's stipulated to. So, in this case it's a CitiMortgage loan, CitiMortgage sends the money. (Document 116 at Page 60).

According to the government, the paralegals had sent the HUD-1 to CitiMortgage, (which is not a "bank"). And, as the Second Circuit held, it is irrelevant that CitiMortgage is "owned by Citibank." The key issue was whether CitiMortgage is insured (it is not) or whether Bouchard was attempting to influence Citibank (he wasn't and there was no proof that he was).[6]

---

[6] The government repeated this erroneous argument several times with respect to the other counts in the Indictment. (Document 116 at page 23). (arguing that government needed to prove only that HUD-1 form is "sent to a financial institution, and in this case the testimony is that it is sent to BNC")(emphasis added).

This court's jury instructions cemented the error. The court initially charged that the object of the conspiracy was the submission of false statements to influence the actions of a federally-insured financial institution. (Document 117 at Page 22).  But in instructing on the substantive false statements count, the court eviscerated the distinction between the uninsured subsidiary (there BNC) and the insured parent (there Lehman). It said: "Count 24 [§1014] charges the defendant with a third crime, providing false statements to <u>a financial institution, the mortgage lender BNC</u>, which was a subsidiary of Lehman Brother, <u>and which the government alleges is a federally insured financial institution</u>." (Document 117 at Page 31, emphasis added).  This instruction was plainly wrong. As the Second Circuit has now made clear, an uninsured subsidiary like BNC is <u>not</u> "a bank" or "a financial institution" or "a federally insured financial institution."  To make matters worse, this court then read directly from Count 24 in the Indictment, which wrongly referred to "influencing BNC Mortgage," the non-insured subsidiary of Lehman Brothers, which could only have added to the jury's confusion. <u>Id.</u> At 31-32.

As a result of the government's trial theory, its summation, and the court's charge, the jury was left with the indelible and erroneous impression that Bouchard was guilty of conspiracy so long as (i) he submitted a false document to an uninsured subsidiary of an FDIC-insured bank and (ii) the FDIC-insured bank relied on that statement, even if (iii) he was unaware of the presence of the FDIC-insured bank.  Applying those rules, the jury may well have convicted Bouchard based on an invalid legal theory.

In sum, the jury was wrongly told that an uninsured subsidiary and its insured parent could be considered the same for purposes of the federal criminal charges it was considering,

and it acted upon that misinformation. It convicted Bouchard of bank fraud on Counts 7 and 19 because of that error. And it convicted Bouchard of submitting a false statement on Count 24 because of that error. There is every reason to believe that it convicted him of conspiracy, too, because of that same error. After all, the jury was applying the same erroneous rules about insured entities to that charge as well. Moreover, the jury acquitted Mr. Bouchard of the substantive Fremont charge (Count 17) further indicating that its conspiracy conviction was grounded in the legally infirm CitiMortgage transaction.

A general verdict is invalid when one of the possible bases of the conviction is invalid. United States v. Scotti, 47 F. 3d 1237, 1246 (2d Cir. 1994); Griffin v. United States, 502 U.S. 46, 52, 112 S. Ct. 466, 474 (1991). "The proper rule to be applied is that which requires a verdict to be set aside where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." Yates v. United States, 354 U.S. 298, 312 (1957).

The McDonnell case clarifies that when a charge such as the conspiracy count here contains both legally permissible and legally impermissible bases for conviction, and it is impossible to tell on what basis the jury convicted, the only remedy is a vacatur of the conviction.

<strong>GROUND 6:</strong>

**THE CONSCIOUS AVOIDANCE JURY INSTRUCTIONS WERE LEGALLY ERRONEOUS, ESPECIALLY VIEWED IN LIGHT OF THE SECOND CIRCUIT'S DECISION IN THIS CASE. ACCORDINGLY, THE CONSPIRACY CONVICTION MUST BE SET ASIDE.**

Prior to the jury's deliberations at trial on November 28, 2012, this Court "charged" its jury instructions. One of the instructions pertained to the doctrine of "conscious avoidance", also sometimes referred to as "willful blindness". At trial, Bouchard's counsel Gaspar Castillo

failed to object to this legally erroneous jury instruction, thereby causing prejudice to Bouchard. (See Ground 7, Example 6 herein).

The test for when a trial court's conscious avoidance charge is permissible has two prongs: "First, the defendant must assert the lack of some specific knowledge required for conviction. Second, there must be an appropriate factual predicate for the charge ..., i.e., the evidence is such that a rational juror may reach the conclusion beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact." United States v. Fofanah, 765 F.3d 141, 144-145 (2d Cir. 2014); See also United States v. Svaboda, 347 F.3d 471, 480 (2d Cir. 2003). "The second prong of this test thus has two components - there must be evidence that the defendant (1) was aware of a high probability of the disputed fact and (2) deliberately avoided confirming that fact." Svaboda at 480.

The charging conference took place on November 27, 2012, the day before the instructions were given to the jury. But, the record for this conference is silent with respect to almost all of the proposed jury instructions, including the conscious avoidance instruction. The conference was scheduled to start at 9:00 a.m. (See Document 54, Page 186, Lines 1-9). However, the official transcript for the conference inexplicably picks up near the end of the proceedings at 10:02 a.m. in this Court's Chambers. (See Document 116, Page 2, Line 1)

In any event, the conscious avoidance instruction was presented to the jury, so this Court concluded that the factual predicate for the charge existed. The Court also made clear its decisiveness regarding what the charges were going to be, telling the jury near the beginning of the instructions: "-- I've been through the charge with the attorneys two days ago, we went through it, yesterday, they know exactly what the charge is going to be, in fact yesterday I even

said at one point you can talk all you want, you know what I'm going to charge, but I'll give it to

this jury myself, take it from me". (Document 117, Page 8 Line 21 -to- Page 9 Line 1).

As for its conscious avoidance instruction, the Court told the jury:

*In determining whether the defendant acted knowingly, you may consider whether the defendant deliberately closed his eyes to what would otherwise have been obvious to him. If you find beyond a reasonable doubt that the defendant acted with, or that the defendant's ignorance was solely and entirely the result of, a conscious purpose to avoid learning the truth, meaning that the statement was false, then this element may be satisfied. However, guilty knowledge may not be established by demonstrating that the defendant was merely negligent, foolish or mistaken. If you find that the defendant was aware of a high probability that, meaning for example the statement was false, and that the defendant acted with deliberate ignorance of the facts, you may find the defendant acted knowingly. However, if you find the defendant actually believed that, e.g. the statement was true, he may not be convicted. It is entirely up to you whether you find that the defendant deliberately closed his eyes and any inferences to be drawn from the evidence on this issue.*
(Document 117, Page 15 Line 21 -to- Page 16 Line 15).

This instruction is legally deficient for at least four reasons:

First, in the context of a conspiracy "the jury may use the conscious avoidance doctrine

to establish the defendant's knowledge of the aims of the conspiracy." Svaboda 347 F.3d at

479; See also United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1195 (2d Cir. 1995).

Here, the instruction focused solely on Bouchard's supposed conscious purpose in avoiding

knowledge of the falsity of the "statement" [the HUD Settlement Statements], but that does

not relate at all to knowledge of the aims or the object of the conspiracy. The alleged object of

the conspiracy was to violate the false statements statute, 18 USC 1014, by knowingly

submitting false statements to FDIC insured banks for the purpose of influencing those banks.

The instruction regarding knowledge that the "statements" were false does not alone relate to

any illegality. But that legally flawed instruction gave the jury a broader, equivocal and legally

erroneous basis upon which to convict by finding only that Bouchard had knowledge that the

HUDs were false, rather than inferring knowledge on Bouchard's part that false HUDs were to be used to effectuate the object of a conspiracy to violate the false statements statute.

Second, the conscious avoidance jury instruction was legally flawed because the crucial words "beyond a reasonable doubt" were inserted into the wrong area of the instruction. The words "beyond a reasonable doubt" do not factor into a finding by a jury that a defendant's ignorance was a result of a conscious purpose to avoid learning the truth, meaning, that the disputed fact [the statement] was false.[7]  Rather, the words "beyond a reasonable doubt" belong only in the operative section of the charge that requires the jury to find beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and that the defendant acted with a deliberate ignorance of the facts. The absence of the words "beyond a reasonable doubt" from this portion of the charge makes the charge even more erroneous by relieving the ultimate fact-finder, the jury, from making a proper finding under the "beyond a reasonable doubt" standard. The law in the Second Circuit is clear: the conscious avoidance instruction permits jurors to infer knowledge only when they are "persuaded beyond a reasonable doubt that the defendant was aware of a high probability of the facts in dispute and consciously avoided that fact." United States v. Rodriguez, 983 F.2d 455, 458 (2d Cir. 1993). A significant difference exists between ignorance that is a result of a conscious purpose to avoid the truth versus there being a high probability of the awareness of a fact and then acting with a deliberate ignorance of that fact. The jury was erroneously instructed that the "beyond a reasonable doubt" standard applied to the former as opposed to the latter.

---

[7] As noted above, mere knowledge that a statement is false is far different from knowing that false HUD statements would be used to carry out the objective or aim of a conspiracy to submit false statements to FDIC insured banks for the purpose of influencing those banks in violation of the false statements statute, 18 USC 1014.

Third, the conscious avoidance charge was erroneously applied to the government's alternative theory of criminal liability under Count 1 that Bouchard "aided and abetted the conspiracy." Under the purported "facts" as crafted by the government, it was impossible for Bouchard to consciously avoid the requisite culpable mental state of specific intent to aid and abet a conspiracy under 18 USC 2(b) by intentionally "causing" an intermediary to submit false statements to FDIC insured banks in order to influence those banks. The government must prove that an accused aider and abettor had the specific intent that his act or omission bring about the underlying crime". United States v. Scotti, 47 F.3d 1237, 1244 (2d Cir. 1995). Aiding and abetting has a heightened mens rea requirement involving "purpose" (specific intent) as opposed to "knowledge" (general intent). Id. at 1244-1245. This element of purpose "demands that a defendant who causes a particular result have consciously desired that result." Id. at 1245. Therefore, it is impossible to consciously avoid "aiding and abetting" when the culpable mental state of the aider and abettor requires a conscious desire to achieve a particular result. The jury was not told that it was wrong to apply the "conscious avoidance" instruction to the alternate theory of aiding and abetting a conspiracy. Therefore, that flawed instruction involving a mistake in the law gave the jury a legally impermissible basis upon which to convict Bouchard on Count 1. As the record stands, it is impossible to tell which theory the jury chose to convict Bouchard. Accordingly, the conviction on Count 1 must be set aside. Yates, 354 U.S. 298, 312; Griffin, 502 U.S. 46, 52; Scotti, 47 F.3d 1237, 1246.

Finally, as a result of the Court of Appeals' decision here, the conscious avoidance instruction must come under even closer scrutiny. With the government's incorrect parent/subsidiary theory booted to the curb, it is clear that the government's evidence that

could have potentially been admitted at trial has now become extremely narrow. What is now inadmissible evidence regarding BNC Mortgage Inc., Citimortgage, Inc., Argent Mortgage Company and other entities should have never been heard by the jury in the first place. All of that bad evidence most assuredly factored into the jury's "high probability" conscious avoidance analysis of the totality of the evidence in convicting Bouchard of conspiracy. The prejudice to Bouchard is apparent - he was convicted on inadmissible evidence that flowed directly from the government's erroneous legal theory. And although that theory was thrown out on appeal, its taint and bad evidence are still there.

For sure, the government will attempt to detour around this entire argument. Perhaps the prosecutors may take the position that the conscious avoidance charge was unnecessary based upon an argument that the record proved Bouchard's guilt. But that can't be the case, because the Court determined that the charge was proper based upon the record itself as it existed at the end of evidence and before the case was submitted to the jury. Otherwise, the charge would not have been given by the Court. Plus, Bouchard asserted his innocence from the very beginning of this case, and he has never wavered from that truth. And of course, based on the appellate decision in this case, almost all of the government's evidence in the trial record is now inadmissible.

Based on the foregoing, justice requires a reversal of the conspiracy conviction.

**GROUND 7:**

**DEFENSE COUNSEL GASPAR CASTILLO'S PERFORMANCE WAS DEFICIENT AND INEFFECTIVE, THEREBY CAUSING PREJUDICE TO MICHAEL BOUCHARD AND DEPRIVING HIM OF THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

This Point is not intended to be a personal attack on Gaspar Castillo, for he is a kind, decent and honorable person.  However, Gaspar's performance in this case was constitutionally deficient and ineffective.

An ineffective assistance of counsel claim may be raised for the first time in a collateral proceeding under section 2255, whether or not the petitioner could have raised the claim on direct appeal. Massaro v. United States, 538 U.S. 500, 504, 123 S. Ct. 1690 (2003); Harrington v. United States, 689 F.3d 124, 129 (2d Cir. 2012). A defendant seeking to attack his sentence based on ineffective assistance of counsel must show: "(1) that counsel's performance fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different". Kaiser v. New York, 56 F.3d 16, 18 (2d Cir. 1995) (per curiam) (quoting Strickland v. Washington, 466 U.S. 668, 688, 104 S. Ct. 2052 (1984).

To show the requisite prejudice at the second step, a petitioner must show "a reasonable probability that his reliance on counsel's ineffective assistance affected the outcome of the proceedings." Pham v. United States, 317 F.3d 178, 182 (2d Cir. 2003). "A reasonable probability is a probability sufficient to undermine confidence in the outcome". Strickland 466 U.S. at 694.

As a lawyer, Gaspar has an unfortunate recent history of professional misconduct. But that history does not reflect Gaspar's genuine goodness as a person, because on the inside

Gaspar is a deeply compassionate and caring individual. But for whatever reason, Gaspar became overwhelmed by too many legal cases and their related obligations, which adversely affected his ability to provide effective legal counsel on a case by case basis. The relevant professional misconduct discussed below transpired before and during Gaspar's representation of Michael Bouchard in this case.

For example, in a May 22, 2013 "Letter of Admonition" addressed to Gaspar, The Committee on Professional Standards for the Third Judicial Department determined there to be certain improper professional conduct by Gaspar in the following respects:

"In December 2009 you were assigned to perfect the appeal of Marcus Green by the Appellate Division, Third Judicial Department. In July 2010 you were also assigned to perfect the appeal of DeJon Moore. You neglected both assigned appeals and did not request extensions of time from the Court. You failed to respond to numerous communications from the Court related to the prosecution of the appeals resulting in you being relieved of both assignments. Finally, you did not respond to letters from the Committee and only provided a response after several telephone calls from Committee staff."

"You were advised by letter of May 3, 2013 of the intention of the Committee to admonish you for the foregoing misconduct. Since you have failed to show cause why such admonition should not issue pursuant to Section 806.4(c) of the Rules of the Appellate Division, Third Department, you are hereby admonished for the foregoing acts of professional misconduct."

As a result of other inquiries, in November 2014 and January 2015 Gaspar was examined under oath by the NYS Third Department's Committee on Professional Standards relative to four complaints of professional misconduct that had been filed against him. One of the matters under investigation was Gaspar's misconduct in defaulting on numerous occasions in the U.S. Second Circuit Court of Appeals case entitled "United States v. Morgan", 12-3231. Previously on May 9, 2014, the Second Circuit's Grievance Panel suspended Gaspar from practicing in the Second Circuit due to his misconduct in that case. In Gaspar's November 17, 2014 NYS Committee testimony, he identified the May 9, 2014 suspension order exhibit, saying: *"This is the order suspending me from practicing in the United States District Court and from the Second Circuit."* Because of this suspension, Gaspar was "ineffective per se" in Bouchard's case. Bouchard was entitled to representation throughout the entire case, but had no counsel during the time period of the suspension.

During the pendency of Second Circuit Grievance suspension, Gaspar's lawyer, Robert Roche, sent a letter to the Clerk of that Court on May 23, 2014 indicating that Gaspar was "scared to death", "overwhelmed", and "potentially clinically depressed." On June 2, 2014, the Second Circuit's Grievance Panel lifted the suspension but privately reprimanded Gaspar for his misconduct in the Morgan case. (See also Example 25 below of Gaspar's ineffectiveness). During his NYS Committee testimony on November 17, 2014, Gaspar testified that "depression", "feeling overwhelmed", "being scared to death" and other reasons contributed to his failure to respond to the Second Circuit Court of Appeals, their messages, and their written order, all prior to the issuance of an order to show cause being issued by that Court ordering him to respond regarding the Morgan case. Gaspar also testified as follows: *"I've done a lot of*

*things to neglect."* At a follow-up NYS Committee hearing on the same four inquiries, Gaspar failed to appear and his lawyer described Gaspar as a "procrastinator."

Gaspar's "procrastination" always made appearances throughout Bouchard's case. Gaspar ignored many, many e-mails, phone calls and text messages from Bouchard. Gaspar also ignored trial notebooks prepared by Bouchard, requests to file motions, requests to examine the facts of the case and requests to review the law that applied to the case.

As a result of the NYS Committee's investigation, the NYS Appellate Division - Third Department found Gaspar guilty of professional misconduct immediately threatening the public interest, and suspended him from the practice of law on June 9, 2016 (Matter of Castillo, 2016 NY Slip Op 04501).

Thereafter, on August 18, 2016 the NYS Appellate Division - Third Department, reviewed another disciplinary matter involving Gaspar, again with the U.S. Second Circuit Court of Appeals. That federal panel publicly reprimanded Gaspar and barred him from representing clients in that Court pursuant to the Criminal Justice Act for two years. (See In re Gaspar Castillo, Attorney, 645 Fed. Appx. 41, 2016 U.S. App. LEXIS 6164 (2d Cir. 2016). As a result of the federal disciplinary matter, the New York court suspended Gaspar from the practice of law for a period of six months. (See Matter of Castillo, D-48-16).

Then, on November 14, 2016, the NYS Appellate Division - Third Department, found Gaspar guilty of professional misconduct charged in a petition filed by the NYS Committee as a follow-up to the June 9, 2016 suspension order. Among other things, the petition alleged that Gaspar violated certain Rules of the New York Rules of Professional Conduct (22 NYCRR Part 1200) Rules and Statutes, such as: Rule 1.3(a) - Failure to act with reasonable diligence and

promptness in representing a client; Rule 1.3(b) - Neglect; Rule 3.2 - Delay of litigation; Rule 3.3(f)(3) - Engaging in undignified and discourteous conduct before a tribunal; Rule 8.4(d) - Conduct prejudicial to the administration of justice; Rule 8.4(h) - Conduct that adversely reflects on the lawyer's fitness as a lawyer. The Court concluded that "under the circumstances presented, in order to protect the public, maintain the honor and integrity of the profession and deter others from similar misconduct, respondent's grave misconduct warrants his suspension from the practice of law for a period of three years." (See Matter of Castillo, 2016 NY Slip Op 08153).

The NYS Committee on Professional Standards and the NYS Court both found it necessary to suspend Gaspar from the practice of law for a period of three years in order to protect the public. Michael Bouchard is part of that public. Most of Gaspar's misconduct that gave rise to the suspension, such as neglect of clients' cases and the failure to act with reasonable diligence and promptness in representing clients, is the exact same misconduct that Gaspar displayed at the same time throughout Bouchard's case. Michael Bouchard was prejudiced by the same unprofessional conduct that led to Gaspar's suspension. Given that history, below are 27 examples of ineffective assistance of counsel that occurred in Michael Bouchard's case.

Below are some examples wherein defense counsel's performance was constitutionally deficient.

**Example 1:** The grand jury proceedings in this case commenced on June 22, 2011. Weeks later on or about Labor Day weekend, Bouchard and Castillo spoke by phone, and Castillo informed Bouchard that Prosecutor Thomas Capezza recently said something to the effect that he had

doubts about this case and that he may not proceed with an indictment. This presented Castillo with an opening to schedule a conference with Capezza to finally convince Capezza to drop the grand jury proceedings, but, Castillo failed to act. Unfortunately, Castillo's strategy throughout this entire case was to simply allow time to elapse without confronting the prosecutors head on regarding any issue. As a result, Capezza never dropped the case, and months later in 2011, he resigned from the U.S. Attorney's Office.

**Example 2:** At Bouchard's arraignment on July 26, 2012, at the insistence of IRS Agent Thomas Fattorusso, the Court issued an additional condition of release that required Bouchard to avoid contact with Kevin M. O'Connell, Kevin D. O'Connell, Michael Crowley, Laurie Hinds, Malissa Edgerton and Aaron Dare (Document 2). Castillo failed to object to the government's interference with Bouchard's constitutional right to access witnesses in his defense.

The prosecutors used Kevin D. O'Connell, Michael Crowley, Laurie Hinds and Malissa Edgerton as government witnesses at trial. Bouchard was not allowed to speak with these witnesses, and, was therefore prevented from stopping the false story lines that were fed to these witnesses by the prosecutors (except Malissa Edgerton - she refused to lie for the prosecutors at trial).

**Example 3:** Gaspar never made a discovery motion. Instead, Gaspar apparently relied upon the false representation from Prosecutor Olmsted that there would be "open file discovery". As we know, Olmsted's representation was a lie. Gaspar's failure to make a discovery motion resulted in the suppression of Brady, Jencks and Giglio material by the government and prejudice to Bouchard. Below are just some of the "open file discovery" items that were suppressed by the government:

- All handwritten notes of federal prosecutors, federal government agents, state prosecutors, state police, local prosecutors and local police (no notes of any nature were provided);

- All typewritten interviews from state police, state prosecutors, local police and local prosecutors (none were provided);

- All tape recordings (none were provided). Prosecutor Olmsted let it slip at the evidentiary hearing on July 2, 2013 that at least one tape recording of Kevin O'Connell exists - therefore, more recordings of O'Connell and other parties must exist, but they were all suppressed.

- Laurie Hinds, Malissa Edgerton, Kevin O'Connell and Michael Crowley all testified in front of the grand jury on June 22, 2011. The government disclosed the pre-testimony typewritten interviews of Laurie and Malissa that were conducted by Prosecutor Capezza and Agent Fattorusso, but they suppressed the typewritten interviews of O'Connell and Crowley.

- Government trial witnesses Thomas Disonell and Nickole Riley-Sutliff testified in front of the grand jury on June 29, 2011, but their pre-testimony typewritten interviews were suppressed.

- All of the trial preparation typewritten interviews with all witnesses were suppressed.

- None of the documents of Team Title, Thomas Disonell and Matthew Kupic were disclosed.

- None of the documents of PB Enterprises, Kevin O'Connell and Michael Crowley were disclosed (except the extremely limited paperwork that the government used as trial exhibits, such as some bank records and selected contracts).

- No loan applications were disclosed.

- No property appraisals were disclosed.

- No loan underwriting documents were disclosed.

- None of the alleged higher priced property contracts were disclosed.

- Michael Bouchard's own files were suppressed (the files were voluntarily handed over to IRS Agent Thomas Fattorusso years before the trial). The only scant documents from

Bouchard's files that the government provided in "discovery" were copies of some of the HUD Settlement Statements, checks and lenders' closing instructions.

**Example 4:** Shortly before trial, Castillo arranged with the government to "review" Bouchard's files that were in possession of the government, and, he supposedly reviewed the files in just one visit to a government building. Castillo did not know what to look for in these files, and, he performed this cursory "review" without Bouchard's knowledge. Consequently, Bouchard was not allowed to review his own transaction files held by the government. Bouchard's office previously kept copies of a very small random sample of approximately six of the numerous files previously delivered to IRS Agent Thomas Fattorusso. Castillo should have demanded complete copies of all of Bouchard's files, but he failed to do so, and his single visit to glance at the files was unproductive.

**Example 5:** The government filed a Trial Memorandum (or Brief) on October 29, 2012. (Document 17). That Brief was filled with false information and erroneous mistakes in the law. Gaspar never filed a Trial Memorandum and he never filed any papers in opposition to the government's erroneous statements of fact and law. Gaspar allowed the prosecutors to control this case from the very beginning with factual falsehoods and misstatements of law.

**Example 6:** Before trial, the government filed 54 pages of jury instructions (Document 14) and 8 pages of Proposed Voir Dire (Document 16). Gaspar filed just 1 page of proposed Voir Dire and a mere 10 pages of jury instructions, all combined in one document. (Document 21). Gaspar did not include the elements of aiding and abetting, conspiracy, bank fraud and/or false statements. Only 4 lines of his erroneous instructions were for what he termed "aiding and abetting / conspiracy". Consequently, the government's instructions were used at trial by the

Court (Document 117) and the jury heard legally erroneous instructions on, among other things, aiding and abetting, conspiracy, financial institutions, false statements, bank fraud and conscious avoidance. At trial, Gaspar did not object to the legally erroneous instructions on the foregoing topics that the Court delivered to the jury on November 28, 2012.

**Example 7:** On October 29, 2012, the government filed its proposed Verdict Form. (Document 15). Gaspar never filed a proposed Verdict Form. Consequently, the Verdict Form used by the jury was a near mirror image of the government's form. (Document 38). The jury's form was a general verdict sheet with no specificity. Given the government's alternate theory of criminal liability of "aiding and abetting" in Counts 1 -through- 23, Gaspar should have requested a special verdict sheet for the jury to select the theory (if any) upon which to convict in Counts 1 - to- 23. And, Gaspar should have requested a special verdict sheet that outlined the overt acts (if any) that the jury found to have been committed by a conspirator under Count 1 - Conspiracy. The jury's verdict was based on erroneous instructions, and the lack of specificity in the verdict sheet only compounded the errors.

**Example 8:** Before trial, Gaspar failed to make a motion for a Bill of Particulars.

**Example 9:** Before trial, Gaspar failed to make a motion to dismiss the Indictment based on the law. This failure was a direct result of Gaspar's fundamental misunderstanding of the law. Before trial, Bouchard informed Gaspar about the 2009 amendments to The United States Code enacted by Congress under the Fraud Enforcement and Recovery Act ("FERA"), 123 Stat. 1617. Under this Act, Congress amended both 18 U.S.C. 20 (which added "a mortgage lending

**Example 9 (continued)**

business" to the definition of a "financial institution" for purposes of 18 U.S.C. 1344, the bank

fraud statute) and 18 U.S.C. 1014, the false statements statute, to cover mortgage lending

institutions specifically. As the Second Circuit recognized on the appeal of this case, "Timing is

everything: the conduct for which Bouchard was convicted occurred prior to 2009". United

State v. Bouchard, 828 F.3d 116, 124 (2d Cir. 2016).

The Court of Appeals also discussed the existing Second Circuit case law at the time of trial,

which also favored Bouchard:

- The false statements statute, 18 U.S.C. 1014, required the government to prove that a
  bank that received a false statement is insured by the FDIC and that a defendant knows
  that it is a bank to which he has made the false statement. United States v. Sabatino,
  485 F.2d 540, 544 (2d Cir. 1973).

- Subdivision 1 of the bank fraud statute, 18 U.S.C. 1344(1), required the government to
  show that a defendant intended to defraud the financial institution itself. United States
  v. Stavroulakis 952 F.2d 686, 694 (2d Cir. 1992); United States v. Rodriguez, 140 F.3d
  163, 168 (2d Cir. 1998); United States v. Laljie, 184 F.3d 180, 189-90 (2d Cir. 1999).

- The bank fraud statute, 18 U.S.C. 1344, as a whole is interpreted to be a "specific intent
  crime requiring proof of intent to victimize a bank by fraud," meaning that "a federally
  insured or chartered bank must be the actual or intended victim of the scheme". United
  States v. Nkansah, 699 F.3d 743, 748 (2d Cir. 2012).

**Example 9 (continued)**

The lenders BNC Mortgage, Inc. and Citimortgage, Inc. were not "financial institutions", they were not "FDIC insured" and they were not "banks". Nor were other lenders, such as Option One Mortgage Corporation, The CIT Group/Consumer Finance, Inc., FFFC f/n/o First Franklin Financial Corp. and America's Wholesale Lender. The government deceived this Court and the jury. And, Gaspar's ineffectiveness allowed that charade to happen.

The indictment alleged an overt act involving Fremont Investment & Loan (Document 1, Paragraph 47b). However, this was not a valid overt act, because the indictment did not allege that Fremont was a bank. And, the indictment did not allege that either Bouchard or an alleged co-conspirator knew that Fremont was a bank to which the statement was submitted. See Sabatino at 544. As noted by the Second Circuit "We are disinclined to affirm a conviction on a theory that was not advanced regarding a critical element." Bouchard, 828 F.3d 116, 127; quoting United States v. Rigas, 490 F.3d 208, 231 n.29 (2d Cir. 2007). The Sabatino and Rigas cases are the law, but they were not argued by Gaspar.

The indictment was legally and constitutionally flawed. Gaspar misunderstood the case law and the 2009 Congressional amendments. He also overlooked the obvious fact that the indictment violated the U.S. Constitution's Ex Post Facto Clause (See Ground 3 herein). A motion would have resulted in a guaranteed dismissal of the indictment: there is no basis in the law for any other decision. Gaspar's performance was ineffective and prejudicial.[8]

**Example 9 (continued)**

---

[8] What is truly disturbing is that not once throughout this entire case did the prosecutors, Michael Olmsted and Tamara Thomson, advise this Court as to the real law that was applicable to this case. They misled this Court by not raising the 2009 Congressional amendments and the Sabatino, Stavroulakis, Rodriguez, Laljie, Rigas and/or Nkansah cases. That is unethical.

In <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the Supreme Court held that a criminal defendant's Sixth Amendment Right under the U.S. Constitution is violated if his trial attorney's performance falls below an objective standard of reasonableness and if there is a reasonable probability that the result of the trial would have been different absent the deficient act or omission. <u>Strickland</u> at 687-688.

Under Strickland, the first determination to be made is whether defense counsel's representations fell below an objective standard of reasonableness. This first prong, "constitutional deficiency - is necessarily linked to the practice and expectations of the legal community: The proper measure of attorney performance remains simply reasonableness under prevailing professional norms". <u>Strickland</u> at 688; <u>Padilla v. Kentucky</u>, 559 U.S. 356, 366 (2010). "An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under Strickland". <u>Hinton v. Alabama</u>, 134 S. Ct. 10891, 1089 (2014). Gaspar's ignorance of the applicable law combined with his failure to perform basic research on this law is a quintessential example of unreasonable under Strickland. That failure was likewise without any strategic calculation whatsoever. Gaspar's ignorance of the facts and the law resulted in his total failure to make a motion to dismiss the indictment. The only conclusion to reach is that Gaspar's performance was constitutionally deficient. The inadequate assistance of counsel here was the inexcusable mistake of law – that being the unreasonable failure by

**Example 9 (continued)**

Gaspar to understand the law, which resulted in his failure to move for a dismissal of the indictment.

Having established that Gaspar's performance was constitutionally deficient, the second prong under Strickland requires Bouchard to "show that that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland at 694; Hinton at 1089. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Strickland at 695; Hinton at 1089.

An analysis of all 24 counts reveals that a motion by Gaspar based on the applicable law and facts would have resulted in a dismissal of the indictment:

## Count 1 (conspiracy to submit false statements to FDIC insured banks -or- aiding and abetting that conspiracy).

The Washington Mutual overt act in Paragraph 47(a) of the indictment is invalid. Prosecutor Olmsted selected Laurie Hinds as Bouchard's coconspirator for this transaction that he labeled as part of the "Team Title Scheme" in Bouchard's indictment. In his zeal to persecute the innocent, Prosecutor Olmsted screwed up the paperwork. Although Laurie was coerced into pleading guilty to a fabricated "conspiracy", Prosecutor Olmsted limited the documents that he crafted in her case to a "conspiracy" related to the different "PB Enterprises scheme". (See United States v. Hinds, case No. 1:12-cr-00374-NAM, Document 2, Pages 3-8; Document 3, Pages 5-6). Because this transaction related only to the Team Title Scheme, and not the

**Example 9 (continued)**

different PB Enterprises Scheme to which Laurie was forced to plead guilty, there were no

"conspirators" for this overt act. Consequently, all of the evidence related to Team Title should

have been excluded at Bouchard's trial. And, because neither Laurie Hinds nor Malissa Edgerton

pled guilty to a conspiracy involving the alleged "Team Title scheme", there is nobody to

conspire with Bouchard to prepare and submit false statements to FDIC insured banks in that

scheme. Prosecutor Olmsted also got the Washington Mutual loan amount wrong: it was

$74,700.00, not $88,000.00. And, Prosecutors Olmsted and Thomson both screwed up at trial

with respect to at least three elements: 1) there was no proof that any particular person

submitted a HUD-1 statement to Washington Mutual; 2) there was no proof that Washington

Mutual was FDIC insured; and 3) the alleged false statements conspiracy is a "specific intent

crime" - such intent was never alleged in Laurie's paperwork and/or Bouchard's indictment -

and it was never presented at trial. Gaspar missed all 3 elements.

The Fremont overt act in Paragraph 47(b) of the indictment is also invalid. Prosecutor

Olmsted selected Malissa Edgerton as Bouchard's coconspirator for this transaction. Once

again, in his zeal to persecute the innocent, Prosecutor Olmsted screwed up the paperwork.

Under United States v. Sabatino,  485 F.2d 540, 544 (2d Cir. 1973), the false statements statute

requires the government to prove that the defendant knew that it was bank to which the false

statement was made.  None of Malissa's paperwork includes anything about her having

"knowledge" that Fremont was a bank. [9] (See United States v. Malissa Edgerton, Case No. 1:12-

**Example 9 (continued)**

---

[9] The Court of Appeals quoted the Sabatino case in its decision reversing the substantive 1014
false statements conviction against Bouchard under Count 24 of the indictment. United States
v. Bouchard, 828 F.3d 116, 127 (2d Cir. 2016).

CR-373-NAM, Documents 2 and 3). The ambiguous name "Fremont Investment & Loan" itself provides no indication as to whether or not it is a bank. Therefore, there were no "conspirators" for this overt act. And, Prosecutors Olmsted and Thomson both screwed up at trial with respect to at least four elements of their fabricated crime: 1) there was no proof that any particular person submitted a HUD-1 statement to Fremont; 2) there was no proof that Bouchard and Malissa knew that Fremont was a bank; 3) there was no proof that the FDIC certificate applied to Fremont's Elmsford, NY mortgage processing office (which is the only Fremont office that communicated with Malissa); and 4) the alleged false statements conspiracy is a "specific intent crime" - such intent was never alleged in Malissa's paperwork and/or Bouchard's indictment - and it was never presented at trial. Gaspar missed all 4 elements.

Malissa's plea paperwork is also erroneous in that it included a transaction from May 31, 2007 involving a lender named JP Morgan Chase Bank. Prosecutor Olmsted wrongly labeled that transaction in Malissa's coerced plea as an "overt act" in furtherance of what is really a non-existent conspiracy. But Olmsted deliberately ignored the fact that this transaction had already been investigated by the IRS and it was revealed that no illegality had occurred. According to an IRS Memorandum of Interview dated September 1, 2011, the seller's attorney Louis Chicatelli provided, among other things, the following information: *"Prior to the closing, Chicatelli sent the settlement agent [Bouchard's office] a statement of sale. In a normal closing, the figures on the statement of sale should be put on the HUD-1. Prior to closing the loan, Chicatelli reviewed the HUD-1 to make sure the numbers matched. In this closing, the numbers matched."* Malissa Edgerton did not engage in any criminal activity at any time, and her complete innocence

**Example 9 (continued)**

embraces this transaction that was unjustly and unethically used by Prosecutor Olmsted to extract a fake and fraudulent guilty plea from Malissa.

The two Citimortgage, Inc. overt acts in Paragraph 47(c) & (d) of the indictment are invalid. Prosecutor Olmsted selected both Laurie and Malissa as Bouchard's coconspirators for these overt acts. Again, in his zeal to persecute the innocent, Prosecutor Olmsted screwed up the paperwork. Under the law, Citimortgage, Inc. was not a "financial institution", it was not "FDIC insured" and it was not a "bank", which means that it is impossible for there to be a conspiracy to violate 18 U.S.C. 1014 relative to any act involving this lender. This basic knowledge of the law escaped Gaspar. In fact, Gaspar signed a stipulation that Citimortgage was a wholly owned subsidiary of Citibank. This inexcusable error prejudiced Bouchard by amending the indictment in accordance with the government's legally erroneous parent/subsidiary argument. (See discussion regarding Count 23 below).

All "overt acts" are invalid. Because of Gaspar's ignorance of the law and facts, a proper motion to dismiss was never made.

Gaspar could have also moved to dismiss Count 1 based on its false, prejudicial and legally flawed incorporation by reference of all closings as part of the "conspiracy to submit false statements to FDIC insured banks". Most of the closings involved ordinary lenders that were not FDIC insured banks, and yet the jury heard and saw irrelevant evidence regarding these ordinary lenders, including BNC Mortgage, Inc., Citimortgage, Inc., Argent Mortgage Company, The CIT Group/Consumer Finance, Inc., FFFC f/n/o First Franklin Financial Corp., America's Wholesale Lender and Option One Mortgage Corporation. It was legally impossible to

**Example 9 (continued)**

conspire to violate the false statements statute with respect to these lenders. The prejudicial

legal errors in the government's case were not challenged by Gaspar.

## Count 17 (bank fraud -or- aiding and abetting bank fraud)

Under the facts and the law, Count 17 should have been dismissed before trial or at the

conclusion of the government case at trial. Count 17 involves the same Fremont transaction

discussed above, and for the same reasons, this Count of the indictment is invalid. At trial, the

jury found Bouchard innocent on Count 17.

## Counts 2-16, 18-22 (bank fraud -or- aiding and abetting bank fraud)

The jury found Bouchard innocent on Counts 2-6, 8-16, 18 and 20-22. However, the jury

voted guilty on Counts 7 and 19. On appeal, the Second Circuit rejected the government's

arguments and reversed the "bank fraud" convictions on Counts 7 and 19. The lender for these

transactions was BNC Mortgage, Inc. Again, BNC was not a "financial institution" and it was not

a "bank". Therefore, it was impossible to commit bank fraud against BNC Mortgage, Inc. This

basic knowledge of the law escaped Gaspar.

## Count 23 (bank fraud -or- aiding and abetting bank fraud)

The jury found Bouchard innocent on this Count. The lender was Citimortgage, Inc. - it

was not a "financial institution" and it was not a "bank". Therefore, it was impossible to commit

bank fraud against Citimortgage, Inc. And it was impossible to conspire to submit false

statements to Citimortgage, Inc. under Count 1. This basic knowledge of the law escaped

Gaspar. Instead of submitting a motion to dismiss the defective indictment, Gaspar did


**Example 9 (continued)**

something else. Without consulting Bouchard, Gaspar signed a government crafted stipulation wherein he agreed, among other things, as follows:

"*The Government and the Defendant agree that, at all times relevant to the Indictment, Citimortgage was a wholly-owned subsidiary of Citibank, a federally insured bank. Mortgage applications filed to Citimortgage affected Citibank because Citibank funded mortgages provided by Citimortgage.*" (Document 34, Page 2). Counts 1 and 23 were legally defective by including Citimortgage, Inc., which was not a bank, not FDIC insured and not a financial institution.  But by signing this stipulation, Gaspar went along with government's erroneous legal theory that a fraud on Citimortgage is a fraud on Citibank, thereby giving the jury a legally impermissible basis to convict Bouchard on Count 1.  The government's legally erroneous theory was based on an unethical stretch of the United States v. Bouyea case.  That flawed theory was abandoned on appeal by the government's appellate counsel, AUSA Thomas Booth from Washington, D.C.

### Count 24 (submitting a false statement to an FDIC insured bank).

At trial, the jury found Bouchard guilty on this Count. On appeal, the Second Circuit rejected the government's arguments and reversed the conviction. Again, it was impossible to violate the false statements statute with BNC Mortgage, Inc. - it was not FDIC insured and it was not a bank. See Bouchard 828 F.3d 116, 127. This basic knowledge of the law escaped Gaspar.

Under the second prong of Strickland, there is a reasonable probability that but for Gaspar's unprofessional errors, the result of the proceeding would have been different. The reasonable probability here is indeed a probability sufficient to undermine confidence in the **Example 9 (continued)**

outcome. Prevailing professional norms required Gaspar to be familiar with the law and the facts of this case. He was not. As noted above, such familiarity would have led to a winning motion to dismiss the indictment. The motion never came.

But, Gaspar had a second bite at apple - he could have presented these points to the jury. He missed that too, thereby depriving the jury of the real facts and compelling arguments regarding Bouchard's innocence. Under Strickland, there is a reasonable probability that absent these errors, the factfinder would have had a reasonable doubt respecting guilt.

**Example 10:** At trial the government introduced exhibits for 8 Team Title files (Exhibits 1.10, 1.11, 1.12, 1.13, 1.14, 1.15, 1.16 and 1.17). The exhibits for 7 of the closings (1.10, 1.11, 1.12, 1.14, 1.15, 1.16 and 1.17) were inadmissible because the lenders were not FDIC insured banks.

Those Team Title documents were irrelevant to the alleged conspiracy to submit false statements to FDIC insured banks. Gaspar failed to object to the introduction of the inadmissible exhibits.

And, the exhibits for all 8 closings were inadmissible because Bouchard had no co-conspirators for those transactions. Laurie Hinds and Malissa Edgerton could not be co-conspirators on these files because they did not plead guilty to any conspiracy involving "Team Title" - their coerced guilty pleas related only to "PB Enterprises" (See United States v. Hinds, Case No. 12-cr-374, Documents 2 & 3, and United States v. Edgerton, Case No. 12-cr-373, Documents 2 & 3). Instead of objecting to this inadmissible evidence, Gaspar made an inexcusable error at trial by signing a "STIPULATION" agreeing that the documents are admissible in evidence. (Document 33). Bouchard did not learn about this damaging and legally erroneous "Stipulation" until after the trial.

The government exhibits were inadmissible. And the related testimony from government witnesses was also inadmissible, but Gaspar failed to object. The prejudice here is apparent - the inadmissible documentary evidence and related testimony poisoned the entire trial, including the jury's deliberations. In fact, Prosecutor Olmsted encouraged the jury to convict Bouchard on this prejudicial evidence alone. In summations, Olmsted explained his fabricated "conspiracy" involving Team Title, and then told the jury: *"And that happens on Exhibit 1.10, 1.11, 1.12, 1.13, 1.14, 1.15, 1.16, 1.17. Those are the Team Title closings. And if you finds that happens on any of those closings, you are entitled to convict on Count 1."* (Document Number 72, Page 30, Lines 8-12). The prejudice also infected the post-trial proceedings: this Court relied upon the inadmissible testimony regarding the Team Title closings in its post-trial Decision affirming the conviction on Count 1. (Document 89, Pages 21-23).

Due to Gaspar's misunderstanding of the elements of the false statements statute and the law of conspiracy, the jury was allowed to see and use this inadmissible evidence to convict Bouchard on Count 1. Gaspar's performance was constitutionally deficient. Under the circumstances, there is a reasonable probability that the result of the proceedings would have been different - and that reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. Strickland, 466 U.S. 668, 694.

**Example 11:** Before trial, the government filed a Notice pursuant to Federal Rules of Evidence 404(b) of its intent to introduce evidence of 20 other real estate closings not charged in substantive counts 2-23. (Document 9). The Notice referenced 14 closings involving Argent Mortgage Company, 5 closings involving BNC Mortgage, and 1 closing involving Fremont Investment & Loan. The government took the position that such evidence is technically not

404(b) material because it is part of the common plan or scheme described in Count 1. But that is false: Argent and BNC were not banks and they were not FDIC insured. Therefore, the alleged acts pertaining to these transactions fall outside the scope of the government's conspiracy. "It is clear that the government may offer proof of acts not included in the indictment, as long as they are within the scope of the conspiracy". United States v. Thai, 29 F.3d 785, 812 (2d Cir. 1994). Since the alleged acts have nothing to do with a supposed "conspiracy" to submit false statements to FDIC insured banks, all evidence pertaining to these acts was inadmissible. As for Fremont, that evidence was also inadmissible because: 1) the government never alleged that Bouchard and a co-conspirator knew that Fremont was a bank; and 2) the government never proved that Bouchard and a co-conspirator knew that Fremont was a bank. Section 1014 requires the government "to prove that the defendant knew that it was a bank ... to which he made the false statement". United States v. Sabatino, 485 F.2d 540, 544 (2d Cir. 1973); United States v. Bouchard, 828 F.3d 116, 127 (2d Cir. 2016). The government offered no such proof on this Fremont transaction and the other Fremont transaction used as an overt act in paragraph 47(b) of the indictment. Before and at trial, Gaspar failed to object to the government's use of this inadmissible evidence, but instead told Bouchard: "They [the government] can put it in." Again, Gaspar's misunderstanding of the law allowed the jury to see and hear inadmissible evidence that infected the entire trial.

**Example 12:** Before trial, Gaspar did not object to the location of the trial in Syracuse. The indictment was filed in Albany. According to the government, the acts alleged in the indictment occurred in Albany County. Almost all trial witnesses were from the Albany area. Bouchard's office and residence were both approximately 20 minutes from the federal court house in

Albany. Gaspar's office and residence were approximately 10 minutes from the same court house. Therefore, the trial should have been in Albany. Instead, Bouchard, his wife and Gaspar had to travel to and from the inconvenient forum hours away in Syracuse for the 12 day trial in the fight to preserve Bouchard's liberty. That is unfair and unjust. The prosecutors didn't have to travel - all they had to do was walk into an elevator to get from their office in the Syracuse federal building to the courtroom in the same building. Gaspar's meritless justification for failing to make a motion to move the trial to Albany was: "We can't do that because we don't want to get the judge mad".

**Example 13:** During opening arguments on November 14, 2012, Gaspar failed to object to numerous false statements made by Prosecutor Tamara Thomson. For example, Thomson deliberately lied to the jury when she described a "warning" on the HUD-1 Statement, as follows: *"Now, if you keep looking on that form, you'll see these forms and we'll go over these forms, below the signature line where all the parties acknowledge the terms as laid out in the HUD-1 is another very important warning, and it says, "Warning, it is a crime to knowingly make false statements to the United States on this or any similar form. Penalties upon conviction can include a fine and imprisonment". It's right there. Right by the signature. The charges in this case focus in on false information."* (Document 114, Page 207, Line 23 -to- Page 208, Line 6).

Gaspar failed to object to Thomson's falsehood because he misunderstood the law. Count 1 charged a conspiracy to make false statements to FDIC insured banks in violation of 18 USC 1014 (not making false statements to the United States). And, the warning on the HUD-1 related to violations of 18 USC 1001 and 1010, which were not charged in the indictment.

Gaspar allowed Prosecutor Thomson to mislead the jury into believing that the warning that she read from the HUD-1 was connected to the charges in the case - but it was not.

**Example 14:** Before trial, Gaspar did not perform any research regarding the alleged parent subsidiary relationship between Lehman Brothers Bank and BNC Mortgage along with the government's false legal theory that "a fraud on BNC is a fraud on Lehman". Gaspar also failed to cross-examine Kelly Monahan of BNC on that subject. Consequently, the government's false fraud theory prevailed at trial. That erroneous theory was later thrown out on appeal.

**Example 15:** At trial on November 15, 2012, Gaspar was horribly deficient in cross-examination of government witness Thomas Disonell. On direct examination, Disonell testified falsely that he called Bouchard to ask if Bouchard would do "double-HUD" closings for PB Enterprises, and, Bouchard said yes. Disonell's testimony was crucial to the government's case, because it provided the invitation by Disonell for Bouchard to join in the PB Enterprises "double-HUD" scheme concocted by O'Connell and Crowley. However, Disonell's story is a lie - the phone call never happened and the conversation never happened. And, Disonell's trial testimony was his third version of the story, all with significant inconsistencies. But that false trial testimony went unchallenged. That's because Gaspar never cross-examined Disonell on this subject, despite having actual knowledge of Disonell's two prior inconsistent statements. Therefore, the trial jury was left with the false impression that Disonell's lie was the truth. After trial, this Court relied upon Disonell's false trial testimony in affirming the conspiracy conviction, ruling that the evidence at trial showed that Bouchard told Disonell that he would do "double HUD" closings. (Document 89, Page 23). The Court of Appeals also relied upon this same outlandish testimony in affirming the conspiracy conviction. United States v. Bouchard, 828 F.3d at 129. Due to

Gaspar's inexcusable neglect, the jury and both Courts never learned that Disonell's story line was really a damaging lie that shifted and changed dramatically over the years. Below are the three different versions of Disonell's lie:

Version 1: According to an official government "Memorandum of Interview" dated November 21, 2009 prepared by IRS Agents Thomas Fattorusso and Pavel Prilutsky, a telephone call was in progress involving these agents and Disonell's wife, Darcie. (Document 95, Exhibit 35). Then, Darcie Disonell connected Thomas Disonell into the conversation through a three-way telephone call. According to the agents, Disonell said, among other things, the following:

> "Disonell stated that he does not want his wife, Darcie to be part of the mortgage fraud
> investigation and he is willing to testify in Court against Michael Bouchard (Bouchard),
> as long as his wife Darcie and his former employees at Team Title will be given letters of
> immunity. Darcie worked at Team Title and she was Disonell's employee. Disonell is
> willing to help any way he can. Nicole Riley (Riley) and Matt (LNU) told Disonell about
> double HUD closings that were done at Bouchard's office. Riley told Disonell that
> Bouchard charges an extra $100.00 for a double HUD closing. Riley called Bouchard and
> asked if he could do double HUD closings for Disonell. Bouchard called Disonell after
> Riley told him that Disonell is interested in doing double HUD closings. Disonell had a
> personal conversation with Bouchard and asked him if he does double HUD closings.
> Disonell did not know what double HUD closings were before he talked to Bouchard.
> Bouchard stated he knew exactly what that was and that he can do double HUD
> closings. Bouchard said he has no problem doing double HUD closings for Disonell and is
> willing to do it for Disonell."

Version 2: Then, on June 29, 2011, Disonell told the grand jury the following:

> "After the FBI raided my office, Matt and I were already out of the creative financing
>
> game, my partner Matt Kupic. And Nickole was still, you know, deep in it with Greater
>
> Atlantic Mortgage, which was the financing arm of PB Enterprises, Kevin O'Connell and
>
> Michael Crowley, I believe his name was. And Nickole would just call me for advice. And,
>
> you know, Matt and I had kind of created the reputation that we don't want anything to
>
> do with creative. And Nickole had stumbled onto a major business item. She had gained
>
> access to all of PB Enterprises loans and we are talking dozens, twenty, thirty loans a
>
> month where she had an opportunity to make three, five, six thousand dollars a deal.
>
> And, they were -- they had created the double HUD scenario .... So Nickole saw that as a
>
> major opportunity to do massive amounts of loans. And, she first called me to offer me
>
> that opportunity to do the closing[s]. I didn't even know what a double HUD was at that
>
> time they had actually happened on. I didn't know what it was. And I said I will call Mike
>
> for you. And I called Michael Bouchard specifically and I said Mike, these guys are doing
>
> double HUD closings. And I was right in the middle of the creative game and I never
>
> heard of it. And he was like absolutely, we know how to do them, send them over. So I
>
> called Nickole and told Nickole".

Version 3: At trial on November 15, 2012, Disonell gave the third version of his lie as follows:

"_Answer_: So she [Nickole Riley Sutliff] got them [PB Enterprises] as a potential customer but they

were asking her to do certain things and she didn't know how to do them. _Question_: What were

those things? _Answer_: They were doing double HUD closings. _Question_: And so did she talk to

you? _Answer_: She called me and said I have a potential to have this huge client, they're doing

double HUDs, can you do them and I was like, I don't even know, at that time I was like I don't

even know what you're talking about, I don't even know what a double HUD closing is.

Question: So what did you do? Answer: Called one attorney in Saratoga and she said yeah, I

don't want to do that, and then I called Michael and I -- Question: Michael who? Answer:

Michael Bouchard. Question: Okay. Answer: I said, Mike, I got -- Nickole's got this customer

who's doing double HUD closings, would you like to do it, he said yes. Question: Did you explain

to him what a double HUD closing was? Answer: No, I didn't know what a double HUD closing

was. Question: Did he explain to you what a double HUD closing was? Answer: I don't think he

explained to me on the phone but I think after the first deal, I'm pretty sure that Malissa

[Edgerton], when we came in, she was like, we've got it, we know what we're doing".

(Document 49, Page 32 Line 11 – Page 33 Line 16).

   The glaring inconsistencies in Disonell's story are so apparent that they are impossible to

overlook, and yet Gaspar missed them.

- In Version 1, Nickole Riley [Sutliff] and Matt [presumably Matt Kupic - Disonell's partner]

   both tell Disonell about double HUD closings that Bouchard is doing. Riley then calls

   Bouchard and asks if he could do double HUD closings for Disonell. Then, Bouchard calls

   Disonell after Riley tells Bouchard that Disonell is interested in doing double HUD

   closings. ----- Compare Version 1 with the inconsistent stories in Versions 2 and 3

   wherein Riley-Sutliff calls Disonell because she doesn't know how to do double HUD

   closings for PB Enterprises and she wants to know if Disonell can do the closings. Then,

   Disonell calls Bouchard to see if he would do double HUD closings for PB Enterprises,

   and Bouchard says yes.

- In Version 2, the telephone calls take place after Disonell's office was raided by the FBI, which was on July 25, 2005. That is impossible, because the PB Enterprises double-HUD closings all took place BEFORE Disonell's office was raided.

- In Version 2, Disonell testified that during his first conversation with Riley-Sutliff about double HUD closings, he only told Riley-Sutliff that he would call Bouchard for her, and, then he called Bouchard. But in Version 3, Disonell never said that he told Riley-Sutliff that he would call Bouchard. Instead, In Version 3 Disonell testified that he first called an attorney in Saratoga to discuss doing double-HUD closings, and, only after that attorney declined the offer did Disonell then decide to call Bouchard.

- Compare that time line above from Version 2 with a different time line in Disonell's trial testimony wherein he expanded on Version 3, saying that his office got raided by the FBI in 2005 AFTER the PB Enterprises double HUD closings had occurred. Disonell testified that these particular closings "scared" him because nobody in the deal knew what was going on ... "So we [as the title company] just -- we just told Nickole, we don't even want to be involved in these deals anymore." (Document 49, Page 36, Lines 5-12). Disonell then testified that the feds raided his office in 2005 well after Team Title stopped doing the title work for the PB Enterprises double-HUD closings: "probably three or four years after we had stopped doing these deals, the FBI raided my office [Team Title] with the IRS." (Document 49, Page 36, Lines 17-19).

The events described by Disonell in Version 1 are irreconcilable with the events he described in Versions 2 and 3.

**Effective cross-examination of Disonell by Gaspar would have entailed Gaspar walking Disonell through the telephone interview and his testimony step by step as follows:**

Mr. Disonell, do you remember having a three-way telephone call on November 21, 2009 with your wife Darcie and IRS Agents Thomas Fattorusso and Pavil Prilutsky? They were calling your wife to ask her about some of the double HUD closings that she performed for PB Enterprises, isn't that right? So to cover up for your wife, you made up a false story about Michael Bouchard, didn't you? You told those agents in 2009 that Nickole Riley Sutliff and your partner Matt Kupic told you about double HUD closings that were done at Michael Bouchard's office. However, your testimony here at trial that you called Michael Bouchard to ask him if he could do double HUD closings for Nickole Riley Sutliff contradicts your 2009 story, because in that story she already knew that these closings were done at Michael Bouchard's office. Therefore, there would be no reason for you to call Michael Bouchard. So when were you lying Mr. Disonell, back in 2009 or today? The fact is, you lied both times, isn't that true? And do you remember telling those agents back in 2009 that it was Nickole Riley Sutliff that called Michael Bouchard and asked him if he could do double HUD closings for you? That also contradicts your testimony today, because you told this jury that you were the one that called Michael Bouchard to ask him if he could do double HUD closings for Nickole Riley Sutliff and PB Enterprises, isn't that correct? So when were you lying, back in 2009 or today? You lied both times, didn't you? And, didn't you also tell those agents back in 2009 that it was Michael Bouchard that called you after Nickole Riley Sutliff told him that you wanted to do double HUD closings? That also contradicts your testimony today that you called Michael Bouchard. Once again Mr. Disonell, when were you lying, back in 2009 or in this courtroom today? You lied both times, didn't you?

**Gaspar should have continued the cross-examination with the following:**

*Mr. Disonell, you also told this jury that your office was raided by the FBI and IRS in the year 2005, correct? And specifically, that raid occurred on July 25, 2005, correct? That raid was a unique and memorable event for you wasn't it? And, the PB Enterprises double HUD closings all happened shortly before your office got raided, isn't that correct? But you told this jury that the raid happened about 3 or 4 years after you told Nickole Riley Sutliff that you were going to stop doing the title work for the PB Enterprises double HUD closings, correct? And isn't it true that you told the grand jury a different time line in sworn testimony on June 22, 2011? You told the grand jury that Nickole Riley Sutliff called you to discuss double HUD closings after your office got raided? Now Mr. Disonell, if you can't even get a simple time line of events straight, how can you expect this jury to believe anything you say? And when you were interrogated by government agents during that raid in 2005, you talked about PB Enterprises didn't you? And one of the those agents you talked to then was IRS Agent Thomas Fattorusso, the same agent you spoke with later on by phone in 2009, isn't that correct? But during your 2005 interview, you said nothing to the government about double HUD closings, did you? In fact, you told the government that you did not do business with PB Enterprises, isn't that correct? To be exact, in 2005 you told the government that you were approached by PB Enterprises and you were asked to change a property's title on a "creative deal", but you turned down the request and you did not do business with PB Enterprises, correct? So, Mr. Disonell, when were you lying, when you told one story to the government in 2005 or when you told a different story to the jury today? [10]*

---

[10] According to FBI Agent Hensle's official "FBI-302 Form", on July 25, 2005 Disonell voluntarily provided, among other things, the following: "Disonell and Kupic were approached by P.B. Enterprises and asked if they would facilitate a "creative deal" by changing a property's title.

**Gaspar should have then concluded a proper cross-examination of Disonell as follows:**

*Mr. Disonell, IRS Agent Thomas Fattorusso is here today, isn't he? Could you please identify him for the record? He is sitting over there with the prosecutors, isn't he? Agent Fattorusso was here for all of your trial testimony, wasn't he Mr. Disonell? And even though the stories that you told Agent Fattorusso in 2005 and 2009 are vastly different from what you told the jury today, he didn't interrupt you during your testimony here to correct you, did he? In fact, Agent Fattorusso just sat there and let you tell a conflicting story to the jury didn't he? And Agent Fattorusso made no effort to inform the jury about the different stories you told him in the past, did he? And the two prosecutors in this case, Michael Olmsted and Tamara Thomson, they know that you told different stories in the past, didn't they? But those two prosecutors made no effort to correct your testimony today, did they? And they prepped you for your testimony here didn't they? And it was Prosecutor Michael Olmsted that asked you the questions in this trial that brought out your contradictory story today, isn't that correct?*

*The real truth of this matter Mr. Disonell is that you never spoke with Michael Bouchard about double HUD closings and/or PB Enterprises, correct?*

Whether or not defense counsel engages in cross-examination of a government witness and what questions to ask are strategic decisions that "generally will not support an ineffective assistance of counsel claim". <u>Dunham v. Davis</u>, 313 F.3d 724, 732 (2d Cir. 2002). "This general rule may be overcome where, for example, counsel fails to examine inconsistencies in a witness's statements that are of enormous value". <u>Jiau v. United States</u>, 2016 U.S. Dist. LEXIS 159782 (S.D.N.Y. 11-16-16); see also <u>Paulino v. Zenk</u>, No. 02- Civ. 2735, 2006 U.S. Dist. LEXIS

---

Disonell stated that he and Kupic turned down P.B. Enterprises' request and did not do business with them."

102287, 2008 WL 356849, at 9 (S.D.N.Y. Feb. 7, 2008) (quoting Eze v. Senkowski, 321 F. 3d 110,

132-33 (2d Cir. 2003) (collecting cases).

The failure of Gaspar to cross-examine Disonell on this important testimony had no strategic

value whatsoever. It was inexcusable deficient performance that caused serious harm to

Bouchard at trial. Before trial, Gaspar was in possession of the government's "Memorandum of

Interview" from November 21, 2009 and Disonell's grand jury testimony from June 22, 2011.

The inconsistencies in those two versions of Disonell's story were known by Gaspar before

Disonell testified at trial on November 15, 2012, because Bouchard and Gaspar specifically

reviewed those inconsistencies together BEFORE the trial. A proper cross-examination of

Disonell by Gaspar would have exploited these known inconsistencies in order to expose the

inherent unreliability of Disonell's false trial testimony, and thereby negate the damaging lie

that Bouchard joined the conspiracy. Unfortunately, the jury never heard any of the

inconsistencies. Gaspar failed to cross-examine Disonell, a key government witness, regarding

major inconsistencies in Disonell's prior statements that were of enormous value. And that was

constitutionally deficient performance by Gaspar that prejudiced Bouchard.

**Example 16:** Gaspar also failed to properly cross-examine Disonell with respect to his motive in

lying about Bouchard. Disonell's real motive is that he wanted immunity for his wife and other

relatives at Team Title. Before trial, Castillo knew that the following Disonell and/or Kupic

relatives were associated with Team Title and its illicit activities:

Darcie Disonell, formerly known as Darcy Palmer (Disonell's second wife);
Bonnie Devoe (Disonell's sister);
Chris Disonell (Disonell's brother);
Mark Dougall (Disonell's brother-in-law);
Erica Kupic, formerly known as Erica Lanari (Kupic's wife);
Mary Smith (Kupic's mother); and

John Stackrow (Kupic's uncle).

Gaspar performed a useless and repetitious cross-examination of Disonell, barely touching the surface of this subject. (Document 49, Pages 64-66). Instead, Gaspar should have methodically gone through each person with Disonell and dig into why it was so important for all of them to work out immunity deals with the government. What was missing here is the fundamental "who, what, why and where" of cross-examination. Gaspar failed to perform this basic task, and lost the opportunity to show the jury that Disonell lied about Bouchard just to get immunity for members of the Disonell/Kupic crime family.

**Example 17:** Before trial, Bouchard reviewed with Gaspar a letter Disonell sent to Judge Sharpe in May 2008 shortly before his sentencing. (See Document 95, Exhibit 33). Gaspar referred to the letter as a "gift from Disonell" and promised that he would use the letter in cross-examining Disonell at trial - but that never happened. In the letter, Disonell described the origin of Team Title, saying: *"Matt [Kupic] and I threw ourselves into building Team Title Abstractors, our title company. Team Title Abstractors was always a legitimate business entity. To date, we were completely hands off. We still did not even really know what the company did on a daily basis."* (Document 95, Exhibit 33, Page 7). The obvious cross-exam on this subject would have entailed Gaspar asking Disonell important questions. For example: *"Mr. Disonell, if you were completely hands off with Team Title, that means you did not call Michael Bouchard and ask him if he would do double HUD closings for PB Enterprises on files that Team Title was the title company, isn't that correct? And, Mr. Disonell, if you didn't know what Team Title was doing on a daily basis, then you certainly would not have known anything about double HUD closings wherein Team Title was the title company for PB Enterprises, isn't that correct? So, Mr. Disonell, when*

*were you lying, when you wrote your letter to Judge Sharpe in 2008 or when you testified for*

*this jury today? You lied both times, isn't that correct? You told one lie to Judge Sharpe in 2008*

*to get a reduced prison sentence for yourself, and today you lied about Michael Bouchard so*

*your wife and other relatives at Team Title can avoid going to prison, isn't that correct?"*

Unfortunately, Gaspar never cross-examined Disonell on this subject.

Disonell also had the audacity to tell Judge Sharpe the following lies about himself and Kupic: *"I*

*can honestly say that Matt [Kupic] and I thought we were legitimate investors and were*

*operating a legitimate business."* (Page 5); *"I wanted you to hear from me that we did not*

*intend it to go down this way."* (Page 7); and *"I have worked hard and attempted to conduct all*

*of my business affairs honestly and ethically."* (Page 8). Here, Disonell opened up the door for

Gaspar to conduct hours of cross-examination, but Gaspar missed that opportunity.

Throughout the letter, Disonell mentioned only 3 attorneys that did closings associated with

Kupic and Disonell: David Swyer, Joseph Murphy and David Goldin. Disonell never mentioned

Michael Bouchard in that letter. Gaspar failed to cross-examine Disonell regarding those other

attorneys, missing the chance to disassemble the government's lie that Michael Bouchard was

the lawyer that played the central role in the Team Title scheme.

**Example 18:** Gaspar did not object to the illegal trial conduct of IRS Agent Thomas Fattorusso.

The government called 28 witnesses to testify at trial. For 27 witnesses, Fattorusso sat at a

table behind the prosecutors. But with respect to paralegal Malissa Edgerton (just 1 of the 28

witnesses), Fattorusso re-positioned himself and sat on a bench directly across from Malissa

and glared at her during her testimony. Right there, Fattorusso was obstructing justice through

the illegal act of witness intimidation. Fattorusso's outrageous conduct was designed for the

sole purpose of frightening and intimidating Malissa as she testified. Malissa had a 1 year old child at home - Fattorusso knew that and he attempted to coerce Malissa into perjuring herself in line with the prosecutors' fabricated story about Bouchard. Gaspar should have objected and also demanded that Fattorusso be arrested and barred from the court house for the remainder of the trial.

**Example 19:** The government argued in its Trial Memorandum that alleged co-conspirators' statements were admissible under the "hearsay exception" under Federal Rules of Evidence 801(d)(2)(E). (Document 17, Pages 17-20). Gaspar never filed any objection.

At trial, Prosecutors Olmsted and Thomson elicited false testimony from witnesses, such as Thomas Disonell, Laurie Hinds, Kevin O'Connell and Michael Crowley. The prosecutors' illegal strategy was quite simple: obstruct justice by making up conversations between Bouchard and the witnesses, coerce the witnesses into repeating those lies at trial, and then get that perjury admitted into evidence under the guise of FRE's "hearsay exception." Gaspar did not object at trial.

**Example 20:** Gaspar did not properly cross-examine Kevin O'Connell. Like his business partner Michael Crowley, O'Connell lied at trial that he and Crowley both met with Bouchard, saying: Document 49, Page 156, Lines 1-8:

Q: And did you describe to him [Michael Bouchard] what you wanted to do?

A: Yes.

Q: And what did you ask him, what did he tell you?

A: That we [O'Connell and Crowley] wanted to basically buy the property, have two closings in one day where we were buying it from somebody at a low price and then reselling it at a higher price.

> *Q: And what did he say to you?*
>
> *A: That wouldn't be a problem.*

Document 49, Page 158, Lines 5-8:

> *Q: All right. So after you had met with Michael Bouchard, discussed the need to have HUDs at a high price and a low price, you then had a series of closings?*
>
> *A: Yes.*

Gaspar did not object to Olmsted's leading line of questioning. And Gaspar failed to

cross-examine O'Connell regarding the real fact that O'Connell and Crowley never met with

Michael Bouchard. All Gaspar had to do was read to O'Connell his prior grand jury testimony

from June 22, 2011, wherein O'Connell said:

> *Q: Did you yourself have any conversations with Michael Bouchard about the use of gift money or double HUD closings or any other technique used to close properties?*
>
> *A: No.*
>
> *Q: When did you become aware of the practices of double HUD?*
>
> *A: Not until after the -- after the IRS agent visited my office and kind of briefed me on, you know, and I got an attorney and got involved in all of this on the specifics of how it was done.*

Gaspar did not impeach O'Connell with the grand jury testimony. An effective cross-

exam would have entailed asking O'Connell important questions, such as why did O'Connell

change his testimony, was he threatened by the prosecutors, did he meet with the prosecutors

to discuss his trial testimony, how often did they meet, who else was present during the

meetings and exactly what was said during the meetings. O'Connell was visibly distraught

during his trial testimony, and a probing cross-exam by Gaspar would have resulted in

O'Connell recanting his perjury in front of the jury along with the revelation that O'Connell lied

because he was threatened by Prosecutor Olmsted. Months after the trial O'Connell recanted

his perjured trial testimony, but the tainted verdict was already in and the jury never heard the

recant.

**Example 21:** At trial, Gaspar did not properly cross-examine Michael Crowley. Like his business

partner Kevin O'Connell, Crowley also lied at trial that he and O'Connell both met with

Bouchard, saying:

Document 50, Page 11, Line 22 -to- Page 12, Line 5:

> *Q: Did you then meet with Michael Bouchard?*
>
> *A: Yes.*
>
> *Q: Where?*
>
> *A: At his office.*
>
> *Q: And what did you ask him and what did he tell you?*
>
> *A: We [O'Connell and Crowley] said, we just wanna make sure that we'll be able to buy a house for 40, sell it for 80 and get the profit and he said no problem, I'll take care of it.*

To negate this coached and coerced lie, Gaspar should have read to Crowley his prior

grand jury testimony from June 22, 2011, wherein Crowley said:

> *Q: And did you have any conversations with Mr. Bouchard about the technical elements*
>
> *of how you were going to close, either discussions about double HUD closings,*
>
> *discussions about gift money, did you have any of those types of conversations with Mr.*
>
> *Bouchard?*
>
> *A: No.*

Gaspar did not impeach Crowley with that prior grand jury testimony. Gaspar should have asked Crowley why he changed his testimony, along with probing questions about the "who, what, why, when and where" of all meetings Crowley had with the prosecutors.

**Example 22:** Despite numerous false statements by Prosecutor Olmsted in his closing argument, Gaspar made no objections. Here are just two of the many instances of Olmsted's misconduct in summations:

1. Olmsted explained his fake version of the Team Title scheme, and then instructed the jury as follows:

> *"And that happens on Exhibit 1.10, 1.11, 1.12, 1.13, 1.14, 1.15, 1.16 and 1.17. Those are the Team Title closings. And if you find that happens on any of those closings, you are entitled to convict on Count 1."* (Document Number 116, Page 30, Lines 8-12).

Olmsted's argument was factually and legally erroneous (See Ground 3 herein and Ground 7 herein - Example 9). Gaspar failed to object due to his fundamental misunderstanding of the law.

2. As to Count 7 involving PB Enterprises, Olmsted told the jury:

> *"Count 7.4, he [Bouchard] attends every moment of that [closing]. He [Bouchard] admits he pays this to Michael -- to Special Agent Hensle. He [Bouchard] admits having conversations with Laurie [Hinds]."* (Document Number 116, Page 64, Lines 20-23).

Simply put, Prosecutor Olmsted lied to the jury. First, Bouchard never admitted anything because he did nothing wrong. Second, at trial FBI Agent Hensle denied discussing PB Enterprises with Bouchard. (Document 49, Page 106, Line 21 -to- Page 107, Line 3). And third, Laurie Hinds had nothing to do with the closing for Count 7. Gaspar failed to object to the many lies uttered by Olmsted in summations.

**Example 23:** In early 2013, Bouchard had an interview appointment with federal probation officer Ed Cox. Gaspar showed up late for the appointment and then left early before it was concluded. Thereafter, the initial Presentence Investigation Report was filed by Mr. Cox. (Document 55). Bouchard reviewed the report and informed Gaspar about various prejudicial errors in the report. Gaspar never filed any objections to the report.

**Example 24:** On July 2, 2013, an evidentiary hearing was conducted regarding the trial perjury of Kevin O'Connell as caused by Prosecutor Olmsted. Gaspar made numerous prejudicial errors, for example:

1. Gaspar never contacted Kevin O'Connell. Gaspar's poor excuse was: "We don't know what O'Connell is going to say." But that initial thought arises in all cases with all potential witnesses. A lawyer does not know what any potential witness is going to say until the lawyer actually reaches out to communicate with that witness. Gaspar made no effort to communicate with O'Connell to investigate the critical issue of his coerced trial perjury.

2. Gaspar allowed the hearing to take place without Lee Greenstein, O'Connell's lawyer throughout numerous meetings with prosecutors, including Olmsted. Greenstein was at trial when O'Connell committed perjury. Gaspar should have requested an adjournment of the hearing to a date when Greenstein could appear to testify.

3. Gaspar's performance in cross-examining Prosecutor Olmsted was pathetic. Olmsted lied under oath on direct examination, for example: denying that he suggested or implied or requested O'Connell to testify untruthfully (Document 87, Page 51), denying that he said to O'Connell "if you do not tell us you met with Michael Bouchard, we can't help you" (Page 51),

denying that he threatened O'Connell (Page 51) and claiming that O'Connell's exculpatory grand jury testimony was "remarkably imprecise." (Page 55).

Before Olmsted testified, Gaspar should have moved to bar Prosecutor Thomson, along with IRS Agents Fattorusso and Haag from the courtroom (to be called later as witnesses). Gaspar should have cross-examined Olmsted for hours with detailed questions about his meetings with O'Connell: the dates, lengths and locations for each meeting, the parties in attendance at each meeting, what Olmsted said, what O'Connell said and what others in attendance said. Those types of questions would have dove-tailed into other topics for questioning. But Gaspar missed the opportunity of a lifetime to grill a federal prosecutor on cross-examination regarding his criminality. Before the hearing, Bouchard assembled 2 large binders with 20 exhibits, which included the grand jury transcripts for O'Connell and Crowley. Gaspar did not use any of the exhibits in cross-examination.

**Example 25:** At a meeting in mid-December 2013, Gaspar told Bouchard that he wanted to file a supplemental affirmation in support of the pending Rule 29 and Rule 33 motions, and that he would like Bouchard's help in preparing the affirmation.  Bouchard reminded Gaspar that he had not yet ordered the transcript for the evidentiary hearing, so Gaspar finally ordered it on or about December 20, 2013 (almost 6 months after the hearing). Bouchard then prepared the affirmation and gave it to Gaspar around the middle part of January 2014. Gaspar never filed the affirmation.

On February 10, 2014, this Court issued its decision denying the motions. (Document 89). Gaspar promised that he would timely file the affirmation as a "Motion for Reconsideration." He did not.

Gaspar then promised to file a new motion. Bouchard made some changes to the motion, and then heard the same promises over and over again by Gaspar that the motion would get filed "next week" or "right away". In the late Spring of 2014, Gaspar told Bouchard that the reason he did not file the motion was because he had been suspended from practice by the Second Circuit, but the suspension was just lifted and he would then file the motion. But Gaspar continued to neglect the motion and did not file it.

After Bouchard made numerous unreturned calls and written requests in the following months, Gaspar finally filed the motion on September 22, 2014 (Document 94 and 95). But Gaspar secretly deleted important parts of the motion, including the section on "prosecutorial misconduct." Bouchard noticed the deletions, contacted Gaspar and then Gaspar filed the missing portions of the motion. (Document 96). This Court denied the motion as untimely. (Document 105).

**Example 26:** Before sentencing in 2014, Bouchard consulted with attorney Sidney Powell, author of the book entitled "<u>Licensed to Lie: Exposing Corruption in the Department of Justice</u>." Recognizing the government's suppression of evidence in this case, Ms. Powell suggested that Bouchard prepare an emergency "Brady, Jencks, Giglio" discovery motion by using a template from her web-site. On or about October 19, 2014, Bouchard prepared the motion and then e-mailed it to Gaspar for filing. Gaspar never filed it.

**Example 27:** Gaspar did not prepare for the October 22, 2014 sentencing hearing. Weeks before, Bouchard performed research on topics such as restitution, sentencing guidelines and errors in the PSI report. Bouchard advised Gaspar about these matters, but the information was ignored. Gaspar never discussed with Bouchard the facts, the law and/or the procedures for

sentencing. At the hearing, Gaspar made no objections to false statements made by Prosecutor Thomson. And when Gaspar spoke, he failed to address the law and the important topics previously raised by Bouchard.

Under Strickland v. Washington, 466 U.S. 668, 687-688 (1984), Michael Bouchard's Sixth Amendment Right under the U.S. Constitution was violated because his trial attorney's performance fell below an objective standard of reasonableness and there is a reasonable probability that the result would have been different absent the deficient act or omission. Detailed above are 27 Examples of the numerous instances of constitutionally deficient performance of defense counsel Gaspar Castillo. Each example alone provides a sufficient basis for the conviction on Count 1 to be set aside. Furthermore, the cumulative effect of these errors provides a separate basis for relief.

In Rodriguez v. Hoke, 928 F.2d 534 (2d Cir. 1991), the Second Circuit Court of Appeals adopted the cumulative error doctrine, also known as the cumulative deficiency doctrine, in the context of an ineffective assistance of counsel claim. The claim in Rodriguez was based on 6 allegations of deficient attorney performance. The Court of Appeals ruled that "Since Rodriguez's claim of ineffective assistance of counsel can turn on the cumulative effect of all of counsel's actions, all his allegations of ineffective assistance should be reviewed together." Rodriguez, 928 F.2d at 538; citing Strickland, 466 U.S. 668, 695-696.  Furthermore, the lower courts "should have been given the opportunity to consider all the circumstances and the cumulative effect of all the claims as a whole." Rodriguez, 928 F.2d at 538. In viewing Michael Bouchard's 27 claims of ineffective assistance of counsel either individually or cumulatively, the

only conclusion to reach is that he was denied the constitutional right to effective assistance of counsel, and, therefore the conviction on Count 1 must be vacated.

## MOTION QUESTIONNAIRE

1. (a) Name and location of court which entered the judgment of conviction you are challenging: United States District Court for the Northern District of New York, 100 South Clinton Street, Syracuse, NY.

(b) Criminal docket or case number: 1:12-CR-00381 (NAM)

2. (a) Date of judgment of conviction related to first sentencing: October 23, 2014; amended judgment October 30, 2014

Date of judgment of conviction related to second sentencing: October 27, 2016

(b) Date of First Sentencing: October 22, 2014; Date of Second Sentencing: October 20, 2016

3. Length of sentence:

first sentencing: October 22, 2014 - 48 months (remanded by Second Circuit Court of Appeals for resentencing by Decision dated July 7, 2016);

second sentencing: October 20, 2016 - 48 months

4. Nature of crime(s) charged in indictment: Count 1 conspiracy (or, aiding and abetting a conspiracy) to make false statements to financial institutions in violation of 18 USC 2(b), 18 USC 371 and 18 USC 1014; Counts 2-23 bank fraud (or aiding and abetting bank fraud) in violation of 18 USC 2 and 18 USC 1344; and Count 24 making a false statement to a financial institution.

5. What was your plea? Not guilty on all 24 counts.

6. If you went to trial, what kind of trial did you have? A jury trial.

7. Did you testify at a pretrial hearing, trial or post-trial hearing? Yes - at trial.

8. Did you appeal from the judgment of conviction? Yes.

9. If you did appeal, answer the following:

First Appeal from 2014:

(a) Name of Court: United States Court of Appeals for the Second Circuit

(b) Docket or case number: 14-4156-cr

(c) Result: The Second Circuit reversed the conviction on Counts 7, 19 and 24; affirmed the conviction on Count 1 and remanded the case for resentencing.

(d) Date of result: July 7, 2016

(e) Citation to Case: United States of America v. Michael Bouchard, 828 F.3d 116 (2d Cir. 2016)

(f) Grounds raised:

Opening Brief for Defendant-Appellant Michael Bouchard:

POINT I: THE EVIDENCE WAS INSUFFICIENT ON EACH OF THE COUNTS OF CONVICTION

POINT II: KEVIN O'CONNELL'S ADMITTED PERJURY WARRANTS A NEW TRIAL

POINT III: THE SENTENCE WAS BASED ON ACQUITTED CONDUCT THAT WAS NOT FOUND BY A PREPONDERANCE OF THE EVIDENCE

Reply Brief for Defendant-Appellant Michael Bouchard: Same Points as Opening Brief

(g) Did you file a petition for certiorari in the United States Supreme Court? No

Second Appeal from 2016: WITHDRAWN

On remand by the Second Circuit Court of Appeals, Michael Bouchard was re-sentenced by this Court on October 20, 2016. On October 27, 2016, an amended judgment was filed. On November 1, 2016, a Notice of Appeal was filed. However, this second appeal was withdrawn.

10. Other than the direct appeal listed above, have you previously filed any other motions, petitions, or applications concerning this judgment of conviction in any court? No.

11. Not applicable.

12. For this motion, state every ground on which you claim you are being held in violation of the Constitution, laws or treaties of the United States.

**GROUND 1: THE JURY'S GENERAL VERDICT ON COUNT ONE DOES NOT INDICATE WHETHER IT CONVICTED ON THE BASIS OF CONSPIRACY OR THE ALTERNATE BASIS OF AIDING AND ABETTING A CONSPIRACY. BECAUSE OF THIS UNCERTAINTY AND THE FACT THAT THE JURY INSTRUCTIONS ON THE AIDING AND ABETTING BASIS WERE LEGALLY INSUFFICIENT, THE CONVICTION MUST BE VACATED.**

(a) Supporting facts: See pages 8 - 17 herein.

(b) Direct Appeal of Ground One:

(1) If you appealed from the judgment of conviction, did you raise this issue? No.

(2) If you did not raise this issue in your direct appeal, explain why: The issue arose as a direct result of the appellate decision.

(c) Post-Conviction Proceedings: (1) Did you raise this issue in any post-conviction motion, petition or application? No.

**GROUND 2: THE EVIDENCE INTRODUCED AT TRIAL ON THE COUNTS REVERSED ON APPEAL POISONED THE JURY'S DELIBERATIONS IN DECIDING TO CONVICT ON COUNT 1 - CONSPIRACY, THEREBY RESULTING IN PREJUDICIAL SPILLOVER. ACCORDINGLY, THE CONVICTION ON THE LAST REMAINING COUNT 1 MUST BE REVERSED.**

(a) Supporting facts: See pages 18 - 23 herein.

(b) Direct Appeal of Ground Two:

(1) If you appealed from the judgment of conviction, did you raise this issue? No.

(2) If you did not raise this issue in your direct appeal, explain why: This issue arose as a direct result of the appellate decision.

(c) Post-Conviction Proceedings: (1) Did you raise this issue in any post-conviction motion, petition or application? No.

**GROUND 3: THE INDICTMENT VIOLATES THE EX POST FACTO CLAUSE OF THE UNITED STATES CONSTITUTION. THEREFORE, THE CONVICTION ON COUNT 1 MUST BE VACATED AND THE INDICTMENT MUST BE DISMISSED WITH PREJUDICE.**

(a) Supporting Facts: See pages 23 - 30 herein.

(b) Direct Appeal of Ground Three:

(1) If you appealed from the judgment of conviction, did you raise this issue? No.

(2) If you did not raise this issue in your direct appeal, explain why: This issue arose as a direct result of the appellate decision. And, it is permissible to raise a constitutional issue in a 2255 motion.

(c) Post-Conviction Proceedings: (1) Did you raise this issue in any post-conviction motion, petition or application? No.

**GROUND 4: THIS TRIAL COURT'S INSTRUCTION TO THE JURY ON THE CONSPIRACY COUNT WAS ERRONEOUS AND VIOLATED DUE PROCESS BECAUSE IT OMITTED MENTION OF ESSENTIAL ELEMENTS OF THE CONSPIRACY ALLEGED IN THE INDICTMENT.**

(a) Supporting facts: See Pages 30 - 37 herein.

(b) Direct Appeal of Ground Four:

(1) If you appealed from the judgment of conviction, did you raise this issue? No.

(2) If you did not raise this issue in your direct appeal, explain why: The issue could not be raised on direct appeal because, due to the "ineffective assistance of counsel" at trial, the issue was not preserved for appeal. Defense counsel, Gaspar Castillo, failed to object to the legally erroneous jury instruction. The erroneous instruction is a constitutional due process violation. Gaspar's failure to object to the instruction was a result of his ignorance of the law and his failure to perform basic research on this point, thereby demonstrating "ineffective assistance of counsel " in violation of the Sixth Amendment. Strickland v. Washington, 466 U.S. 668 (1984); Hinton v. Alabama, 134 S. Ct. 1081, 1089 (2014).

(c) Post-Conviction Proceedings:

(1) Did you raise this issue in any post-conviction motion, petition, or application? No.

**GROUND 5: THE JURY'S GENERAL VERDICT ON THE CONSPIRACY COUNT DOES NOT INDICATE WHETHER IT CONVICTED BASED ON THE POTENTIALLY LEGALLY-SOUND FREMONT TRANSACTION OR ON THE LEGALLY-UNSOUND CITIMORTGAGE TRANSACTION. BECAUSE OF THIS UNCERTAINTY, THE CONVICTION ON COUNT 1 MUST BE VACATED.**

(a) Supporting facts: See Pages 37 - 42 herein.

(b) Direct Appeal of Ground Five:

(1) If you appealed from the judgment of conviction, did you raise this issue? Yes. After the Second Circuit rendered its decision on July 7, 2016, appellate counsel filed a "Petition for Panel

Rehearing". The Petition was based largely on the United States Supreme Court's decision rendered 10 days earlier in the case of <u>McDonnell v. United States</u>, 136 S.Ct. 2355 (June 27, 2016), which outlines the proper analysis where, as here, one of several bases for conviction is tainted by an erroneous charge that is compounded by a prosecutor's similarly misguided conduct. Unfortunately, the Second Circuit denied the "Petition for Panel Rehearing" with no decision on the merits.

(2) If you did not raise this issue in your direct appeal, explain why: not applicable.

(c) Post-Conviction Proceedings:

(1) Did you raise this issue in any post-conviction motion, petition or application? Yes, this issue was raised in the "Petition for Panel Rehearing" discussed above.

(2) If your answer to Question (c)(1) is "Yes", state:

Type of Motion or petition: Petition for Panel Rehearing

Name and location of court wherein the motion or petition was filed: United States Court of Appeals for the Second Circuit, New York, N.Y.

Docket or case number: 14-4156-cr

Date of Court's decision: August 5, 2016

Result: The Petition was denied with no decision on the merits.

(3) Did you receive a hearing on the motion, petition, or application? No.

(4) Did you appeal from the denial of your motion, petition, or application? No.

**GROUND 6: THE CONSCIOUS AVOIDANCE INSTRUCTIONS WERE LEGALLY ERRONEOUS, ESPECIALLY VIEWED IN LIGHT OF THE SECOND CIRCUIT'S DECISION IN THIS CASE. ACCORDINGLY, THE CONSPIRACY CONVICTION MUST BE SET ASIDE.**

(a) Supporting facts: See Pages 42 - 47 herein.

(b) Direct Appeal of Ground Six:

(1) If you appealed from the judgment of conviction, did you raise this issue? No.

(2) If you did not raise this issue on appeal, explain why: This issue arose in part due to the appellate decision. And, counsel failed to object to the jury instruction at trial.

(c) Post-Conviction Proceedings: (1) Did you raise this issue in any post-conviction motion, petition or application? No.

**GROUND 7: DEFENSE COUNSEL GASPAR CASTILLO'S PERFORMANCE WAS DEFICIENT AND INEFFECTIVE, THEREBY CAUSING PREJUDICE TO MICHAEL BOUCHARD AND DEPRIVING HIM OF THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

(a) Supporting facts: See Pages 48 - 89 herein.

(b) Direct Appeal of Ground Seven:

(1) If you appealed from the judgment of conviction, did you raise this issue? No.

(2) If you did not raise this issue on appeal, explain why: It is permissible to raise a constitutional issue in a 2255 motion, including a claim of ineffective assistance of counsel.

(c) Post-Conviction Proceedings: (1) Did you raise this issue in any post-conviction motion, petition or application? No.

13. Is there any ground in this motion that you have not previously presented in some federal court? If so, which ground or grounds have not been presented, and, state your reasons for not presenting them:

Grounds One, Two, Three, Four, Six and Seven have not been presented until now.

The reasons that the aforementioned Grounds have not been presented until now are as follows:

Ground One: This issue arose as a direct result of the appellate decision.

Ground Two: This issue arose as a direct result of the appellate decision.

Ground Three: This issue arose as a direct result of the appellate decision. And, it is permissible to raise a constitutional issue in a 2255 motion.

Ground Four: It is permissible to raise a constitutional issue in a 2255 motion.

Ground Five: This ground was raised at the Second Circuit Court of Appeals in a Petition for Panel Rehearing, but the Petition was denied with no hearing and no determination on the merits.

Ground Six: This issue arose in part due to the appellate decision.

Ground Seven: It is permissible to raise a constitutional issue in a 2255 motion. Furthermore, **Grounds One through Six were all tainted by the ineffective assistance of counsel as described in Ground Seven.**

14. Do you have any motion, petition or appeal now pending (filed and not decided yet) in any court for the judgment of conviction you are challenging? No.

15. Give the name and address, if known of each attorney who represented you in the following states of the judgment of conviction you are challenging:

(a) At the preliminary hearing: There was no preliminary hearing.

(b) At the arraignment and plea of not guilty: Gaspar M. Castillo, Jr., 817 Madison Avenue, Albany New York 12208

(c) At trial: Gaspar M. Castillo, Jr., 817 Madison Avenue, Albany, New York 12208

(d) At first sentencing on October 22,2016: Gaspar M. Castillo, Jr., 817 Madison Avenue, Albany, New York 12208 (for Counts 1, 7, 19, 24)

On second sentencing on October 20, 2016: Nathaniel Z. Marmur, 500 Fifth Avenue, 40th Floor, New York, N.Y. 10110

(e) On appeal: Nathaniel Z. Marmur, 500 Fifth Avenue, 40th Floor, New York, N.Y. 10110

(f) In any post-conviction proceeding: not applicable.

(g) On appeal from any ruling against you in a post-conviction proceeding: not applicable.

16. Were you sentenced on more than one count of the indictment, or on more than one indictment, in the same court and at the same time? Yes. The first sentencing on October 22, 2014 pertained to Counts 1, 7, 19, 24 of one indictment.

17. Do you have any future sentence to serve after you complete the sentence for the judgment for which you are challenging? No.

18. TIMELINESS OF MOTION: THIS MOTION IS TIMELY

Therefore, the Movant herein, Michael G. Bouchard, asks that the Court grant the following relief: vacatur of the judgment of conviction on Count 1, dismissal of the indictment with prejudice, together with any other relief to which the Movant may be entitled.

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.


On _____October 3_____, 2017


_____

Signature of Movant – Michael G. Bouchard